1   Richard B. Glickman, SBN 47898
    Jose A. Cordova, SBN 201243
2   RICHARD B. GLICKMAN, APC.
    1 Embarcadero Center, Suite 500
3   San Francisco, CA 94111
    glickmanlawcorp@gmail.com
4   Ph. : 415-362-7685
    Fax: 415-433-5994
5

6   Attorneys for Plaintiff Robert Hegarty

7

8                     UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                       SAN FRANCISCO DIVISION

11

12  ROBERT HEGARTY,                     Case No._____

13              Plaintiff,              COMPLAINT FOR CAUSES OF ACTION
                                        INVOLVING:
14         v.
                                        BREACH OF CONTRACT
15  TRANSAMERICA LIFE INSURANCE         (INCLUDING BREACH OF THE
    COMPANY,                            COVENANT OF GOOD FAITH AND
16                                      FAIR DEALING);
            Defendants.
17                                      UNLAWFUL, UNFAIR AND
                                        DECEPTIVE BUSINESS
18                                      PRACTICES;

19                                      ELDER ABUSE

20
                                        JURY DEMANDED
21

22

23

24

25

26

27

28

**INTRODUCTION**

1.     Plaintiff Robert F. Hegarty ("Hegarty" or "Plaintiff") purchased a direct recognition life ("DRL") vanishing premium insurance contract ("Insurance Contract") from General Services Life Insurance Company ("GSLIC"), a predecessor in interest to Defendant Transamerica Life Insurance Company ("Transamerica"), in August 1989.  The Insurance Contract was subject to California law.  Mr. Hegarty was 48 years old and in good health when he purchased the Insurance Contract.  He therefore had a choice of competing insurance products, policies and companies.

2.      Hegarty entered into the Insurance Contract in order to protect his sense of well-being and peace of mind and to provide for the well-being, peace of mind and financial security of his wife and children.

3.      Hegarty's Insurance Contract, as well as other GSLIC DRL insurance contracts, contained a material feature commonly called a "persistency bonus."  This bonus substantially increased the cash value of the Insurance Contract.  More precisely, a "persistency bonus" is a contract specified addition to the cash value of the insurance contract if the insurance contract is kept in force for a specified period or periods of time.  Hegarty's Insurance Contact provided for three persistency bonuses, all based on the total amount of scheduled premiums paid during the first ten years of the Insurance Contract ("Ten Year Premiums") -- the first, for 30% of the Ten Year Premiums, on the 20th anniversary of the issuance of the Insurance Contract; the second, for 300% of the Ten Year Premiums, on the 30th anniversary; and the third, also for 300% of the Ten Year Premiums, on the 40th anniversary.  This represented a 20-year persistency bonus of not less than $17,965.92 and both 30 and 40-year persistency bonuses of not less than $179,659.20 each, i.e., a total of not less than $377,289.32 of persistency bonuses.  Further, the Insurance Contract guaranteed a portion of the persistency bonus.  Specifically, the Insurance Contract guaranteed a 20-year persistency bonus of 22% of the Ten Year Premiums, and 30 and 40-year persistency bonuses of 150% of the Ten Year Premiums, i.e., a total of not less than $192,834.21 of guaranteed persistency bonuses.  And Hegarty is informed, believes and therefore alleges that GSLIC set aside reserves to help protect the payment of all persistency bonuses -- both the

guaranteed and the non-guaranteed.

4.      These persistency bonuses effectively establish sufficient cash value in the Insurance Contract to pay all costs required after 20 years to keep the Insurance Contract in full force and effect without the payment of unscheduled additional premiums.

5.      In 1997, parties unrelated to Hegarty filed a class action in Texas state court against Transamerica's predecessors in interest ("*Oakes*" or "the *Oakes* case").  The action alleged claims arising from fraudulent sales practices concerning "private pensions" involving DRL insurance contracts.

6.      *Oakes* was settled in 2000.  As part of the settlement process, a portion of the settlement agreement, a notice of the proposed settlement and a letter written by Transamerica's predecessor in interest that explained the proposed settlement were sent to all potential class members including Hegarty.  These documents repeatedly stated that "[t]he settlement of this lawsuit does not alter your contractual rights under the express terms of your existing Policy."  Moreover, none of these documents mentioned, let alone purported to release, claims arising from guaranteed persistency bonuses.

7.      Following the settlement of the *Oakes* class action, in both 2005 and 2006 Hegarty asked Transamerica's predecessor when he could stop paying premiums.  In response, the predecessor sent Illustrations to Hegarty which repeated prior representations regarding the full 20, 30 and 40-year persistency bonuses.  Based upon these representations Hegarty continued to make premium payments and keep the Insurance Contract in full force and effect.  Moreover, in 2009 Transamerica credited Hegarty's Insurance Contract with $17,965.92, and told Hegarty that this was his full 20-year persistency bonus, i.e., 30% of The Ten Year Premiums.  Additionally, in 2012, Hegarty became aware of another GSLIC DRL insurance contract Owner who had received his full 20-year persistency bonus and assurances that he would receive his 30 and 40-year bonuses.  And in 2015 Hegarty became aware that the same GSLIC DRL insurance contract Owner received an Illustration again confirming that his 30 and 40-year persistency bonuses would be paid.  Significantly, this Owner's persistency bonuses, like Hegarty's, were partially guaranteed and the 2015 Illustration confirmed his partial guarantee.

8.     In 2016, for the first time Transamerica informed Hegarty that it contended the *Oakes* settlement eliminated any obligation to pay persistency bonuses.  Transamerica claimed that the settlement made all persistency bonuses -- both guaranteed and non-guaranteed -- subject to its complete discretion.  Therefore, Transamerica told Hegarty that his Insurance Contract would lapse on its 30-year anniversary if he did not pay large new annual premiums.  These premiums were never anticipated under the Insurance Contract and were not warned about in 2000, 2005, 2006, 2009 or at any other time before 2016.

9.     Hegarty was in good health and young enough to obtain substitute or alternative life insurance in 2000, at the time of the *Oakes* settlement; in 2005 and 2006, when Transamerica provided illustrations representing that his persistency bonuses would be paid; in 2009, when he received the 20-year persistency bonus; and in 2012, when he learned about another DRL insurance contract Owner who had received assurances about the 30 and 40-year persistency bonuses similar to the assurances he had received.  But by 2016, Hegarty was unable economically to replace his Insurance Contract's coverage.  He was then 75 and, in 2013, had had major heart surgery.

10.     Quite simply, Transamerica's 2016 assertions that guaranteed persistency bonuses no longer existed, all persistency bonuses were now subject to its complete discretion and, as an exercise of its discretion, 30 and 40-year persistency bonuses had been eliminated were made and targeted at the most vulnerable time in Hegarty's life.  The decisions behind them flew in the face of Transamerica's quasi-public obligation as an insurance carrier to treat its policyholders at least as well as it treated itself as they were solely for Transamerica's benefit and without regard to Hegarty's interest.  The elimination of all persistency bonuses permitted Transamerica either to keep all premiums paid on DRL insurance contracts then in force without the risk of paying death benefits on those contracts or to earn additional premiums on those contracts.  It also likely permitted Transamerica to regain the use of the money held in the persistency bonus (and possibly the death benefit) reserves for those contracts.

/////

/////

**PARTIES**

11.     Plaintiff Hegarty is, and at all times relevant has been, a resident of Orinda, California.  Hegarty purchased, and at all times relevant has owned, the Insurance Contract which is the subject of this action.

12.     Hegarty is informed, believes and therefore alleges as follows:  Defendant Transamerica is a corporation organized and existing under the laws of the State of Iowa with its principal offices in Cedar Rapids, Iowa.  Transamerica is an "admitted life insurance carrier" in California, i.e., it is licensed to do business in the State of California and to sell and service life insurance in California.  At the time GSLIC sold the Insurance Contract to Hegarty, GSLIC was also an "admitted life insurance carrier" in California.  GSLIC merged into Bankers United Life Insurance Company ("Bankers United") in or about 1992-1996, GSLIC's reserves were transferred to Bankers United and Hegarty's Insurance Contract was thereafter administered by Bankers United.  Bankers United merged into Life Investors Insurance Company of America ("Life Investors") in or about 2001, Bankers United's reserves were transferred to Life Investors and the administration of Hegarty's Insurance Contract was transferred to Life Investors.  In or about 2008, Life Investors merged into Transamerica, Life Investor's reserves were transferred to Transamerica and Transamerica has thereafter serviced and has full responsibility to administer and pay Hegarty's Insurance Contract.  GSLIC, Bankers United, Life Investors and Transamerica are all affiliated with and controlled by Aegon, N.V. ("Aegon"), a public limited liability company with its statutory seat and headquarters in the Netherlands.  Transamerica and each of its predecessors in interest are at times hereafter referred to herein as "Transamerica."

**JURISDICTION AND VENUE**

13.     This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. Section 1332 because the amount in controversy exceeds $75,000.00, Plaintiff is a California resident and neither Defendant nor any of its predecessors in interest were or are citizens of the same state.

14.     Plaintiff Hegarty is informed, believes and therefore alleges as follows: Transamerica is an Iowa corporation with its principal place of business in Cedar Rapids Iowa. Life Investors was an Iowa corporation with its principal place of business in Cedar Rapids Iowa.

1    Bankers United was an Iowa corporation with its principal place of business in Cedar Rapids

2    Iowa.  GSLIC was a District of Columbia corporation with its principal place of business in the

3    District of Columbia.  Plaintiff is informed, believes and therefore alleges that all of these

4    companies were, or still are, affiliates of Aegon.

5         15.    Venue is proper in this district because Defendant Transamerica is authorized to

6    conduct the business of insurance, and does conduct the business of insurance, in this District and

7    maintains substantial operations in this District.  Plaintiff Hegarty is also a resident of this District,

8    the Insurance Contract at issue was sold in this District and much of Defendant Transamerica's

9    communications with Plaintiff Hegarty that are relevant to this action were received in this

10   District.

11                        **INTRADISTRICT ASSIGNMENT**

12        16.    Assignment to the San Francisco/Oakland division is proper because defendant

13   Transamerica is authorized to conduct the business of insurance and does conduct the business of

14   insurance in this division and maintains substantial operations in this division.  Additionally, the

15   Insurance Contract at issue was sold to Plaintiff Hegarty in this division, Plaintiff Hegarty lives in

16   this division and he received much of the communications relevant to this action in this division.

17                              **<u>BACKGROUND</u>**

18              **The GSLIC Life Insurance Contract and the Master Policy**

19        17.    Hegarty is informed, believes and therefore alleges as follows:   Hegarty's DRL

20   Insurance Contract is composed of several parts.  The first part applicable to this action is a group

21   insurance policy bearing Master Policy Number D-1B, effective July10, 1986, and issued to GSL

22   Multiple Employer Trust, a Missouri insurance trust created by GSLIC to market life insurance

23   contracts to individuals and small businesses ("Master Policy").   The Master Policy describes

24   itself as an "Adjustable/Flexible Group Permanent Policy providing Death Benefits with optional

25   group-term life Insurance, group annuity and other benefit Riders, and guaranteed minimum

26   Interest credits."

27        18.    The Master Policy defines the several parts of Hegarty's Insurance Contract (or for

28   that matter any DRL insurance contract of which the Master Policy is a part) as follows:

1

2

3

4

5

> The entire contract consists of the [Master] Policy and its Riders providing group permanent, group term and other. insurance and/or annuity coverage(s); the application of the Policyholder; the Illustrations prepared for the Participant: and the Participants' applications, health questionnaires, and the medical examinations, a copy of each of which is included in and made a part of each Certificate and/or provided for the Owner of such rights and benefits.

6

7

8

9

10

19.     In light of the Master Policy's explanation of what comprises Hegarty's Insurance Contract, the second -- and only other -- written part of Hegarty's Insurance Contract applicable to this action is the Illustrations he received from GSLIC and its successors in interest. (None of the other written parts of Hegarty's Insurance Contract, e.g., the various applications, his health questionnaires, etc., affect this action.)  The Master Policy defines an Illustration as:

11

12

> The Illustration(s) attached to the Certificate(s) of the Participant or otherwise furnished to the Owner showing the premiums and assumptions required to provide the benefits and Account Values specified therein.

13

14

15

16

20.     Individual sales of the GSLIC DRL insurance contract were made by way of (a) the issuance and delivery of a Certificate which summarized, but did not supersede, the Master Policy, and (b) Illustration(s) of the particular insurance contract being offered to the Owner and Participant.

17

18

19

20

21

22

23

24

25

26

27

28

21.     As set forth on the signature page of the Master Policy, each insurance contract containing the Master Policy was designed to be "Permanent" insurance.  As such, the premiums charged far exceeded the costs of the death benefit and GSLIC's charges.  The premium payments in excess of these costs and charges were credited to an account GSLIC and its successors had for each Owner ("The Account").  The amount in The Account was invested at the discretion of GSLIC, with the Owner having the option of providing non-binding guidance as to preferred investment options.  The Master Policy provided a guaranteed minimum interest of 4% on The Account, but The Account would actually be credited with all money earned after death benefit costs and GSLIC charges if the net earnings exceeded the guaranteed interest.  The sums in The Account, including interest earned, could then be: (a) used to pay premiums; (b) withdrawn as cash by the Owner; (c) borrowed against; (d) used to purchase additional term insurance; or (e) used to increase The Account value in order to reduce the premium payment period.

22.     To discourage Owners from surrendering their DRL insurance contracts, GSLIC imposed high surrender charges for the first twenty years of the contract.  And to make the DRL contracts more attractive to purchasers and to induce Owners to continue making premium payments and to leave the additions to their Accounts under GSLIC's management, GSLIC's DRL contracts featured the 20, 30 and 40-year persistency bonuses described above.  Hegarty is informed, believes and therefore alleges that the amount in the persistency bonus reserves was increased by all surrender charges GSLIC and its successors received in order to provide further protection for the payment of the persistency bonuses.

23.     The GSLIC DRL insurance contracts, like all other contracts, contain an implied covenant of good faith and fair dealing.  This covenant prohibits each party to the contract from interfering with the right of any other party to receive the benefits of the contract.  And to the extent a particular GSLIC DRL insurance contract is subject to California law, as is Hegarty's Insurance Contract, the covenant of good faith and fair dealing is further molded by the special relationship between the insurer and the insured that California law recognizes. As well explained in *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809 ("*Egan*"), the insurer's obligations are rooted in their status as purveyors of a "quasi-public" service.  Insurers must therefore take the public's interest seriously, and where necessary insurers must place the public's interests at least equal to their own interest in maximizing gains and limiting disbursements.  As a result, an insurer's obligations of good faith and fair dealing encompass qualities of "decency and humanity" inherent in the responsibilities of a fiduciary.

24.     Hegarty was the Owner of, and Participant under, Certificate G0127767, issued pursuant to the Master Policy by GSLIC on August 8, 1989, with an effective date of August 27, 1989, and with a death benefit face amount of $600,000 ("The Certificate").  Attached hereto as Exhibit A and made a part hereof by this reference as though fully set forth herein is a true and correct copy of the Master Policy.  Attached hereto as Exhibit B and made a part hereof by this reference as though fully set forth herein are The Certificate and the Illustration attached to it (with Hegarty's date of birth redacted).  An unredacted version of Exhibit B was delivered to Hegarty soon after The Certificate was issued.

25.     Pursuant to the Illustration sent with the Certificate, Hegarty's Insurance Contract projected a 9.5% annual interest rate on the cash value in his Account -- a rate consistent with interest being offered in other investments at the time.  And on the basis of this interest rate, the Illustration projected premium payments ceasing after 10 years.  With respect to the persistency bonuses, the Illustration provided:

> The above illustrates an increase in cash values. The amount of the increase is a percentage of all due premiums paid in the first ten years (excluding unscheduled premiums), according to the following schedule: End of the 20th year 30%; End of the 30th year 300%; End of the 40th year 300%. (***The minimum interest column illustrates 22% 20th year; 150% 30th year; 150% 40th year. These are the amounts which are guaranteed***.) (Emphasis added.)

26.     After receiving Exhibit B, Hegarty purchased the Insurance Contract.  Thereafter, until 2016 Hegarty timely made all premium payments Transamerica told him were required in order to keep the Insurance Contract in force. The persistency bonuses described in the Illustration contained in Exhibit B –- both the guaranteed and the non-guaranteed portions -– were material to Hegarty's decisions to purchase and to keep the Insurance Contract in force because these bonuses would reduce the period during which he would be required to make premium payments.  If his Insurance Contract did not offer these persistency bonuses (and particularly the portions which were guaranteed), Hegarty would have purchased different coverage at a lesser premium or ceased making premium payments and purchased alternative coverage when his age and health condition still allowed him to obtain such coverage at reasonable rates.

27.     In 1996, Hegarty became concerned that the 9.5% interest rate on the cash value in his Account might be overly optimistic.  He therefore asked Transamerica for an illustration projecting when he could stop paying premiums if the guaranteed interest rate of 4% was used.

28.     Transamerica provided Hegarty with the requested Illustration.  The new Illustration, dated December 5, 1996. expressly provided a 20-year persistency bonus of 30% of the Ten Year Premiums, a 30-year persistency bonus of 300% of the Ten Year Premiums and a 40-year persistency bonus of 300% of the Ten Year Premiums. The 1996 Illustration further provided that Hegarty's premiums would cease in year 18 of the Contract.  By the terms of the Master Policy, the 1996 Illustration became a part of the Insurance Contract.  Based upon these

1   statements in the 1996 Illustration, Hegarty continued paying the premiums required to keep the

2   Insurance Contract in force.  A true and correct copy of the 1996 Illustration is attached as Exhibit

3   C.

4       29.    The 1996 Illustration did not mention the guaranteed persistency bonus.

5   Nevertheless, under the terms of the Master Policy Hegarty's Insurance Contract may only be

6   modified:

7
8          to conform to any requirements of the Internal Revenue Service or any other
    federal or state agency, or to liberalize the provisions of this Policy, or to make
9   any change applicable to new Participants or future increases in coverage for
    existing Participants.

10  Any modification of the guaranteed persistency bonus –- unless it was increased to "liberalize the

11  provisions of this Policy" – was thus not permitted under the express terms of the Master Policy.

12  As a result, the guaranteed persistency bonuses remained unchanged at 22% of the Ten Year

13  Premiums on the 20th anniversary, 150% on the 30th anniversary and 150% on the 40th

14  anniversary.

15  **The *Oakes* Class Action Settlement of 2000**

16      30.    In or about 1997, a class action entitled *Oakes vs. Bankers United Life Assurance*

17  *Company, et al.,* Cause No. 96-06849, was brought in the Dallas County, Texas state court.  The

18  action was brought on behalf of all purchasers of certain DRL policies for misleading and

19  fraudulent sales practices.  Notably, *Oakes* was brought by representative plaintiffs who purchased

20  "private pensions" involving DRL policies containing annuity riders, which were not a part of

21  Hegarty's Insurance Contract.

22      31.    In or about June 2000, a proposed settlement of *Oakes* was reached and a Notice of

23  Class Settlement ("Notice") was sent to absent class members.

24      32.    Additionally, Bankers United, defendant Transamerica's predecessor in interest,

25  sent a letter in question-and-answer format to absent class members.  The letter purported to

26  explain the meaning and implications of the terms of the proposed settlement ("Letter").

27      33.    In conjunction with the *Oakes* settlement, Hegarty received the Notice, Letter and

28  a portion of the Settlement Agreement.  All made clear that the proposed settlement would not

alter the Owner's contractual rights under their Insurance Contracts.

34.     The Notice specifically states:

> You do not have to give up your Policy to receive benefits under the proposed settlement.
>
> * * * * *
>
> **The settlement of this lawsuit does <u>not</u> alter your contractual rights under the express terms of your existing Policy. You will still be able to make a claim for any benefits that may become payable in the future under the express terms of your existing Policy.** (Emphasis in original)

35.     Likewise, the question and answer section of the Letter states:

> [T]he proposed settlement does not alter your contractual rights under the express terms of your existing Policy.  You will still be able to make a claim for any benefits that may become payable in the future under the express terms of your Policy.

36.     And both the Settlement Agreement (and the Order Approving it) provide:

> Nothing in this Release shall be deemed to alter a Class Member's rights … to make a claim for benefits that will become payable in the future pursuant to the express terms of the policy form issued by the Defendants.  Under no circumstances shall this Section H.1.b.2. entitle a Class Member to assert claims that relate to the allegations contained in the Action or to the matters described in Section H.1

37.     Shortly after receiving the Notice, the Settlement Agreement and the Letter, Hegarty called the GSLIC general agent from whom he purchased the Insurance Contract and was told that the settlement was put in place to help the agents, but did not hurt the policyholders in any way.

38.     Based on the assurances in the Notice, Settlement Agreement and the Letter, along with the assurances provided by the general agent, Hegarty understood that if he did not opt out of the settlement he would be entitled to retain all benefits in his Insurance Contract and also receive both a small interest payment and a small five-year term increase in his Insurance Contract's death benefit.  He therefore did not opt out of the settlement.

39.     The only purported discretionary authority conferred upon Bankers United under the Settlement Agreement was discretion as to the timing of the insurer's implementation of the terms of the Settlement.  The Settlement Agreement did not contain any mention of guaranteed

persistency bonuses, let alone purport to release claims or grant discretion upon Bankers United to adjust or change the guaranteed benefits, elements or policy charges with respect to guaranteed persistency bonuses.

40.     The Settlement Agreement would have been expected to make clear any changes to guaranteed terms such as "guaranteed persistency bonuses" if they were intended.  The terms "guaranty" and "guaranteed" are well known terms of art in the insurance industry.  And they have significant legal consequences.  Thus, they cannot be changed ambiguously.  Additionally, as GSLIC and the other Transamerica predecessors well knew, the guaranteed persistency bonuses were important to DRL insurance contract Owners -- the DRL insurance contracts had not sold well before guaranteed persistency bonuses were added.  Therefore, DRL Owners distinguished "guaranteed persistency bonuses" from persistency bonuses that were not guaranteed.  As a result, any change or elimination of "guaranteed persistency bonuses" had to be clear, specific and unambiguous.

41.     The only rights reserved for Bankers United with regards to changes in non-guaranteed benefits, elements or policy charges were those expressly conferred by the Policies.  And these rights were subject to the covenant of good faith and fair dealing.

42.     Nothing in the Settlement Agreement, the Notice or the Letter states that the *Oakes* Settlement eliminated the obligation to pay the non-guaranteed portion of each persistency bonus, let alone the guaranteed portion.  Given that the attorneys in *Oakes* were presumably competent and honorable, the failure to mention the elimination of any part of the DRL persistency bonuses strongly implies that there was no intention at the time of the settlement to eliminate any part of them.  And the statements made in the Notice, Letter and Settlement Agreement that are set forth in Paragraphs 34 through 36, above, further strengthen this implication.

43.     In 2001, Hegarty received notice that a $543.95 interest payment had been credited to his Account.  But he never received any official notice, certificate, policy or other carrier document confirming a five-year increase in the death benefit under his Insurance Contract.

44.     Recently, Hegarty was told by Transamerica that as a result of the *Oakes* settlement the death benefit under his Insurance Contract had been increased $39,000 during the

period from 2001 through 2005.  Assuming Transamerica's statement true, Hegarty is informed, believes, and therefore alleges that the total cost, if he had paid for it himself, of a five-year, $39,000 death benefit term life insurance policy, on his life, for the period from 2001 through 2005, would have been about $400.

45.     At the time of the *Oakes* settlement, Hegarty was 59 years old and in good health.  He was thus capable of replacing his Insurance Contract with a comparable one at a more favorable premium rate.  He was also willing to opt out of the *Oakes* settlement if he decided, after further investigation, that such approach was best for his family and him.  But he was never willing to risk losing $377,289.32 – or more – of persistency bonuses (or even $192,834.21 – or more -- of guaranteed persistency bonuses) for total settlement benefits worth less than $1,000.00. Therefore, if the *Oakes* parties had provided him with notice that his Insurance Contract had been modified by the *Oakes* settlement to eliminate any portion of his persistency bonuses,  Hegarty would have opposed the settlement, excluded himself  from it, and/or purchased alternative coverage at reasonable rates.  Due to the repeated assurances that "[t]he settlement of this lawsuit does not alter your contractual rights under the express terms of your existing Policy,"  and the presumed validity of these assurances, Hegarty filed a claim under the Settlement Agreement and continued to make all premium payments Transamerica and its predecessors in interest told him were required to keep his Insurance Contract in full force and effect.

46.     Hegarty is informed, believes and therefore alleges that no persistency bonuses were due or close to being due under any of the DRL insurance contracts when *Oakes* was initiated in 1997 or when the *Oakes* settlement was reached in 2000, and no persistency bonuses would become payable until at least six years after the *Oakes* settlement was concluded.  Thus, it is quite unlikely that the elimination of any aspect of the DRL persistency bonuses was contemplated at the time of the *Oakes* settlement.

47.     Hegarty is informed, believes and therefore alleges that when the *Oakes* parties asked the Texas Court to approve their settlement, they never specified to the Court that any part of the persistency bonuses set forth in the DRL policies was guaranteed, never pointed out the persistency bonuses were set to be paid in the future, and never specified that the settlement would

(or even could) eliminate the persistency bonuses Transamerica and its predecessors in interest had promised to pay in the future.  These failures also imply that the *Oakes* settlement's elimination of any aspect of the DRL persistency bonuses was never contemplated.

**Further Assurances to Plaintiff and the Subsequent Refusal to Pay 30 and 40 Year Bonuses**

48.      In 2005 and in 2006, approximately five and six years after the *Oakes* settlement, Hegarty again wrote a Transamerica predecessor in interest to ask how long he was required to continue paying premiums pursuant to his Insurance Contract.  In response to both of his notes, Hegarty received Illustrations.  The 2005 and 2006 Illustrations repeated the prior representations regarding the 30% 20-year persistency bonus and the 300% 30 and 40-year persistency bonuses. The 2006 Illustration further advised Plaintiff that he was only required to pay policy premiums through year 17 of his Contract (i.e., through 2006).  Plaintiff responded by making the premium payments listed on his Illustrations through year 17.  True and correct copies of the 2005 and 2006 Illustrations are attached hereto as Exhibits D and E, respectively.

49.      In 2009, approximately nine years after the Oakes settlement, Hegarty's Account was credited with $17,965.92 and he was told this was the full 20-year persistency bonus payment of 30% of the Ten Year Premiums.  This payment represented both the guaranteed and non-guaranteed portions of Hegarty's 20-year persistency bonus.

50.      Hegarty is informed, believes and therefore alleges that other DRL insurance contract Owners who did not opt out of the *Oakes* settlement were also paid the full guaranteed and non-guaranteed portions of their respective 20-year persistency bonuses.

51.      At the time Hegarty was credited with his 20-year persistency bonus, he had not received any notice that Transamerica's obligation to pay persistency bonuses for the 30th and 40th years of the Contract had been terminated, would be terminated or even might be terminated. Indeed, Hegarty is informed, believes and therefore alleges that Transamerica, in conjunction with

the payment of the 20-year persistency bonus, reaffirmed payment of the 30 and 40-year bonuses as well as the fact that at least a portion of those bonuses was guaranteed ("Transamerica's 20-Year Persistency Bonus Letter").  A true and correct copy of what Hegarty is informed, believes and therefore alleges is Transamerica's 20-Year Persistency Bonus Letter is attached hereto as Exhibit F.

52.     In 2012, Hegarty wrote Transamerica on behalf of Kenneth Silverman ("Silverman"), another GSLIC DRL insurance contract Owner who had not opted out of the *Oakes* settlement. In response, Hegarty received an Illustration reassuring that the 30 and 40-year persistency bonuses would be paid.  Nothing in this Illustration said or implied that the remaining persistency bonuses for the 30th and 40th years of Silverman's contract would, or even might, not be paid.

53.     Silverman also purchased his DRL insurance contract in 1989, his contract was subject to California law and his contract was subject to the same Master Contract as was Hegarty's Insurance Contract.

54.     In 2015, Hegarty again wrote Transamerica on behalf of Silverman asking for an updated Illustration for the Silverman contract.  In response, Hegarty received an Illustration ("The 2015 Silverman Illustration") reassuring that the 30 and 40-year persistency bonuses would be paid and specifically stating that 22.5% of the Ten Year Premiums were guaranteed as a 20-year persistency bonus (even though 30% of the Ten Year Premiums -- i.e., the full persistency bonus, both the guaranteed and the non-guaranteed portions -- had already been paid as a 20-year persistency bonus), and 75% of the Ten Year Premiums were guaranteed for Silverman's 30 and 40-year persistency bonuses.  These bonuses and guarantees were identical to Silverman's pre *Oakes* bonuses and guarantees.  Nothing in the Illustration said or implied that the remaining persistency bonuses for the 30th and 40th years of Silverman's contract would, or even might, not

be paid.  A true and correct copy of The 2015 Silverman Illustration is attached hereto as Exhibit G.

55.     In or about the spring of 2016, Hegarty received a letter from Transamerica notifying him, for the very first time, that unless he immediately resumed paying annual premiums his Insurance Contract would likely lapse in August 2019, at or around the 30-year anniversary of his Insurance Contract (the "Crash Letter").  The new premiums were approximately six times higher than the last premium called for by the 2006 Illustration, approximately three times higher than any premiums shown in the 2005 Illustration and about three times higher than any premiums shown in the 1989 and 1996 Illustrations.  If Transamerica had credited the persistency bonuses specified in each of the Illustrations, which were expressly made a part of the Insurance Contract by the Master Policy, these bonuses would have been sufficient to continue the Insurance Contract in full force and effect.  Indeed, if Transamerica had even credited the guaranteed persistency bonuses in Hegarty's Insurance Contract, his Insurance Contract would continue for a substantial additional period in full force and effect.  A true and correct copy of the Crash Letter is attached hereto as Exhibit H.

56.     Hegarty is informed, believes and therefore alleges that other DRL insurance contract Owners with similar insurance contracts received their own Crash Letters between March and October 2016.

57.     Transamerica's refusal to credit the 30 and 40-year persistency bonuses has caused Hegarty and his wife, the sole primary beneficiary under the Insurance Contract, great anxiety.  At the time Hegarty received his Crash Letter he was almost 75 years old and was economically uninsurable for age and health reasons, including having had a pericardial tissue aortic heart valve problem in February 2013.  At the time Hegarty received his crash letter his wife was about 71.5 years old and had not worked full-time for approximately 38 years.

58.     Hegarty challenged Transamerica's refusal to pay the persistency bonuses.  In January 2019, Transamerica sent Hegarty a letter asserting that the *Oakes* settlement eliminated its obligation to pay persistency bonuses and that in 2016 Transamerica had decided it would not pay the 30 and 40-year bonuses as a matter of business judgment -- i.e., it baldly asserted that it had based its decision not to pay on the "anticipated future performance" of the DRL policies.  No details were given.

59.     On September 6, 2019, counsel for Hegarty asked Transamerica to keep Hegarty's Insurance Contract in full force without the payment of further premium during the pendency of this action.  Transamerica refused the request and offered no alternative other than to begin paying large new annual premiums.  On September 13, 2019, Transamerica provided Hegarty an Illustration ("The 2019 Illustration") showing no credit whatsoever for either the guaranteed or non-guaranteed portion of the 30-year persistency bonus (which was due on the Insurance Contract's August 2019 anniversary date).  The 2019 Illustration further states that the premiums needed to keep the Insurance Contract in full force and effect from 2019 through 2024 total $108,148.00.  True and correct copies of Transamerica's refusal to keep the Insurance Contract in force and The 2019 Illustration are attached hereto as Exhibit I.

60.     Hegarty is informed, believes and therefore alleges as follows:  More than 17,000 DRL insurance contracts were sold by Transamerica and its predecessors in interest.  Many of those Contracts still in force in 2016 were surrendered.  Transamerica regained the use of the persistency bonus and death benefit reserves for these surrendered contracts.  Other DRL insurance contracts remained in force, but Transamerica was paid substantial additional premiums with regard to these contracts.

61.     Hegarty is informed, believes, and therefore alleges as follows:   In or about 2016, Transamerica sent $2 billion to its corporate parent – Aegon.  In 2015 and 2016, Aegon suffered

substantial losses.

## PLAINTIFF SEEKS A PRELIMINARY INJUNCTION

62.     Hegarty seeks a preliminary injunction on all Counts requiring Transamerica to keep his Insurance Contract in full force and effect without payment of additional premiums until the conclusion of this litigation.

63.     As set forth above, Hegarty's Insurance Contract, at a minimum, provides for guaranteed 30 and 40-year persistency bonuses of 150% of the Ten Year Premiums, i.e., a total of not less than $179,659.20.  Hegarty's Insurance Contract has been in force for over 30 years, so his guaranteed 30-year persistency bonus of not less than $89,829.60 is now due under the express terms of his Insurance Contract.  Nothing to date has eliminated Hegarty's right to his guaranteed 30-year bonus.  The guaranteed portions of his 30 and 40-year persistency bonuses were not modified or released by the *Oakes* settlement as they were not mentioned in the Notice, Letter or Settlement Agreement.  And, as explained above, the issuance to Hegarty of Illustrations that did not include reference to guaranteed portions of the 30 and 40-year persistency bonuses could not serve to modify his Insurance Contract.  Indeed, Transamerica has reaffirmed the guaranteed portions of the 30 and 40-year persistency bonuses in Transamerica's 20-Year Persistency Bonus Letter and in The 2015 Silverman Illustration.  Therefore, there can be little doubt that Hegarty will, at a minimum, prevail on the merits with respect to the guaranteed portions of the 30 and 40-year persistency bonuses.

64.     As set forth above, Transamerica has refused Hegarty's request to keep his Insurance Contract in full force during the pendency of this action and has offered no alternative other than to begin paying large, new, unanticipated annual premiums.  The 2019 Illustration Transamerica provided Hegarty showing these premiums gave no credit whatsoever for either the guaranteed or non-guaranteed portion of the 30-year persistency bonus.

65.     Hegarty is now 78 years old and for the past several years has been phasing down his business.  He is thus unable to pay the unscheduled premiums Transamerica is demanding to keep his Insurance Contract in full force and effect during the pendency of this litigation without either selling his home or severely reducing his standard of living.  As a result, if the requested preliminary injunction were not issued, Hegarty will be forced to forfeit the insurance benefits for which he has paid all required premiums since 1989 and will thus suffer irreparable harm.

66.     In contrast, if Transamerica were forced to keep the Insurance Contract in full force and effect during the pendency of this litigation, ended up paying Hegarty's death benefit before this litigation was completed and ultimately fully prevailed, it could recover any unpaid premiums from the death benefit it paid.  Therefore, the balance of equities between the parties strongly supports a preliminary injunction.

67.     The issuance of such a preliminary injunction is in the public interest as expressed in California's Insurance Code, Unfair Competition Law (Cal. Business and Professions Code §17200, et seq.), Elder Abuse and Dependent Adult Civil Protection Act ("EADACPA") (Cal. Welfare & Institutions §15610, et seq.) and the special relationship California recognizes between insurers and insureds.

## COUNT 1
### (Breach of Written Contract –
### Including the Implied Covenant of Good Faith and Fair Dealing)

68.     Hegarty incorporates paragraphs 1 through and including 67 herein as if they were fully set forth.

69.     As explained above, in or about August 1989 Hegarty and Transamerica entered into a written Insurance Contract.

70.     As explained above, the Insurance Contract contains an implied covenant of good faith and fair dealing that is molded in part by the insurer's special relationship with the insured that is explained in *Egan*.

- 18 -

71.     At all relevant times, the Illustrations provided to Hegarty by Transamerica or its predecessors in interest provided for the payment of a 20-year persistency bonus of 30% of the Ten Year Premiums, a 30-year persistency bonus of 300% of the Ten Years Premiums and a 40-year persistency bonus of 300% of the Ten Year Premiums.  The Insurance Contract further guaranteed portions of these bonuses -- for the 20-year bonus 22% of the Ten Year Premiums were guaranteed, and for each of the 30-year bonus and the 40-year bonus half of the bonus (i.e., 150% of the Ten Year Premiums) was guaranteed.

72.     As explained above, to Hegarty the persistency bonuses (and particularly the guaranteed portions thereof) were, and are, a material and integral part of his Insurance Contract and were, and are, a key feature that makes the contract a "Permanent Policy," as represented in the Master Policy.  The persistency bonuses substantially increase the cash value of the Insurance Contract in years 20, 30 and 40, and this feature ensures the availability of sufficient cash values to offset the administrative charges, loads, policy fees, risk charges, etc. deducted, even if interest earnings and premium payments were to fail to generate sufficient values.

73.     The written Illustrations provided to Hegarty, including the Illustration delivered with the Certificate in 1989 and the Illustrations he received in 1996, 2005 and 2006, are part of the Insurance Contract.  Along with the Master Policy and the covenant of good faith and fair dealing they substantially control the Insurance Contract.

74.      As explained above, the *Oakes* settlement did not modify the express terms of the Insurance Contract with respect to persistency bonuses.  Likewise, neither the *Oakes* Settlement Agreement, Notice or Letter mentioned, let alone modified, the guaranteed persistency bonuses provided by the Insurance Contract.

75.     Transamerica and its predecessor in interest reaffirmed their obligation to pay the persistency bonuses by the issuance of the 2005 and 2006 Illustrations, payment of the 20-year persistency bonus, Transamerica's 20-Year Persistency Bonus Letter, and the 2012 and 2015 Silverman Illustrations.

76.     Hegarty performed all material obligations required of him under the Insurance Contract, or he was excused from performing those things.  Specifically, as explained above,

Hegarty paid all premiums for the Insurance Contract when due.

77.     Transamerica's announcement in the Crash Letter that it would not credit the 30-year and 40-year bonuses, including the guaranteed bonuses, constitutes an anticipatory repudiation of the Insurance Contract.   This anticipatory repudiation is a denial of Hegarty's rights under the Insurance Contract, including his right to "Permanent" insurance.  Refusal to credit the persistency bonuses, particularly the bonuses expressly guaranteed, when due removes an essential element needed to make the Insurance Contract function as promised, in violation of its express terms.

78.     Transamerica's failure to credit Hegarty's 30-year persistency bonus, and particularly the guaranteed portion of that bonus, when it was due in August 2019 also constitutes a breach of the express terms of the Insurance Contract.

79.     Transamerica's anticipatory repudiation, and its express breach, were also unreasonable interferences with Hegarty's right to receive the benefits of his Insurance Contract. As a result, they also violated the Insurance Contract's covenant of good faith and fair dealing because Transamerica unreasonably interfered with Hegarty's right to receive the benefits of the Insurance Contract and failed to treat Hegarty's interests in a manner at least equal to its own.

80.     As a direct and proximate result of Transamerica's anticipatory repudiation and its express breach of the Insurance Contract, Hegarty has been damaged in an amount to be proved at trial because the Insurance Contract will not perform according to its terms. Alternatively, and at Hegarty's option, because he is economically uninsurable and his rights under his Insurance Contract are thus unique and irreplaceable, Hegarty is entitled to specific performance of his Insurance Contract, including, without limitation, receipt of the full 30 and 40-year persistency bonuses set out in the Illustration attached to his Certificate.

81.     Transamerica is not excused from providing the persistency bonuses by virtue of the *Oakes* settlement or any other reason.

82.     Additionally, because Hegarty told Transamerica that he wanted to stop making premium payments as soon as possible, Transamerica knew that Hegarty would rely on the representations it made in its 2005 and 2006 Illustrations, the payment of his full persistency

bonus in 2009 and the Silverman Illustrations in 2012 and 2015.

83.     Hegarty was ignorant of the true state of the facts with respect to Transamerica's contention about how the *Oakes* settlement affected the persistency bonuses established by his Insurance Contract ("Transamerica's Contention").

84.     Hegarty reasonably relied to his injury on Transamerica's representations made in the Illustrations it sent him in 2005 and 2006, the payment of his full persistency bonus in 2009 and the Silverman Illustrations that Transamerica sent him (Hegarty) in 2012 and 2015.   If at any of these times Hegarty had known about Transamerica's Contention, he would not have relied on Transamerica's representations.  Hegarty was healthy when he received the *Oakes* Notice in 2000, when he received the 2005 and 2006 Illustrations, when Transamerica paid his 20-year persistency bonus in 2009 and when he received the 2012 Silverman Illustration.  He therefore would have obtained alternative insurance at reasonable rates or taken other steps to protect himself. However, when Hegarty received the Crash Letter he was almost 75 years old, not healthy and had required heart valve surgery a little more than two years earlier.  In short, Hegarty was economically uninsurable in 2016 when Transamerica first informed him it would not pay any portion of the 30 and 40-year persistency bonuses.  In other words, he relied to his detriment on Transamerica's representations.

85.     For the reasons set forth herein, Transamerica is estopped from asserting that the *Oakes* settlement or anything else released it of its obligation to pay Hegarty any portion of his persistency bonuses, whether guaranteed or non-guaranteed.

86.     For the reasons set forth herein, Transamerica waived any claim it had that the *Oakes* settlement or anything else released it of its obligation to pay Hegarty any portion of his persistency bonuses, whether guaranteed or non-guaranteed.

87.     In correspondence to Hegarty in 2019, Transamerica claimed that it had discretion to terminate the payment of persistency bonuses to Hegarty based on "future policy performance for Direct Recognition Life policies as well as the provisions of the settlement and judgment in the *Oakes* class action."

88.     Even if Transamerica had discretion to terminate the payment of persistency

bonuses, pursuant to its duty of good faith and fair dealing Transamerica was required to exercise this discretion reasonably.  In the exercise of this discretion, Transamerica could not prefer its own interest in maximizing gains and limiting disbursements over Hegarty's interests. It is not reasonable for Transamerica -- after setting up Hegarty's Insurance Contract, collecting all requested premiums from Hegarty, constantly reassuring him that his persistency bonuses would be paid and establishing reserves to protect the payment of his bonuses -- to terminate his persistency bonuses and thus take away his fully paid life insurance unless he pays very large, unanticipated, additional annual premiums for the rest of his life.  The business risk of "future policy performance for Direct Recognition Life policies," whatever that means, should have been anticipated and prepared for by Transamerica.  When weighed against the interests of a 75-year old uninsurable person in Hegarty's position, it is not a reasonable basis for termination.

89.     Transamerica and its predecessors in interest breached their duty of good faith and fair dealing by, among other things, taking the following actions:

(a)     Failing to inform the Texas Court approving the *Oakes* settlement that certain DRL insurance contracts, such as Hegarty's, contained guaranteed persistency bonuses;

(b)     Informing Hegarty in the Settlement Agreement, Notice and Letter that "[t]he settlement of this lawsuit does not alter your contractual rights under the express terms of your existing Policy;"

(c)     Paying the full 20-year persistency bonus without providing Hegarty notice that the payment was made solely on a discretionary basis;

(d)      Exercising their purported discretion to cease paying persistency bonuses without treating Hegarty's interests at least equal to their own; and

(e)      Failing to provide Hegarty notice, in 2000 and thereafter, of their contention that the payment of all persistency bonuses, including guaranteed persistency bonuses, were discretionary, and that none were guaranteed.

90.     As a direct and proximate result of Transamerica's breach of the implied covenant of good faith and fair dealing Plaintiff has suffered general damages in an amount to be proved at

trial. Alternatively, and at Hegarty's option, because he is economically uninsurable and his rights under his Insurance Contract are thus unique and irreplaceable, Hegarty is entitled to specific performance of his Insurance Contract, including, without limitation, receipt of the full 30 and 40-year persistency bonuses set out in the Illustration attached to his Certificate.

**COUNT 2**
**(Breach of Written Contract –**

**Including the Implied Covenant of Good Faith and Fair Dealing)**

91.      Plaintiff incorporates herein paragraphs 1 through and including 90 as if fully set forth.

92.      In the alternative to Plaintiff's First Count for Breach of Written Contract, Plaintiff alleges that to the extent the *Oakes* settlement in 2000 either eliminated or made the payment of persistency bonuses, including guaranteed persistency bonuses, discretionary, this constitutes a material change in the Insurance Contract.  This change of a material term of the original Insurance Contract -- the one Hegarty purchased in 1989 -- created a new written insurance contract between Transamerica and Hegarty ("New Insurance Contract") which includes the new modified provisions and the unchanged old provisions of the original Insurance Contract.  The New Insurance Contract, like the original Insurance Contract, is governed by California law.

93.      In 1996, Chapter 5.5, dealing with "the regulation of life insurance policy illustrations," was added to the California Insurance Code.  Insurance Code Section 10509.950 specified the purpose of Chapter 5.5 as follows: "It is the intent of the Legislature in enacting this chapter to make sure that illustrations do not mislead purchasers of life insurance and to make illustrations more understandable . . . ."  Chapter 5.5, which includes Insurance Code Sections 10509.950 through 10509.965, became effective on July 1, 1997 and applies to policies sold on or after July 1, 1997.

94.      By claiming the *Oakes* settlement eliminated any obligation to pay persistency bonuses -- both guaranteed and non-guaranteed, applying this elimination to all insurance contracts of class members who did not opt out of the *Oakes* settlement and charging and

- 23 -

demanding premiums not set forth in Illustrations issued under the class members' original DRL insurance contracts, Transamerica unilaterally created and sold the New Insurance Contract to Hegarty as part of the *Oakes* settlement in 2000.

95.     As a result of the creation of new insurance contracts in 2000, Insurance Code Section 10509.959(c) makes the following provisions of Sections 10509.955(a) and (b) and 10509.956(a) and (e) applicable when Owners of the new insurance contracts request an Illustration of future benefits, as Hegarty did in 2005 and 2006 for himself and in 2012 and 2015 on behalf of Silverman.  Section 10509.959(c) provides:

"Upon the request of the policy owner, the insurer shall provide an in force illustration of current and future benefits and values based on the insurer's present illustrated scale.  This illustration shall comply with the requirements of subdivisions (a) and (b) of Section 10509.955 and subdivisions (a) and (e) of Section 10509.956."

96.     Cal Ins Code § 10509.955(b) provides in pertinent part [the numbers before each subparagraph below are the numbers used in the statutory section] -- An "insurer or its producers or other authorized representatives shall not do any of the following:

"(2) Use or describe nonguaranteed elements in a manner that is misleading or has the capacity or tendency to mislead.

"(3) State or imply that the payment or amount of nonguaranteed elements is guaranteed.

"(4) Use an illustration that does not comply with the requirements of this chapter.

"(5) Use an illustration that at any policy duration depicts policy performance more favorable to the policy owner than that produced by the illustrated scale of the insurer whose policy is being illustrated.

"(6) Provide an applicant with an incomplete illustration.

"(7) Represent in any way that premium payments will not be required for each year of the policy in order to maintain the illustrated death benefits, unless that is the fact.

"(8) Use the term 'vanishing' or 'vanishing premium,' or a similar term that implies the policy becomes paid up, to describe a plan for using nonguaranteed elements to pay a

portion of future premiums.

"(9) Except for policies that can never develop nonforfeiture values, use an illustration that is 'lapse–supported.'

"(10) Use an illustration that is not 'self–supporting.'"

97.     Cal Ins Code § 10509.956(a) provides in pertinent part [the numbers before each subparagraph below are the numbers used in the statutory section] -- An "illustration shall conform with the following requirements:

"(6) Guaranteed death benefits and values available upon surrender, if any, for the illustrated premium outlay or contract premium shall be shown and clearly labeled guaranteed.

"(7) If the illustration shows any nonguaranteed elements, they cannot be based on a scale more favorable to the policy owner than the insurer's illustrated scale at any duration. These elements shall be clearly labeled nonguaranteed.

"(8) The guaranteed elements, if any, shall be shown before corresponding nonguaranteed elements and shall be specifically referred to on any page of an illustration that shows or describes only the nonguaranteed elements.

"(12) Any illustration of nonguaranteed elements shall be accompanied by a statement indicating that:

(A) The benefits and values are not guaranteed.

(B) The assumptions on which they are based are subject to change by the insurer.

(C) Actual results may be more or less favorable.

"(13) If the illustration shows that the premium payer may have the option to allow policy charges to be paid using nonguaranteed values, the illustration shall clearly disclose that a charge continues to be required and that, depending on actual results, the premium payer may need to continue or resume premium outlays. Similar disclosure shall be made for premium outlay of lesser amounts or shorter durations than the contract premium. If a contract premium is due, the premium outlay display shall not be left blank or show zero unless accompanied by an asterisk or similar mark to draw

1    attention to the fact that the policy is not paid up."

2    98.    Cal Ins Code § 10509.956(e) provides in pertinent part [the number and letter

3    before each subparagraph below are the number and letter used in the statutory section]:

4         "(1) A basic illustration shall include the following information for at least each policy

5         year from 1 to 10 and for every fifth policy year thereafter ending at age 100, policy

6         maturity or final expiration; and except for term insurance beyond the 20th year, for

7         any year in which the premium outlay and contract premium, if applicable, is to

8         change:

9           (C) The corresponding guaranteed value available upon surrender, as provided in

10         the policy."

11    99.    The creation of the new insurance contracts also subjected Transamerica to the

12    annual report requirements with respect to insurance contracts sold on or after July 1, 1997 set

13    forth in Cal Ins Code § 10509.959(d).  That Section provides:

14         "If an adverse change in nonguaranteed elements that could affect the policy has been

15         made by the insurer since the last annual report, the annual report shall contain a notice

16         of that fact and the nature of the change prominently displayed."

17    100.    At all relevant times, the Illustrations provided to Hegarty by Transamerica or its

18    predecessors in interest provided for the payment of a 20-year persistency bonus of 30% of the

19    Ten Year Premiums, a 30-year persistency bonus of 300% of the Ten Years Premiums and a 40-

20    year persistency bonus of 300% of the Ten Year Premiums.

21    101.    As explained above, to Hegarty the persistency bonuses were, and are, a material

22    and integral part of his New Insurance Contract and were, and are, a key feature that makes the

23    contract a "Permanent Policy," as represented in the Master Policy.  The persistency bonuses

24    substantially increase the cash value of the New Insurance Contract in years 20, 30 and 40, and

25    this feature ensures the availability of sufficient cash values to offset the administrative charges,

26    loads, policy fees, risk charges, etc. deducted, even if interest earnings and premium payments

27    were to fail to generate sufficient values.

28    102.    The written Illustrations provided to Hegarty in 2005 and 2006 are part of the New

Insurance Contract.  Along with the Master Policy and the covenant of good faith and fair dealing they substantially control the New Insurance Contract.

103.     Transamerica and its predecessor in interest reaffirmed their obligation to pay the persistency bonuses by the issuance of the 2005 and 2006 Illustrations, payment of the 20-year persistency bonus, the Transamerica 20-Year Persistency Bonus Letter and the 2012 and 2015 Silverman Illustrations.

104.     Hegarty performed all material obligations required of him under the New Insurance Contract, or he was excused from performing those things.  Specifically, as explained above, Hegarty paid all premiums for the New Insurance Contract when due.

105.     Transamerica's announcement in the Crash Letter that it would not credit the 30-year and 40-year bonuses constitutes an anticipatory repudiation of the New Insurance Contract. This anticipatory repudiation is a denial of Hegarty's rights under the New Insurance Contract, including his right to "Permanent" insurance.  Refusal to credit the persistency bonuses when due removes an essential element needed to make the New Insurance Contract function as promised, in violation of its express terms.

106.     Transamerica's failure to credit Hegarty's 30-year persistency bonus when it was due in August 2019 also constitutes a breach of the express terms of the New Insurance Contract.

107.     Transamerica's anticipatory repudiation, and its express breach, were also unreasonable interferences with Hegarty's right to receive the benefits of his New Insurance Contract.  As a result, they also violated the New Insurance Contract's covenant of good faith and fair dealing because Transamerica unreasonably interfered with Hegarty's right to receive the benefits of the New Insurance Contract and failed to treat Hegarty's interests in a manner at least equal to its own.

108.     As a direct and proximate result of Transamerica's anticipatory repudiation and its express breach of the New Insurance Contract, Hegarty has been damaged in an amount to be proved at trial because the New Insurance Contract will not perform according to its terms. Alternatively, and at Hegarty's option, because he is economically uninsurable and his rights under his Insurance Contract are thus unique and irreplaceable, Hegarty is entitled to specific

performance of his New Insurance Contract, including, without limitation, receipt of the full 30 and 40-year persistency bonuses set out in his 2006 Illustration.

109.   Transamerica is not excused from providing the persistency bonuses by virtue of the *Oakes* settlement or any other reason.

110.   Additionally, because Hegarty told Transamerica that he wanted to stop making premium payments as soon as possible, Transamerica knew that Hegarty would rely on the representations it made in its 2005 and 2006 Illustrations, the payment of his full persistency bonus in 2009, the Silverman Illustrations in 2012 and 2015 and its annual reports.  But Transamerica's 2005, 2006, and 2012 Illustrations failed to comply with California Insurance Code Sections 10509.955 and10509.956, essentially because they failed to state which elements of the Insurance Contracts were guaranteed and which were non-guaranteed.  And Hegarty's annual reports failed to state adverse changes to the "nonguaranteed elements" of his insurance contract.

111.   Hegarty was ignorant of the true state of the facts with respect to Transamerica's Contention that the *Oakes* settlement affected the persistency bonuses established by his New Insurance Contract.

112.   Hegarty reasonably relied to his injury on Transamerica's representations made in the Illustrations it sent him in 2005 and 2006, the payment of his full persistency bonus in 2009, the Silverman Illustrations that Transamerica sent Hegarty in 2012 and 2015 and his annual reports.   If at any of these times Hegarty had known about Transamerica's Contention he would not have relied on Transamerica's representations.  Hegarty was healthy when he received the *Oakes* Notice in 2000, when he received the 2005 and 2006 Illustrations, when Transamerica paid his 20-year persistency bonus in 2009, when he received the 2012 Silverman Illustration and when he received his pre-2013 annual reports.  He therefore would have obtained alternative insurance at reasonable rates or taken other steps to protect himself.  However, when Hegarty received the Crash Letter he was almost 75 years old, not healthy and had required heart valve surgery a little more than two years earlier.  In short, Hegarty was economically uninsurable in 2016 when Transamerica first informed him it would not pay any portion of the 30 and 40-year persistency bonuses.  In other words, he relied to his detriment on Transamerica's representations.

113.    For the reasons set forth herein, Transamerica is estopped from asserting that the *Oakes* settlement or anything else released it of its obligation to pay Hegarty any portion of his persistency bonuses, whether guaranteed or non-guaranteed.

114.    For the reasons set forth herein, Transamerica waived any claim it had that the *Oakes* settlement or anything else released it of its obligation to pay Hegarty any portion of his persistency bonuses, whether guaranteed or non-guaranteed.

115.    In correspondence to Hegarty in 2019, Transamerica claimed that it had discretion to terminate the payment of persistency bonuses to Hegarty based on "future policy performance for Direct Recognition Life policies as well as the provisions of the settlement and judgment in the *Oakes* class action."

116.    Even if Transamerica had discretion to terminate the payment of persistency bonuses, pursuant to its duty of good faith and fair dealing Transamerica was required to exercise this discretion reasonably.  In the exercise of this discretion, Transamerica could not prefer its own interest in maximizing gains and limiting disbursements over Hegarty's interests.  It is not reasonable for Transamerica -- after setting up his Insurance Contract and New Insurance Contract, collecting all requested premiums from Hegarty, constantly reassuring him that his persistency bonuses would be paid and establishing reserves to protect the payment of his bonuses -- to terminate his persistency bonuses and thus take away his fully paid life insurance unless he pays very large, unanticipated, additional annual premiums for the rest of his life.  The business risk of "future policy performance for Direct Recognition Life policies," whatever that means, should have been anticipated and prepared for by Transamerica.  When weighed against the interests of a 75-year old uninsurable person in Hegarty's position, it is not a reasonable basis for termination.

117.    Transamerica and its predecessors in interest breached their duty of good faith and fair dealing by, among other things, taking the following actions:

        a.    Failing to inform the Texas Court approving the *Oakes* settlement that certain DRL insurance contracts, such as Hegarty's, contained guaranteed persistency bonuses;

b.      Informing Hegarty in the Settlement Agreement, Notice and Letter that "[t]he settlement of this lawsuit does not alter your contractual rights under the express terms of your existing Policy;"

c.      Paying the full 20-year persistency bonus without providing Hegarty notice that the payment was made solely on a discretionary basis;

d.       Exercising their purported discretion to cease paying persistency bonuses without treating Hegarty's interests at least equal to their own;

e.       Failing to provide Hegarty notice, in 2000 and thereafter, of their contention that the payment of all persistency bonuses, including guaranteed persistency bonuses, were discretionary, and that none were guaranteed; and

f.      Failing to comply with the illustration and annual report requirements set forth in Chapter 5.5 of the California Insurance Code.

118.    As a direct and proximate result of Transamerica's breach of the implied covenant of good faith and fair dealing Plaintiff has suffered general damages in an amount to be proved at trial.  Alternatively, and at Hegarty's option, because he is economically uninsurable and his rights under the New Insurance Contract are thus unique and irreplaceable, Hegarty is entitled to specific performance of his New Insurance Contract including, without limitation, receipt of the full 30 and 40-year persistency bonuses set forth in his 2006 Illustration.

**Count 3**
**(Unlawful Conduct in Violation of Business and Professions Code Section 17200)**

119.    Plaintiff incorporates herein paragraphs 1 through and including 118 as if fully set forth.

120.    California Business and Professions Code §17200, et seq., prohibits unfair competition.  "Unfair competition" is defined in §17200 as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

121.    As explained above, to the extent a New Insurance Contract was formed as a result of the *Oakes* settlement, the Illustrations issued with regard to the New Insurance Contract

between Hegarty and Transamerica and the new insurance contract between Silverman and

Transamerica are governed by Chapter 5.5 of the California Insurance Code.

122.    As explained above, this Chapter is based on a strong public policy of protecting

consumers from misleading or unclear life insurance policy Illustrations.  Cal. Ins. Code

§10509.950 explains this policy thusly:

> "In order to protect consumers and foster consumer education, this chapter shall
>
> govern the regulation of life insurance policy illustrations.   It is the intent of the
>
> Legislature in enacting this chapter to ensure that illustrations do not mislead
>
> purchasers of life insurance and to make illustrations more understandable by
>
> providing illustration formats, prescribing standards to be followed when
>
> illustrations are used, and specifying the disclosures that are required in
>
> connection with illustrations."

123.    As explained above, the subsections of Cal. Ins. Code §§ 10509.955 and 10509.956

quoted in pertinent part above are applicable to Illustrations issued with regard to the New

Insurance Contract as a result of Cal. Ins. Code §10509.959(c) and the fact that Hegarty requested

Illustrations in 2005 and 2006 for himself and in 2012 and 2015 on behalf of Silverman.

Significantly, the Illustrations sent to Hegarty in 2005 and 2006 were sent at least five years after

the *Oakes* settlement and at least eight years after Chapter 5.5 of the Cal. Ins. Code became

effective, and the Illustrations Hegarty received on behalf of Silverman were sent to him at least

six years later.

124.    The 2005 and 2006 Hegarty Illustrations and the 2012 Silverman Illustration

violated the subsections of Cal. Ins. Code sections 10509.955 and 10509.956 set forth above.  For

example, all three Illustrations showed full payment of all persistency bonuses but did not identify

any portion of the persistency bonuses as non-guaranteed.  Nothing in the Illustrations said or

implied that the persistency bonuses would not, or even might not, be paid.  Similarly, all three Illustrations failed to properly state what premiums would not be required.  In short, all three Illustrations effectively misrepresented the terms of the New Insurance Contract.

125.    Cal. Ins. Code Section 10509.961, provides that any enforcement by the Insurance Commissioner is "[i]n addition to any other penalties provided by law."

126.    Transamerica's conduct is "unlawful" pursuant to Section 17200 because a new contract was formed as a result of the *Oakes* settlement, Cal. Ins. Code Sections 10509.955 and 10509.956 apply to Illustrations relating to Hegarty's New Insurance Contract and Transamerica has violated these Insurance Code Sections.

127.    As a direct and proximate result of Transamerica's unlawful business practices, Hegarty suffered out-of-pocket losses in that he paid Transamerica and its predecessors in interest a total of not less than $103,137.69 in premiums on his original Insurance Contract and his New Insurance Contract over the 17-year period from 1989 through 2006.

128.    California Business and Professions Code Section 17203 grants the Court authority to issue the following orders:

> "Any person who engages, has engaged, or proposes to engage in unfair
> competition may be enjoined in any court of competent jurisdiction.  The court
> may make such Orders or judgments, including the appointment of a receiver, as
> may be necessary to prevent the use or employment by any person of any practice
> which constitutes unfair competition, as defined in this chapter, or as may be
> necessary to restore to any person in interest any money or property, real or
> personal, which may have been acquired by means of such unfair competition."

129.    Hegarty is entitled to an injunction preventing Transamerica from asserting that the *Oakes* settlement or anything else in any way eliminated its obligations to Hegarty pursuant to his

New Insurance Contract, including, but not limited to, its obligation to credit the 30 and 40-year persistency bonuses due to him in an amount of not less than $359,318.40..  Alternatively, at Hegarty's choice, Hegarty should be entitled to an order compelling Transamerica to restore to him not less than $103,137.69, representing the premiums he paid, plus interest thereon from the time each premium payment was made.  The interest should be at the California legal rate.

130.    Hegarty is further entitled to an award of attorneys' fees and costs as provided by statute.

## COUNT 4
### (Unfair Business Practices in Violation of Business and Professions Code §17200, et seq.)

131.    Plaintiff incorporates herein paragraphs 1 through and including 130 as if fully set forth.

132.    California Bus. & Prof. Code § 17200 applies, regardless of whether Hegarty's original Insurance Contract or his New Insurance Contract is in force, because Transamerica's business acts and practices with regard to Hegarty were unfair and § 17200 prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

133.    As explained above, Transamerica and its predecessors in interest engaged in, among other things, the following unfair acts and practices:

(a)    Transamerica and its predecessors failed to tell Hegarty and other DRL insurance contract Owners, during their time to review the *Oakes* settlement in order to determine whether to object or opt out, that Transamerica contends the *Oakes* settlement eliminated Transamerica's obligation to pay persistency bonuses, including guaranteed persistency bonuses.  Instead, Transamerica sent Hegarty and the other Owners settlement materials stating the opposite;

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(b)      In 2005 and 2006, when Hegarty sought information about the remaining premiums he needed to pay, he was sent the 2005 and 2006 Illustrations. These showed that all persistency bonuses would be paid, never indicated the possibility that some, or all, of the bonuses would not be paid, never mentioned that Transamerica contended that all of the persistency bonuses shown on these Illustrations were non-guaranteed and never said that Transamerica claimed that as a result of the *Oakes* settlement (i) Hegarty's guaranteed persistency bonuses had been terminated and (ii) Transamerica had unfettered discretion to pay or not pay future persistency bonuses.  To the extent that the *Oakes* settlement created New Insurance Contracts, the California Insurance Code essentially required Transamerica to tell Hegarty this information:

(c)      Transamerica thereafter failed to explain this information to Hegarty when it had later opportunities to do so, e.g., when it paid the full 20-year persistency bonus in 2009 and when it sent Hegarty the Silverman Illustrations in 2012 and 2015;

(d)      Transamerica waited until 2016, when it knew Hegarty was 75 and likely uninsurable, to tell him that it contended that guaranteed persistency bonuses had been eliminated by the *Oakes* settlement and that it had unfettered discretion to decide whether or not to pay the 30 and 40-year persistency bonuses.  In fact, by 2016 Hegarty was uninsurable for reasons of health and age;

(e)      Transamerica breached the covenant of good faith and fair dealing in both the Insurance Contract and the New Insurance Contract when it "terminated" the 30 and 40-year persistency bonuses.  As a result, Hegarty was left with the unfair choice of paying very large, unanticipated annual premiums for the rest of his life or leaving his loved ones without the protection he had planned and paid for;

(f)     Transamerica had established reserves to cover its 30 and 40-year persistency bonus obligations.  By terminating the persistency bonuses, Transamerica was able to keep the money reserved for the persistency bonuses; and

(g)     Transamerica's excuse for "terminating" the 30 and 40-year persistency bonuses was "the anticipated future performance of the Direct Recognition Life policies."  In other words, Transamerica hurt its insurance contract Owners in order to protect itself from a potential business risk it should have anticipated and planned for when it first offered the DRL insurance contracts.  Under the circumstances, Transamerica improperly placed its interests well ahead of its insurance contract Owners' interests in violation of its obligation as the purveyor of a "quasi-public" service.

134.    Transamerica committed the unfair acts and practices listed above in order to induce Hegarty and the other insurance contract Owners not to opt out of the *Oakes* settlement and to keep their contracts in force by paying the scheduled premiums and not surrendering the contract.  These acts and practices did have success with regard to Hegarty and, Hegarty is informed, believes and therefore alleges, other contract Owners.

135.    Hegarty is informed, believes and therefore alleges that Transamerica's unfair acts and practices also helped Transamerica and its predecessors maximize their profits from their DRL insurance contracts unfairly at the expense of its insurance contract Owners.

136.    As a direct and proximate result of Transamerica's unfair business acts and practices, Hegarty suffered out-of-pocket losses in that he paid Transamerica and its predecessors in interest a total of not less than $103,137.69 in premiums on his original Insurance Contract and his New Insurance Contract over the 17 year period from 1989 through 2006.

137.    California Business and Professions Code Section 17203 grants the Court authority

to issue the following orders:

> "Any person who engages, has engaged, or proposes to engage in unfair
> competition may be enjoined in any court of competent jurisdiction.  The court
> may make such Orders or judgments, including the appointment of a receiver, as
> may be necessary to prevent the use or employment by any person of any practice
> which constitutes unfair competition, as defined in this chapter, or as may be
> necessary to restore to any person in interest any money or property, real or
> personal, which may have been acquired by means of such unfair competition."

138.    Hegarty is entitled to an injunction preventing Transamerica from asserting that the *Oakes* settlement or anything else in any way eliminated its obligations to Hegarty pursuant to his Insurance Contract or New Insurance Contract, including, but not limited to, its obligation to credit the 30 and 40-year persistency bonuses due to him in an amount of not less than $359,318.40.  Alternatively, at Hegarty's choice, Hegarty should be entitled to an order compelling Transamerica to restore to him not less than $103,137.69 representing the premiums he paid, plus interest thereon from the time each premium payment was made.  The interest should be at the California legal rate.

139.    Hegarty is further entitled to an award of attorneys' fees and costs as provided by statute.

**Count 5**
**(Fraudulent Business Practices in Violation of Business and Professions Code §17200 et seq.)**

140.    Plaintiff incorporates herein paragraphs 1 through and including 139 as if fully set forth.

141.    California Bus. & Prof. Code § 17200 applies, regardless of whether Hegarty's original Insurance Contract or his New Insurance Contract is in force, because Transamerica's

business acts and practices with regard to Hegarty were fraudulent and §17200 prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

142.    Transamerica's fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200 involved non-disclosures, misleading half-truths and misstatements of material facts.  The material facts involved Transamerica's intention, at the time of and after the *Oakes* settlement, to eliminate guaranteed persistency bonuses, to treat the obligation to pay non-guaranteed persistency bonuses as eliminated and to treat the payment of future persistency bonuses as subject to its unfettered discretion ("The Material Facts").  The misstatements were both direct and by implication.

143.    During the period when DRL insurance contract Owners, including Hegarty, were considering whether to oppose the *Oakes* settlement or opt out of it, Transamerica was obligated to disclose The Material Facts.  It didn't -- to Hegarty or any other Owner.  Transamerica had these disclosure obligations because of, among other reasons, its due process obligation as a co-preparer of the Notice and a party to the *Oakes* settlement, its special relationship with its California insurance contract Owners, its various obligations under the California Insurance Code and its sole possession of The Material Facts.

144.    Transamerica's misleading half-truths and misstatements include:

a.      The statement in the Letter telling DRL contract Owners, including Hegarty, that "the proposed settlement does not alter your contractual rights under the express terms of your existing Policy", despite the fact that The Material Facts are to the contrary;

b.      The 2005 and 2006 Illustrations for Hegarty's contract in which Transamerica represented that Hegarty would receive the full 30 and 40-year persistency

bonuses, despite the fact that without The Material Facts the representation appears stronger than it is;

c.      Transamerica's payment of Hegarty's full 20-year persistency bonus in or about 2009, which without The Material Facts reinforced Hegarty's belief that Transamerica would pay his full 30 and 40-year persistency bonuses; and

d.      Hegarty's receipt of the Silverman Illustrations in 2012 and 2015, which without The Material Facts reinforced even more Hegarty's belief that Transamerica would pay his full 30 and 40-year persistency bonuses.

145.    Transamerica engaged in the aforementioned conduct knowing that it was false and with the intent to defraud Hegarty and the other DRL contract Owners because in 2016 and 2019 it asserted in letters to Hegarty that the 2000 *Oakes* settlement established its right to act on its intent as set forth in The Material Facts.  Transamerica could have told Hegarty The Material Facts at the time of the *Oakes* settlement in 2000 but chose not to do so.

146.    Undoubtedly, Transamerica did not disclose The Material Facts to Hegarty and the other DRL contract Owners because they were material to Hegarty and the other DRL contract Owners and Transamerica was concerned that knowledge of The Material Facts would cause substantial objections to the Oakes settlement and/or opt outs to it, as well as substantial premium non-payments and/or surrenders .  Hegarty is informed, believes and therefore alleges that Transamerica's executives and General Agents frequently discussed the importance of persistency bonuses to the consumer, and how DRL insurance contract sales did not substantially increase until persistency bonuses were partially guaranteed.  Hegarty, himself, was attracted to DRL life insurance because of the persistency bonuses but would not purchase a DRL contract until persistency bonuses were partially guaranteed.

147.    Hegarty justifiably relied on Transamerica's conduct because he had no indication

that Transamerica would not pay his 30 and 40-year persistency bonuses and was led to believe that Transamerica would pay the full bonuses by Transamerica's above-described conduct.

148.    As a direct and proximate result of Transamerica's fraudulent business acts and practices, Hegarty suffered out-of-pocket losses in that he paid Transamerica and its predecessors in interest a total of not less than $103,137.69 in premiums on his original Insurance Contract and his New Insurance Contract over the 17 year period from 1989 through 2006.

149.    California Business and Professions Code Section 17203 grants the Court authority to issue the following orders:

> "Any person who engages, has engaged, or proposes to engage in unfair
> competition may be enjoined in any court of competent jurisdiction.  The court
> may make such Orders or judgments, including the appointment of a receiver, as
> may be necessary to prevent the use or employment by any person of any practice
> which constitutes unfair competition, as defined in this chapter, or as may be
> necessary to restore to any person in interest any money or property, real or
> personal, which may have been acquired by means of such unfair competition."

150.     Hegarty is entitled to an injunction preventing Transamerica from asserting that the *Oakes* settlement or anything else in any way eliminated its obligations to Hegarty pursuant to his Insurance Contract or New Insurance Contract, including, but not limited to, its obligation to credit the 30 and 40-year persistency bonuses due to him in an amount of not less than $359,318.40.  Alternatively, at Hegarty's choice, Hegarty should be entitled to an order compelling Transamerica to restore to him not less than $103,137.69 representing the premiums he paid, plus interest thereon from the time each premium payment was made.  The interest should be at the California legal rate.

151.     Hegarty is further entitled to an award of attorneys' fees and costs as provided by

1    statute.

2                              **Count 6**

3                         **(Financial Elder Abuse)**

4          152.    Plaintiff incorporates herein paragraphs 1 through and including 151 as if fully set

5    forth.

6          153.    In engaging in the conduct alleged herein, Transamerica took, secreted,

7    appropriated, obtained, or retained Hegarty's property, which includes, among other things, the

8    Insurance Contract and/or New Insurance Contract premiums he had paid and the persistency

9    bonuses to which he was entitled.  Transamerica's actions were taken with both a fraudulent intent

10   and for a wrongful use.  Hegarty was 65 or more when Transamerica's actions were taken -- e.g.,

11   sending Hegarty the 2006 Illustration without disclosing The Material Facts, paying Hegarty his

12   full 20-year persistency bonus in 2009 without disclosing The Material Facts, sending Silverman's

13   2012 and 2015 Illustrations without disclosing The Material Facts and sending the Crash Letter to

14   Hegarty in 2016 and seeking to implement it thereafter.  Therefore, Transamerica violated

15   California's Elder Abuse and Dependent Adult Civil Protection Act ("EADACPA") (Cal. Welfare

16   & Institutions §15610, et seq).

17         154.    As explained above, Transamerica's actions were taken with the intent to defraud

18   and all of his damages were caused by Transamerica's fraud.

19         155.    Transamerica's actions were also, and equally, undertaken "for a wrongful use,"

20   and all of his damages were also, equally, caused by these actions.  Cal. Welfare & Institutions

21   Code §15610.30 (b) explains one aspect of when a "taking" "for a wrongful use" occurs:  A

22   person shall be deemed to have "taken" property for a wrongful use if the person "takes" the

23   property "and the person [i.e., the taker] knew or should have known that this conduct [i.e., the

24   "taking"] is likely to be harmful to the elder . . . ."  Transamerica knew from Hegarty's application

25   for insurance that Hegarty was 75.  It therefore knew or should have known, for several reasons,

26   that its "taking" of Hegarty's premiums and persistency bonuses when he was 75 years old were

27   likely to be harmful to Hegarty.  For example, people of that age are likely to be uninsurable for

28   reasons of age and health, as Hegarty was.  Thus, they can no longer obtain alternative insurance

at a reasonable cost.  But at that age, Hegarty and other 75 year olds are quite focused on their estate and how their loved ones will be able to manage without them.  If they lose the life insurance they counted on, they -- like Hegarty -- become very anxious, lose sleep and otherwise receive psychological pain, which can sometimes be very substantial.  Further, 75-year olds -- like Hegarty -- are often long past their peak earning years, if they are not already retired.  As a result, the large, additional, unscheduled annual premiums Transamerica demanded in 2016 in order for Hegarty to retain his DRL contract would have been difficult, if not impossible, for Hegarty to afford.  At best, these premiums could only be paid with great hardship, e.g., by, as noted above, Hegarty's selling his home or substantially lowering his standard of living. Similarly, Transamerica's September 2019 refusal to keep Hegarty's Insurance Contract in full force and effect during the pendency of this action without the payment of even larger annual premiums is another harmful taking.

156.    Hegarty was harmed by Transamerica's conduct, and Transamerica's conduct was a substantial factor in causing Hegarty's harm.

157.    Based upon the information available to Transamerica from Hegarty's application, Transamerica knew or should have known that its conduct was directed to one or more senior citizens.  Transamerica's conduct caused and will continue to cause Hegarty substantial loss of property set aside for retirement, or for personal or family care and maintenance, including, without limitation,  the fees and expenses he has incurred and will continue to incur investigating and prosecuting his claims

158.    As a result of Transamerica's conduct, Hegarty is entitled to recover compensatory damages according to proof at trial, general damages for his pain and suffering according to proof at trial, interest at the California legal rate on the damages, and attorney's fees and expenses. Hegarty is also entitled to recover from Transamerica exemplary or punitive damages and treble damages in amounts sufficient to punish and make an example of Transamerica in order to deter similar conduct in the future.  The punitive or exemplary damages and the treble damages are by way of statute, including, but not limited to, EADACPA and California Civil Code §3345.

1

**PRAYER**

2    WHEREFORE, Hegarty prays for relief as follows:

3    **Count 1:**

4          i.     An order compelling specific performance by Transamerica of Hegarty's

5                Insurance Contract on the terms described in the Illustration attached to the

6                Certificate; or, at Hegarty's choice;

7          ii.    Compensatory damages in an amount to be proven at trial.

8    **Count 2:**

9          i.     An order compelling specific performance by Transamerica of Hegarty's

10              New Insurance Contract on the terms described in the 2006 Illustration; or,

11              at Hegarty's choice;

12          ii.    Compensatory damages in an amount to be proven at trial;

13    **Counts 3, 4 and 5:**

14          i.     An order enjoining Transamerica from asserting that the *Oakes* settlement

15              or anything else in any way eliminated its obligations to Hegarty pursuant

16              to his Insurance Contract or New Insurance Contract, including, but not

17              limited to, its obligation to credit the 30 and 40-year persistency bonuses

18              due to him in an amount of not less than $359,318.40; or, at Hegarty's

19              choice;

20          ii.    An order compelling Transamerica to restore to him an amount not less than

21              $103,137.69 representing the premiums he paid, plus interest thereon from

22              the time each premium payment was made, at the California legal rate; and

23          iii.   Attorneys' fees, costs and expenses pursuant to statute.

24    **Count 6:**

25          i.     Compensatory damages in an amount to be proven at trial;

26          ii.    General damages for pain and suffering;

27          iii.   Interest, at the California legal rate;

28          iv.   Treble damages pursuant to California Civil Code Sec. 3345;

1        v.      Punitive damages in an amount sufficient to punish and make an example of

2                Transamerica in order to deter similar conduct in the future; and

3        vi.     Attorney's fees, costs and expenses pursuant to statute.

4    **On all Counts:**

5            A preliminary injunction;

6            Costs and attorneys' fees; and

7            Such other and further relief as this Court deems just and proper.

8

9                        **DEMAND FOR JURY TRIAL**

10   Plaintiff demands a jury trial.

11

     DATED:  September 24, 2019            Respectfully submitted,

12                                         RICHARD B. GLICKMAN APC

13

14

                                           By:  _____/S/_____
15                                              RICHARD B. GLICKMAN

16                                         Attorneys for Plaintiff
                                           Robert Hegarty
17

18

19

20

21

22

23

24

25

26

27

28

                                    - 43 -

# EXHIBIT A

# ☰ TRANSAMERICA®

WBILL

4333 EDGEWOOD ROAD NE
CEDAR RAPIDS IA 52499

0000148        08 SP 2.470  **SNGLP  T4 1 3699 94556-005757    -C05-P00148-I



ROBERT F. HEGARTY
PO BOX 57
MORAGA, CA 94556-0057

3699-05-00-0000148-0001-0001680

## THIS PAGE INTENTIONALLY LEFT BLANK
## PLEASE SEE IMPORTANT DOCUMENT(S) ENCLOSED





**TRANSAMERICA**®

**Transamerica Premier Life Insurance Company**
4333 Edgewood Rd NE
Cedar Rapids, Iowa  52499

OCTOBER 18, 2018

ROBERT F. HEGARTY
PO BOX 57
MORAGA, CA  94556

Policy #:   000G012767
Insured(s): ROBERT F. HEGARTY

Dear Mr. Hegarty:

In response to your faxed request, attached is a copy of the Group Master policy.


If you have any questions regarding this letter or need assistance with additional options, please call us at 1-800-934-1007, Monday through Friday between 9:00 a.m. to 4:00 p.m. ET, and one of our representatives will be more than happy to assist you.

On behalf of Transamerica, we thank you for being a valued customer.




Best Regards,
 km
Transamerica
tii.customerservice@transamerica.com

**Application for Group Insurance to**
**GENERAL SERVICES LIFE INSURANCE COMPANY**
Home Office:  Washington, DC
Regional Office:  475 Gate Five Road, #A-215, Sausalito, California 94965

**GSL Multiple Employer Trust**

hereby applies for Group Policy No. D-1B to which this application is attached.

Said Group Policy is hereby approved and the terms thereof are hereby accepted.

This application is executed in duplicate, with one part being attached to said Policy and the other returned to GENERAL SERVICES LIFE INSURANCE COMPANY.

It is understood and agreed that no agent of General Services Life Insurance Company has power on behalf of said Company to make or modify this or any other application for insurance.

This application supersedes any previous application for the said Group Policy.

Dated at _____ this _____ day of _____, 19_____.

_____

By   _____

G-II-70000 (5/86) [GSL005/W2]

3689-05-00-0000148-0002-0001681



### GENERAL SERVICES LIFE INSURANCE COMPANY
**Home Office: Washington, DC**
**Regional Office: 475 Gate Five Road, #A-215, Sausalito, California 94965**

(Hereinafter called the "Company" or "We"/"Us"/"Our")

Master Policy Number _____ D-1B _____          State of Delivery __Missouri__

Master Policy Effective Date_____ July 10, 1986 _____

By this group Master Policy and its Riders in effect from time to time (hereinafter called the "Policy") issued to
_____ GSL Multiple Employer Trust _____
(hereinafter called the "Policyholder"), in consideration of the application herefore, which application is hereby made a part of this Policy, the Company agrees to provide permanent and term insurance benefits and any other benefits as provided in Riders in accordance with the provisions of the group Policy and any Riders thereto on the lives of those Eligible Individuals and their Dependents, of a Participating Employer, who have applied for such coverage(s) and have been accepted by the Company in accordance with the terms and conditions set forth herein.

This Policy is governed by the laws of the jurisdiction where it is delivered.

IN WITNESS WHEREOF, GENERAL SERVICES LIFE INSURANCE COMPANY has by its president and secretary executed this Policy and caused the same to be countersigned as of the Master Policy Effective Date.

*George R. Lambert*
**SECRETARY**

*Robert D. Ray*
**PRESIDENT**

### DIRECT RECOGNITION LIFE I

an

Adjustable/Flexible Group Permanent Policy
providing Death Benefits with optional group-term
life insurance, group annuity and other benefit Riders,
and guaranteed minimum interest credits

G-DRL 0150-1     (5/86) [GSL002/W2]



**INTRODUCTORY**

The Provisions of this Policy and its Riders are applicable only to those Participants of a Participating Employer for whom coverage(s) is being provided in accordance with the applications, and the medical evidence provided in conjunction with the applications of Participants.

### SECTION 1 - DEFINITIONS

**ACCOUNT** - An Account established under this Policy and administered by the Company for each Participant encompassing the Ultimate and Current Cash Values (which include the Excess Account Values) available from time to time to the Owner, all of which constitute the "Account Values" for each such Participant.

**ACCOUNTING YEAR** - The first Accounting Year shall be a 12-month period beginning on each Participant's Coverage Effective Date and each subsequent Accounting Year shall be a 12-month period beginning on the respective anniversary(ies) of each Participant's Coverage Effective Date.

**ANNUITY ACCOUNT** - The account established under any of the Annuity Riders to the Policy and which encompasses the Annuity Cash Value attributable to such Rider.

**BENEFICIARY** - The person or entity so designated by an Owner of any Certificate to receive the benefits payable upon the death of a Participant.

**CERTIFICATE** - The respective Certificate(s) of insurance, including any illustrations, applications, medical statements, endorsements and Riders, issued for each Participant stating and defining the benefits to which each Certificate Owner is entitled, to whom benefits are payable and the manner in which benefits are payable to the Beneficiary.

**DATES**

> **CERTIFICATE ISSUE DATE** - The date that the Certificate is prepared and issued by the Company for a particular Participant.
>
> **COVERAGE EFFECTIVE DATE** - The date the Certificate is effective for a Participant as to any benefits thereunder.
>
> **TARGETED PAID-UP DATE** - The date upon which the Group Permanent Coverage under the Certificate is projected to reach Paid-Up Status, and which date must be an anniversary of the Participant's Coverage Effective Date which completes a period of full Accounting Years between the Participant's age on the Coverage Effective Date and the paid-up age specified in his application for insurance, or such earlier date elected by the Owner.
>
> **PROGRAM EFFECTIVE DATE** - The effective date of inclusion of the Participating Employer under this Policy.
>
> **MASTER POLICY EFFECTIVE DATE** - The date this Policy is effective.

**DEPENDENT** - An Eligible Individual's spouse, parent, or descendant.

**ELIGIBLE INDIVIDUAL** - An individual rendering services to the Participating Employer. In addition, if the Participating Employer is a sole proprietor or partnership, the term shall also include any proprietor or partner actively engaged in the business of the Participating Employer. The term also includes ex-employees, directors and retired employees, as well as members of any association.

**ILLUSTRATION** - The Illustration(s) attached to the Certificate(s) of the Participant or otherwise furnished to the Owner showing the premiums and assumptions required to provide the benefits and Account Values specified therein.

**MARKET VALUE EQUITY CONCEPT.** The Market Value Equity Concept adjustment is a factor equal to the weighted average value of the ratio of the Market Value Factor in the month of a surrender, withdrawal or a transfer due to a change in an interest earning strategy to the Market Value Factor in the month premiums were paid, on a First-In-First-Out basis. The Market Value Factors are calculated by dividing the market value of the managed assets at the end of each month by the corresponding book value. The Market Value Factors are available from the Company upon request.

**OWNER** - The Primary Owner of the rights and benefits specified in a Certificate issued under the Policy and its Riders.

**PARTICIPANT/YOU/YOUR** - An Eligible Individual or Dependent who has applied to and been accepted by the Company under this Policy in accordance with the Program of a Participating Employer.

G-DRL 0150-2   (5/86) [GSL002/W2]



PARTICIPATING EMPLOYER - An association, an employer which is a party to a trust agreement, or an association which is a party to a trust agreement.

PROGRAM - The Program of Group Insurance and other benefits which a Participating Employer has established for its Eligible Individuals and their Dependents.

RIDERS - The agreement(s) providing additional benefits by the Company which have been made a part of this Policy.

### SECTION II - GENERAL PROVISIONS

ENTIRE CONTRACT. The Company makes the promises described in the Policy and its Riders issued hereunder in return for the payment of premiums and the answers to the questions in the Participants' application(s) and medical questionnaire(s). The Company will not use any statement made by the Insured Participant to void these benefits or to defend against a claim, unless that statement is in the written application(s), medical questionnaire(s) or medical examination(s) signed by the Insured Participant and a copy of such application(s), medical questionnaire(s) or medical examination(s) has been furnished to such person or his or her Beneficiary or personal representative. All statements in the application(s), medical questionnaire(s) or medical examination(s) will be considered representations and not warranties.

The entire contract consists of the Policy and its Riders providing group permanent, group term and other insurance and/or annuity coverage(s); the application of the Policyholder; the illustrations prepared for the Participant; and the Participants' applications, health questionnaires, and the medical examinations, a copy of each of which is included in and made a part of each Certificate and/or provided for the Owner of such rights and benefits.

INCONTESTABILITY. If premiums are paid when due, the Company will not contest the benefits described by a Certificate after it has been in force during the lifetime of the Insured Participant for two years from the Certificate Issue Date as to each such Insured Participant. In addition, any evidence of insurability voluntarily submitted by the Participant to obtain an increase in coverage or a more favorable Risk Charge after the Certificate Issue Date will be incontestable after the increase in coverage or more favorable Risk Charge(s) have been in effect during the lifetime of the Participant for two years. In the event that such evidence was submitted solely to obtain an increase in coverage, the Company will not contest the original benefits.

ELIGIBILITY FOR INSURANCE AND EFFECTIVE DATE OF COVERAGE. Individuals are eligible for insurance on or after the Program Effective Date upon completion of any eligibility period of continuous active employment or other requirements specified in the Participating Employer's Program of Insurance on the terms and conditions and premium rates applicable on the day following the completion of such period.

Each Eligible Individual or Eligible Dependent who in accordance with the Participating Employer's Program of Insurance makes written application to the Company will become insured on the Coverage Effective Date if he or she furnishes evidence of insurability satisfactory to the Company and has complied with all the requirements of the Company for new entrants and has been notified in writing of the Company's acceptance of the risk.

TERMINATION OF COVERAGE. A Participant's insurance will terminate on the earlier of: (1) the date of surrender of the Participant's Certificate; and (2) the Coverage Effective Date for a new Participant requested by the Owner under the "Change of Participant" provision; and (3) the expiration of the Grace Period for an unpaid premium; and (4) the date the Current Cash Value would be insufficient to pay the applicable Risk Charge; and (5) the date that any indebtedness exceeds the Amount Available For Loans; and (6) the date he or she ceases to be employed, unless: continuation of insurance coverage following cessation of employment is elected, or he or she was a member of a class of Eligible Individuals for whom continued employment or continued membership in an association was not required, or he or she was an eligible Dependent for whom employment was not required.

DEATH BENEFIT. The face amount of the Group Permanent Death Benefit is the amount defined and stated in the Participant's Certificate(s). Upon receipt of due proof of death, the Company will pay the Death Benefit if the Insured Participant dies while the benefits provided by the Policy are in force and no premium is unpaid beyond its grace period.

OWNERSHIP PROVISION - The Owner of the rights and benefits provided under this Policy and described in the Certificate(s) and the Owner of the rights and benefits provided in any Rider attached to this Policy may be the same person or different persons or entities in accordance with the most recent designation as Owner for the respective coverage(s) that has been acknowledged by the Company.

Such designations will remain in effect unless a new Owner is named. The Certificate(s) also provides for the designation of a Contingent Owner in the event that the designated Owner dies prior to the Insured. If there is no designated Owner, or if such designated Owner is deceased and there is no Contingent Owner, then: (1) the owner of any term Certificate will be (a) the beneficiary, if any, otherwise (b) the Insured; and (2) the Owner of any Certificate with permanent benefits will be the insured.

G-DRL 0150-3   (5/86) [GSL002/W2]

3899-05-00-00001148-0005-0001684



·The Owner shall not be considered a party to this Policy or an owner of this Policy.

BENEFICIARY: The Death Benefits shall be paid to the Primary Beneficiary designated by the Owner. If no Beneficiary has been designated by the Owner or if the Primary Beneficiary does not survive the Insured Participant, the Death Benefits shall be paid to the surviving person or persons in the first of the following classes of successive preference beneficiaries of which a member survives the Insured Participant: (1) the Contingent Beneficiary; (2) the Insured Participant's: (a) spouse; (b) children including legally adopted children; (c) natural parents; (d) full brothers and sisters; (e) executor or administrator.

Unless the Company is told otherwise in writing, it will follow these rules: (1) the Company will pay equal shares when more than one Beneficiary will share the funds; (2) if any Beneficiary dies at the same time as the Insured Participant, or within 30 days after and before the Company makes any payments, it will pay as if that Beneficiary did not live as long as the Insured Participant; however, the Company will not be required to delay payment for more than 30 days after an Insured Participant's death; (3) when the Beneficiaries are not shown by name (such as "children"), the Company may determine who they are from sworn statements and not wait for court records; (4) the word "child" means only a child born to or adopted by the Insured Participant.

TRUSTEES AS OWNERS OR BENEFICIARIES: The fact that the Owner or Beneficiary is a designated trust will not make any difference in the way the Company deals with the Certificates. If there is any conflict between the terms of this Policy and its Riders and the terms of the designated trust, the Company will follow the terms of this Policy and its Riders. Payment of any money to the trustee of the designated trust will release the Company from any liability for that money.

ASSIGNMENT OF BENEFITS. The Owner may assign the benefits at any time. The Owner must notify the Company in writing of the assignment. After the Company acknowledges the assignment, it will become effective as of the date of the assignment. The Company is not responsible for the validity of any assignment. The rights of the Owner and the Beneficiary may be restricted or ended if these benefits are assigned.

NON-ALIENATION OF BENEFITS. Amounts payable under this Policy may not be pledged, commuted, encumbered or assigned by any person other than the Owner, and, to the extent permitted by law, no amount will be subject to any legal process to satisfy the payment of a claim against any such person.

CHANGE OF OWNER AND BENEFICIARY. The Owner can name someone else as Owner at any time, or as Beneficiary at any time, as long as the Insured Participant is still alive, and subject to any irrevocable beneficiary designation(s). The Owner must write to the Company and notify the Company of the change. After the Company receives the change, it will be effective as of the date that the Owner signed the request, even if the Insured Participant died in the meantime. However, the Company will not be liable for any payments it makes, or actions it takes, before it receives and acknowledges the request.

CHANGE OF DEATH BENEFIT. Any increase in the Death Benefit or any increases in the Risk Insurance Amount including increases resulting from a change in the Paid-Up Date requested by the Owner; will be subject to all the Company's requirements for new applicants including evidence of insurability satisfactory to the Company.

CHANGE OF PARTICIPANT. The Insured Participant shown on the Certificate may be changed by the Owner to another Participant subject to: (1) payment of any required costs; and (2) compliance with any other conditions determined by the Company, including but not limited to the following: (a) the attained age of such proposed Participant may not exceed 90 on the date of change unless approved by the Company; (b) such proposed Participant has provided evidence of insurability satisfactory to the Company; and (c) the Owner must have an insurable interest in the life of such proposed Participant.

The Coverage Effective Date for the new Participant will be the later of: (1) the date of the request to change; or (2) the date that evidence of insurability satisfactory to the Company has been furnished on the new Participant.

The insurance and other benefits on the new Participant become effective and the insurance and other benefits on the previously Insured Participant terminates on the Coverage Effective Date for the new Participant. The contestable and suicide periods begin on the new Participant's Coverage Effective Date.

On the date of the change, the amount of coverage for the new Participant may be determined by the Owner so that either: the Account Values are equal; or the amount of coverage is equal; or the premiums are equal; or any other amount acceptable to the Company. The Owner may use any extra Account Values to prepay premiums and the Owner shall have the right to make up any deficiency in Account Values by additional payments to, or loans against, the Certificate. The Certificate will continue to be subject to any existing indebtedness or assignment.

CHANGE OF PLAN. Any Owner may exchange any Certificate providing permanent benefits owned under this Policy for any other permanent life insurance plan offered by the Company at that time subject to: (1) payment of any required costs; and (2) compliance with any other conditions determined by the Company.

G-DRL 0150-4   (5/86) [GSL002/W2]



CHANGE OF RISK INSURANCE AMOUNT TO NEW CERTIFICATE. At the request of the Owner, within 31 days of the date any Certificate(s) is placed under Option 2 or 3 under the section headed Paid-Up/Settlement Options, the Company will agree to issue a new Certificate(s) on the Participant without requiring new evidence of insurability subject to the condition that the sum of the Risk Insurance Amount of the paid up Certificate and the Risk Insurance Amount of the new Certificate may not exceed the Risk Insurance Amount of the original Certificate immediately before the Paid-Up/Settlement Option was taken.

CONTINUATION PRIVILEGE. If a Participant with respect to any Certificate becomes ineligible for coverage under the Program of the Participating Employer, the Company will allow for the continuation of the coverage described in the Certificate, unless the Owner has requested that the Company not continue such Certificate; provided the Certificate is still in force and all premiums with respect to that Certificate have been and continue to be paid when due. The Certificate will continue to be subject to all the terms and conditions of this Policy and its Riders.

GRACE PERIOD, AUTOMATIC PREMIUM LOAN AND REINSTATEMENT PROVISIONS. If any premium except the first premium is not paid on or before the due date, the Company will allow a period of 31 days after such due date during which time the Certificates under the Policy and its Riders will remain in force. This is called the grace period. If a Group Permanent premium is not paid before the end of the grace period, the premium for such coverage(s) will be made as a Policy Loan from the Amount Available For Loans to the Participant under the Certificate(s) only if the Amount Available For Loans is sufficient so that all coverage will remain in full force and effect. This process will continue until the loan amount exceeds the Amount Available For Loans, at which time the coverage will lapse and the corresponding Certificates will be of no force and effect; subject to 31 days' written notice being sent to the Owner at his last known address.

If the coverage lapses, then the respective Owner or Owners may apply to the Company to have such coverage reinstated. The Company will reinstate such coverage on four conditions: (1) reinstatement must be requested; (2) evidence of insurability that is satisfactory to the Company must be supplied by the Participant; (3) payment of the overdue premiums, with interest, compounded yearly must be made; and (4) payment or reinstatement of indebtedness with interest compounded yearly must be made.

Any Policy Loan resulting from these provisions will be given effect to and accounted for on the same terms as any other Policy Loan under Section V of this Policy. The interest rate charged under this provision will not exceed the applicable policy loan interest rate, and a portion of the Account Values equal to the amount loaned will be regarded as being in the Policy Loan Interest Earning Strategy for the period during which the loan remains unpaid.

CONVERSION PRIVILEGE. Within 31 days following termination of coverage for a Participant, the Participant or the Participant's designee may convert the Risk Insurance Amount provided by this Policy and its Riders on the Participant, without evidence of insurability, to any plan of life or endowment insurance on the Participant that the Company is then authorized to routinely issue. The Participant or the Participant's designee must apply to the Company in writing and will have to surrender the insured Participant's Certificate(s) if requested by the Company. The Company has restrictions on the minimum amounts of insurance it will issue. These vary from plan to plan and may limit the Owner's choice of policies. However, they will not be used to deny conversion.

The Company will not issue a policy which contains a provision which puts it at any greater risk than the similar provision in this Policy and its Riders. The premium rate for the new plan will be based on the Participant's attained age and risk class(es) applying under the converted Certificate(s). A waiver of premium benefit, waiver of risk charge benefit, or accidental death benefit may be included if the insured Participant enjoyed that benefit(s); however, the Company will not include a waiver of premium or waiver of risk charge benefit in the new policy if the insured Participant is over age 55 on the Conversion Date.

EXTENSION OF COVERAGE. If a Participant insured under this group Policy or any Rider dies during the period within which the individual would have been entitled in terms of the section headed "Conversion Privilege" to have an individual policy issued under this Policy or any of its Riders and before such individual policy becomes effective, the amount of life insurance which he would have been entitled to under such individual policy shall be payable as a claim under the Policy whether or not application for the individual policy or payment of the first premium has been made.

SUICIDE. If the policy is issued to a Missouri citizen, suicide is no defense to the payment of life insurance benefits nor is suicide, while insane, a defense to payment of accidental death benefits, if any, under the group Policy or any Riders unless the Company can show that the insured Participant intended suicide when he applied for coverage under this Policy or its Riders.

AGE. "Age" of the insured Participant referred to herein, means his or her age on his or her nearest birthday.

MISSTATEMENT OF AGE. If the insured Participant's age is incorrectly stated, the Company will adjust all benefits under this Policy and its Rider(s) to what the monthly Risk premiums at the time of death, would have bought at his or her correct age. The adjustment will be based on the same rates the Company would have used had there been no misstatement of age.

G-DRL 0150-5    (5/86) [GSL002/W2]



**ADMINISTRATIVE ERROR.** The Certificates of Insurance issued to Participants under this Policy and its Riders will state the amount of life insurance coverage and/or other benefits to be provided under the Participating Employer's Program of Insurance, and no action by the Company, whether by mistake or otherwise, will convey to the Participant any greater or lesser benefit or insurance protection other than that which is intended by this Policy and its Riders, and for which the Participant has applied, and for which premiums have been paid in accordance with the provisions of this Policy.

**TAXES.** The Company may deduct from amounts applied or held under this Policy any applicable premium taxes or other taxes or assessments levied against it in relation to this Policy or its Riders by the Federal Government or by any state or local government or taxing authority.

**GUARANTEED MINIMUM VALUES.** The Policy benefits, recurring premiums, net single premiums, and Account Values are based on Age nearest birthday, the assumption that deaths occur at the end of Accounting Years and that premiums are paid annually. Minimum Cash Values are based on a 4% minimum interest credit. All values are at least equal to those required, if any, by statutes of the jurisdictions in which this Policy is delivered; and, subject to the conditions of the Policy applicable to amounts surrendered or loaned, the Company guarantees the principal amount of the Minimum Cash Values. Allowance will be made for elapsed time and when premiums are actually paid when calculating Account Values between anniversaries. The Company will furnish any values not shown in the Illustration or annual statement of Account Values upon request.

**MODIFICATION OF POLICY.** The Company may change or modify any terms and conditions of the Policy or its Riders provided such change or modification is limited to the right to conform to any requirements of the Internal Revenue Service or any other federal or state agency, or to liberalize the provisions of this Policy, or to make any change applicable to new Participants or future increases in coverage for existing Participants. No one can change the Policy or any Riders attached thereto except the Company's President, a Vice President, or Secretary.

SECTION III - GROUP PERMANENT INSURANCE DEATH
BENEFIT AND PREMIUM PROVISIONS

**GROUP PERMANENT INSURANCE DEATH BENEFIT:** The face amount of the Group Permanent Death Benefit is equal to the initial face amount of Group Permanent Life Insurance as shown on the Certificate plus the face amount of any Paid-Up Additions. **OPTION A:** As shown in the Certificate, the Group Permanent Death Benefit on the Participant will be the greater of: (1) The face amount; or (2) The amount determined in accordance with Table B. **OPTION B:** As shown in the Certificate, the Group Permanent Death Benefit on the Participant will be the greater of: (1) The face amount plus the Ultimate Cash Value (including any Excess Account Values); or (2) The amount determined in accordance with Table B. **OPTION C:** As shown in the Certificate, the Group Permanent Death Benefit on the Participant will be the greater of: (1) the face amount plus the Excess Account Values, if any; or (2) the amount determined in accordance with Table B.

**PREMIUM PAYMENT CONDITIONS:** All premiums are payable in advance by check made payable only to the Company. The first premium on the Policy or any of its Riders must be paid while the health of the insured Participant is as stated in the application. Otherwise, the coverage will not go into force. The Company will ignore the difference in health, however, if it does not, in the Company's opinion, put the Company at any greater risk under the Policy or its Riders. After that, each premium is due at the end of the period for which the premium(s) before it was paid. If the insured Participant dies on or before the date a premium is due, the Owner does not have to pay that particular premium.

If a Certificate under this Policy or its Rider(s) is issued in any jurisdiction in which a limitation of employee contribution is required, then, in that event, the contribution by an employee toward the cost of his or her insurance may not exceed forty (40) cents per one thousand dollars ($1,000) insured amount per month.

**RISK INSURANCE AMOUNT AND RISK CHARGE:** On each monthly anniversary of each Participant's Coverage Effective Date, the Monthly Risk Charge will be determined for the following month on the following basis:

    1.) The Risk Insurance Amount shall mean the sum of: (a) the amount of Group Permanent Death Benefit less the accumulated amount of Current Cash Values; and (b) the Death Benefit of any Group Life Insurance Rider; and (c) the Death Benefit of any Group Term Insurance Rider; and (d) any other Death Benefit provided to such participant under this Policy or any of its other Riders, less the accumulated amount of any applicable Account Values.

    2.) The Risk Rate applicable to the insured Participant for each Accounting Year shall be based on the age at the beginning of the Accounting Year and obtained (a) from the Table of Maximum Risk Rates Per $1,000 applicable to the Group Permanent Policy and/or any applicable term Rider(s); or (b) from such lower rate(s) as may be declared by the Company for such coverage based on factors such as continuing good health, non-smoker, volume, or such other factors as the Company may recognize from time to time.

G-DRL 0150-6    (5/86) [GSL002/W2]



3.)  The Monthly Risk Charge for the Group Permanent Certificate or any applicable Rider(s) shall be determined as: (a) the applicable Risk Rate; times (b) any special class rating; plus (c) any flat extra amount; times (d) the respective Risk Insurance Amount, using the Risk Insurance Amounts and the respective Risk Rates applicable to said Group Permanent Certificate and/or the Risk Rate(s) applicable to any Rider(s).

The Risk Charge for the Group Permanent Certificate shall be subtracted from the Account Values on a monthly basis starting with the first such deduction on the Participant's Coverage Effective Date.  In addition, the Risk Charge for any Riders to the Policy on the life of the Participant or other family members may be deducted from the Account Values if agreed to by the Owner(s), unless such Risk Charge has been paid by any other person or entity.

**DETERMINING GROUP PERMANENT PREMIUMS.**  There shall be determined, based on the interest and/or other assumptions selected by the Owner, the premiums which shall be due and payable and which, if paid on a timely basis, should be sufficient in the aggregate to maintain the Account Values, net of any applicable taxes, Loading Charges and policy fees at the levels necessary for:  the payment of any applicable Risk Charges, Administrative Charges and monthly service charges; and the continuation of the life insurance and any other benefits provided to the Participant(s) as shown in the Certificate(s).  The choice of any interest or other assumption(s) by the Owner in determining the premiums in no way assures that the Account Values will be adequate to provide for the applicable charges and/or the continuation of the life insurance or other benefits.  The Company makes no warranty or representation regarding the adequacy or the reasonableness of any of the assumptions selected by the Owner or the sufficiency of the premiums.  Although all the anticipated annual premiums continue to be paid, the actual Death Benefits, and Account Values, may be more or less than those shown in the Participant's Illustration, if the Risk Charge deducted from, and/or actual rate of net interest earnings credited to, each Participant's Account Values are more or less than the assumed rate of return selected by the Owner, or the assumed Risk Charge.

**CHANGES IN GROUP PERMANENT PREMIUMS.**  Upon giving 31-days' notice to the Company, the Owner may elect to increase or decrease the premium in the event that (1) the age or amount of life insurance has been changed or misstated; (2) the Targeted Paid-Up Date is changed; or (3) any change is made with respect to any actuarial assumption including those with regard to interest, expense, mortality or turnover.  However, a change in interest and/or premium assumptions by an Owner cannot be made more than once in any Accounting Year.

**UNSCHEDULED GROUP PERMANENT PREMIUM PRIVILEGE.**  At any time the Owner may enrich the Participant's benefits through the payment of an unscheduled premium subject to a minimum of $1,000 and the agreement of the Company.  Such premium(s) is voluntary and in addition to any other premiums due.  Any unscheduled premium may be used to:  (1) shorten the premium payment period; and/or (2) lower future premiums; and/or (3) provide additional coverage before, after, or on the Targeted Paid-Up Date subject to evidence of insurability satisfactory to the Company; and/or (4) increase the Account Values.

**REFUSAL OF PREMIUMS.**  The Company reserves the right at any time to refuse to accept a premium if as a result of its acceptance the Death Benefit would not be in compliance with applicable Federal Law or Regulations of the Internal Revenue Service.

SECTION IV - ACCOUNT VALUES; GUARANTEED MAXIMUM  EXPENSES;
INTEREST AND EXCESS INTEREST CREDITED
TO ACCOUNT VALUES; USE OF SURPLUS INTEREST;
CHANGES IN INTEREST EARNINGS STRATEGY

**ESTABLISHING THE ACCOUNT.**  There shall be established for each Participant an Account to be administered by the Company in accordance with this Policy incorporating the Ultimate and Current Cash Values (which include the Excess Account Values).  This Account will be credited with premiums paid, net of any applicable Loading Charges, policy fees, and taxes.  The Company shall credit interest on the Account Values and shall deduct from the Account Values the Administrative Charge, any applicable Risk Charge and monthly service charge, as reflected in the account values shown in the Illustration.  The Ultimate Cash and Excess Account Values represent the accumulation of policy values assuming a levelized amortization of costs and expenses.  In the event of early withdrawals the Ultimate Cash and Excess Account Values will be adjusted by the Premature Withdrawal Penalty shown in the Illustration or in the Table of Premature Withdrawal Penalties which are attached to and made part of the Certificate.  Each year the Company may prepare a statement showing the balance of the Account Values for each Participant.

3899-05-0C-000148-0009-0001688

G-DRL 0150-7      (5/86) [GSL002/W2]



"Excess Account Values" are created by unscheduled premiums and are included in the Account Values. The Excess Account Values are an amount (not to exceed the Current Cash Value) which equals (1)-(2) where (1) is the sum of any unscheduled premiums paid, net of any applicable taxes and Loading Charges, plus interest and Excess Interest thereon; and (2) is any applicable Administrative Charges, Risk Charges, monthly service fees, and any prior withdrawals of Excess Account Values or use of Surplus Interest thereon other than option 4 (account value additions). Any Excess Account Values may be withdrawn by the Owner at any time upon 30 days' written notice to the Company subject to any applicable Market Value Equity Concept adjustment and/or Premature Withdrawal Penalty and/or Surrender Charge as specified in the Participant's Illustration and/or Table of Premature Withdrawal Penalties or Surrender Charges which is attached to and made part of the Certificate. Any withdrawals of Excess Account Values which total less than 10% of the Excess Account Value on an annual basis are not subject to any Surrender Charge or Market Value Equity Concept adjustment. The Company may require that such withdrawals be taken within 30 days of any anniversary of a Coverage Effective Date. The Company has the right to automatically reduce the face amount of the Death Benefits by an amount equal to the Unscheduled Premium withdrawal if the Risk Insurance Amount would be increased by such withdrawal. If it is necessary to reduce the face amount as a result of withdrawals of Excess Account Values, such reductions in the face amount will be made on a first-in first-out basis.

MAXIMUM GUARANTEED LOADING AND ADMINISTRATIVE CHARGES: The Company shall withdraw on a monthly basis from the Account Values an Administrative Charge in an amount not to exceed the greater of: (1) 1.5% of the Account Values per annum; or (2) 10% of the annual Interest earnings. The Company at its sole discretion may by written agreement signed by an officer agree to charge a lesser Administrative Charge. The applicable Loading Charge for marketing and other expenses will be deducted from the premiums paid and/or Account Values. The tables of Guaranteed Annual Premiums Required to Accumulate $1,000 of Principal which are based on and define the Loading Charges, and the tables of guaranteed Sufficient Values Per $1,000 Insurance applicable to the particular Participating Employer's Program of group insurance, will be attached to and made a part of the Participant's Certificate. The Guaranteed Administrative Charge and the Guaranteed Loading Charges and the policy fees based upon the Company's rates in effect on the Participant's Coverage Effective Date that apply to a Participant's Account Values, are reflected in the Illustration attached to such Certificate.

ACCOUNT VALUES; INTEREST AND EXCESS INTEREST CREDITED TO ACCOUNT VALUES. The Company will invest the Policy reserves in its sole discretion but will attempt to recognize the Owner's preference as indicated in the Participant's application. The assets held under the Policy will at all times remain the sole property of the Company. The effective annual "Interest Earnings Rate" for a particular interest earnings strategy, shall be determined net of direct investment expenses and any taxes which may be levied on investment income, and shall be applied to the accumulated balance of the Account Values for each respective Participant held in that interest earnings strategy. The Interest Earnings Rate will be related only to the Company's overall portfolio performance for the particular interest earnings strategy(ies) underlying the Participant's Account Values, and shall have no individual investment characteristics whatsoever. Neither the Policyholder, nor the Participating Employer, nor the Participant, nor the Owner, will have any right to direct the Company concerning any investments owned by the Company in any of the interest earnings strategies. The Interest Earnings Rate will be credited in full, first to the 4% minimum guarantees or such higher guaranteed rate as the Company may declare from time to time, and then to Excess Interest for that Participant's Certificate. The payment of Excess Interest (in excess of the guaranteed rates) for any period does not guarantee that such Excess Interest will be credited in future periods. However, the Company guarantees that the interest earnings rate applicable to any particular premium paid in accordance with this policy shall be guaranteed for a period of one year from the date such premium is paid, except that such guarantee shall be limited to six months in the case of any premium paid when preference for a money market interest earnings strategy has been indicated by the Participant.

USE OF INTEREST EARNINGS IN EXCESS OF PREMIUM ASSUMPTIONS. On the anniversary of each Accounting Year prior to the Targeted Paid-Up Date, "Surplus" interest earnings on the Current Cash Value which are attributable to the immediately preceding Accounting Year, which are in excess of the interest earnings assumptions selected by the Owner to determine Group Permanent Premiums may be applied by the Owner on behalf of the Participant under the Group Permanent Certificate in any of these ways:

1.  PREMIUM PAYMENT - To pay part or all of the annual premium currently due. Any amounts in excess of the premium due will be added to the Account Values or may be withdrawn in cash.

2.  PAID-UP ADDITIONS - To establish additions to the face amount of the Group Permanent Death Benefit prior to the Targeted Paid-Up Date. Such additions will be calculated from the table of Sufficient Values Per $1,000 Insurance at the then attained age and interest assumption chosen by the Owner for premiums before the Targeted Paid-Up Date. The values attributable to these additions will remain in the Participant's Account and share in Excess Interest and be available at the Targeted Paid-Up Date for application to the Paid-Up Option selected by the Owner.

3.  CASH - To be paid in cash.

G-DRL 0150-8     (5/86) [GSL002/W2]

3899-05-00-0000148-0010-0001689

4.   ACCOUNT VALUE ADDITIONS - To increase the Account Values and/or reduce the premium payment period.

5.   FIFTH INTEREST OPTION - To purchase additional one year term insurance.

The Owner may change the use of such Surplus Interest upon giving written notice to the Company at least 31 days prior to any Accounting Year Anniversary. Such change may be subject to evidence of insurability satisfactory to the Company if such change would increase the Risk Insurance Amount. If no election is made, Surplus Interest will automatically be used to increase the Account Values.

LIMITATION ON CHANGES IN INTEREST EARNING STRATEGY.  The Owner may upon giving thirty-one (31) days' notice advise the Company of a change in interest earning strategy for their Account Values.  No change in interest earning strategy used by the Company for reserves under this Policy will be made more than twice in any Accounting Year as to each particular Participant's Certificate unless such change is the automatic result of a request for a policy loan.  The Company may cease to accept premiums for a particular interest earning strategy upon giving of written notice to that effect whereupon any new premiums on behalf of the Participant will be accepted subject to the terms and conditions in existence for other new premiums received by the Company in respect of the interest earning strategy(ies) available at that time.  When a change in interest earning strategy is effected as a result of the Owner's request, or a change arises from transfers to the Policy Loan Interest Earning Strategy, the Company reserves the right to adjust the amount of the Account Values being transferred to a different interest earning strategy by the Market Value Equity Concept adjustment.

### SECTION V - POLICY LOANS

AMOUNT AVAILABLE FOR LOANS.  The amount available to the Owner for loans will be at least 95% of the adjusted Current Cash Value, which includes the Current Cash Value of any paid up additions and any Excess Account Values.  The adjusted Current Cash Value will be determined as an amount after the Account Value has been transferred to the Policy Loan Interest Earnings Strategy, less: (1) any due and unpaid premium as of the loan date to pay the Certificate to its next Accounting Year anniversary, which shall become a loan subject to loan interest; and (2) any loan interest to the next Accounting Year anniversary; and (3) any monthly charges to the next Accounting Year anniversary.

TERMS OF POLICY LOANS.  The Company will give a Policy Loan on the sole security of the Participant's Certificate if: (1) written request is made for a loan by the Owner of the Participant's Certificate; (2) the Participant's Certificate is in force; (3) the Account has a Current Cash Value; and (4) the Owner has completed the documentation required by the Company.  Any portion of the Current Cash Values which is loaned will automatically be regarded as a request to transfer a sufficient portion of the Account Value from the selected interest earning strategy to the "Policy Loan Interest Earning Strategy", subject to the conditions on "Limitation on Changes in Interest Earnings Strategy" in section IV of the Policy.  The resulting net amount, equal to the loan, will be held in the Policy Loan Interest Earnings Strategy until such loan is repaid.  Policy loans will be regarded as applying to any Current Cash Values attributable to premiums other than unscheduled premiums; and thereafter to any Account Values under a Participant's Certificate.  Any Policy loans outstanding will be deducted from any Death Benefits payable.

LOAN INTEREST.  Interest, payable in advance, will be charged on a loan, and shall be due and payable on each Accounting Year anniversary; subject however to the restriction that the maximum rate charged will not exceed the greater of Moody's Corporate Bond Yield Average or the Interest Earnings Rate credited to that portion of the Account Values held under the Policy Loan Interest Earnings Strategy, which will never be less than fifteen percent (15%).  The interest rate charged, and credited to loaned Account Values, may be changed from time to time, but not more often than once every three (3) months.  Interest not paid when due will be treated as an automatic request for an additional loan and accounted for under the terms of this section in the same way as a request for a new loan.

LOAN REPAYMENT.  All or any part of a loan may be repaid by payments of at least $100 at any time the insured Participant is alive and the Certificate is in force.

DEFERMENT.  The Company has the right to delay making any loan, except for a loan to pay a premium, for up to six months after the date the loan is requested.

RIGHT OF TERMINATION.  If indebtedness at any time exceeds the amount available for Loans, the Company will have the right to terminate the Certificate without further value 31 days after notice of termination has been mailed to the last known address of the Owner and of any assignee of record.



## SECTION VI - WITHDRAWALS AND SETTLEMENT OPTIONS

**VALUE AVAILABLE FOR APPLICATION TO PAID-UP/SETTLEMENT OPTIONS.** The amount available for application to any Paid-Up/Settlement Option will be the Death Benefit proceeds, or the Current Cash Value calculated as of the date of such application. If not paid in a lump sum, Death Benefit proceeds may only be applied to Option 4. Current Cash Values may be applied by the Owner to any of the Paid Up/Settlement Options, and the Owner may request a change from one option to another for the application of the Participant's Current Cash Values at any time prior to the Paid Up Date. Values under Option 1 and Option 2 will be subject to existing indebtedness and assignment.

**PAID-UP/SETTLEMENT OPTIONS**

**OPTION 1 - Universal Option:** If Option 1 is selected by the Owner, the Company will withdraw from the Participant's Account Values such amount as may be required in accordance with the Company's Risk Rates in effect at that time to pay the Risk Charge on the Risk Insurance Amount attributable to the Group Permanent life insurance on the Participant including the face amount of any Paid-Up Additions and term Riders. If agreed to by the Owner(s), the Risk Charge attributable to any term Certificate on the Participant or any other family member of the Participant may be deducted from the Account Values of the Participant or such other family member. If the Participant's Current Cash Value at any withdrawal date is insufficient to fully pay the Company's then required Risk Charge, policy fees and loan interest, if any, for the following year the Company shall notify the Owner of the amount of the deficiency and request payment. If the deficiency is paid within 31 days after the date of request, the coverage will remain in force in the same manner and with the same effect as if there had been no deficiency. If the deficiency amount is not paid within the stated time, the Certificate will terminate without further value 31 days after notice of termination has been mailed to the last known address of the Owner and any assignee of record.

**OPTION 2 - Interest Sufficiency Option:** If Option 2 is selected by the Owner, the Company will apply to paid up status a level "Amount" of life insurance coverage based on the Current Cash Values, the interest assumptions selected by the Owner and the table of Sufficient Values Per $1,000 Insurance. The maximum Amount of life insurance coverage placed on paid up status will be (1) + (2), where (1) is the Risk Insurance Amount described by the Certificate(s) on the Participant on the Targeted Paid Up Date including the face amount of any Paid-Up Additions and term Riders; and (2) is the Current Cash Value applied under this Option. If in any Accounting Year the cumulative net interest earnings credited on the Current Cash Value (net of the Administrative Charge and the applicable policy fees), expressed as a net rate of return thereon, is equal to or greater than the interest rate assumption selected by the Owner for the purpose of calculating such Amount, then the Current Cash Values will remain sufficient to maintain such Amount in Paid Up status. If in any subsequent Accounting Year the cumulative net interest earnings is less than the interest earnings resulting from the assumption selected, the Owner must pay the shortfall determined by the Company, or else:

(1) the life insurance coverage will be multiplied by a fraction, the numerator of which is the Current Cash Value, and the denominator of which is the amount required in the table of Sufficient Values Per $1,000 Insurance applicable on the beginning of the next Accounting year based on the interest assumption selected by the Owner; or
(2) if requested by the Owner, the Company will switch the Participant's Current Cash Values to another Paid Up Option.

**OPTION 3 - Full Guaranteed Option:** If Option 3 is selected by the Owner, the Company will apply to Paid-Up Status a level Amount no greater than (1) + (2), where (1) is the Risk Insurance Amount described by the Certificate(s) on the Participant on the Targeted Paid-Up Date, including the face amount of any Paid-Up Additions and term Riders; and (2) is the Current Cash Value applied under this Option. The Current Cash Value applied under this Option will be net of any outstanding indebtedness unless otherwise agreed to by the Company. The Amount will be based on the Company's rates at that time and the Current Cash Value available at the time this Option is elected and given effect.

The table of Sufficient Values Per $1,000 Insurance, attached to the Policy from time to time, shows in the column headed "GUARANTEED MAXIMUM" the maximum amount which is guaranteed by the Company to be sufficient if paid as a single sum under Option 3 to pay up $1,000 (one thousand U.S. dollars) of life insurance coverage at the respective ages shown in the table. After this Option has been exercised Current Cash Values and any Amount Available For Loans will be determined by the Company's actuary.

If the Amount calculated under the preceding options includes all or a portion of the life insurance coverage provided under any of the Riders, the Death Benefit under those Riders will be reduced to such Amount as will ensure that the Company does not have any greater Risk Insurance Amount than existed prior to the exercise of these options.

3689-05-00-00001149-0012-0001691



Option 4 - Payments at Intervals: The death proceeds or Current Cash Value which is withdrawn from the Account and applied to any interval payment alternative must be at least $10,000 and periodic payments to any payee must be at least $100. If proceeds are payable to an administrator, association, corporation, executor, partnership or trustee, a lump sum payment will be made unless the Company agrees to an alternative payment. An assignee's portion of proceeds must be paid in a lump sum. The balance of proceeds may be paid under an alternative. If payment is being made under an alternative payment arrangement no part of any payment may be alienated, anticipated, assigned, commuted, encumbered or withdrawn, unless the Company agrees.

The following interval payment alternatives are available:

1.   Interest Alternative: (a) interest is compounded annually on the proceeds held by the Company and principal and total interest are paid at the end of an agreed upon period; or (b) interest is paid at the end of each month on the proceeds held by the Company and the principal and any unpaid accrued interest are paid at the end of an agreed upon period.

2.   Installment Alternative: (a) installments are paid at the beginning of each month of a fixed amount until the proceeds and compounded interest are all paid out; or (b) installments are paid at the beginning of each month for a fixed period.

3.   Life Income Alternative: (a) installments are paid at the beginning of each month during the payee's lifetime; or (b) installments are paid at the beginning of each month during the payee's lifetime, and are continued during the balance of the 'period certain'; or (c) installments are paid at the beginning of each month during the payee's and the joint payee's lifetime.

   Under this option, evidence of each payee's age satisfactory to the Company is required before the first installment is made. Also, the Company may require proof each time an installment is to be made that the payee(s) is then alive. Payments under this option are based on 1971 Group Annuity Mortality Tables at 4% interest.

4.  Other Alternatives: any other alternative agreed to by the Company may be elected.

The amounts payable under any of the alternatives above will be determined by the Company upon written request by the Owner or Beneficiary. The guaranteed effective annual interest rate under alternative 1, 2 and 3 is 4% or such greater guaranteed rate as the Company may establish from time to time. Interest in excess of 4% may be declared by the Company, at its sole discretion, to be payable under any of the interval payment alternatives. Should the Company declare interest in excess of 4% on interval payment amounts for any group of policies or certificate holders, at any time, certificate holders under this group Master Policy will receive at least such greater amount of interest.

Upon written request before payments begin, any alternative paying monthly installments may be changed to make quarterly, semi-annual or annual installments.

   OPTION 5 - Surrender for Cash. Any Group Permanent Certificate may be surrendered for its Current Cash value less any Policy Loans outstanding, and any applicable surrender charges. The Company reserves the right to adjust the Current Cash Value, in the event of such surrender, by the amount of any Market Value Equity Concept adjustment. However, the Company guarantees that in no event will the Current Cash Value, after application of the Market Value Equity Concept adjustment, but before deduction of any Policy Loans or applicable surrender charges, be less than the sum of the participant's Net Principal Payments corresponding to such Current Cash Value accumulated at 4% interest per annum. For this purpose, Net Principal Payments are defined as premiums paid less applicable Loading Charges, Administrative Charges, Taxes, and a proportionate share of applicable Risk Charges, monthly service charges, and annual policy fees. The Owner must return the Certificate to the Company's Regional Office and complete the Company's requirements for surrendered Certificates. The Company has the right to delay making any payments for up to six months from the date surrender is requested and in accordance with established rules has the right to deduct a surrender charge as shown in the Participant's illustration and/or the Table of Surrender Charges which is a part of the Group Permanent Certificate being surrendered.

3699-05-00-0000148-0013-0001692



GENERAL SERVICES LIFE INSURANCE COMPANY
DIRECT RECOGNITION LIFE I–SMOKER
SUFFICIENT VALUES PER $1000 INSURANCE AT SELECTED PAID UP AGES AND DIFFERENT ASSUMED
NET RATES OF INTEREST (SEE EXPLANATION BELOW*)

### SMOKER SUFFICIENT VALUE PER $1000 INSURANCE ASSUMING INTEREST AT:

| Paid Up Age | Guaranteed Maximum | 6.0% | 7.0% | 8.0% | 9.0% | 10.0% | 11.0% | 12.0% | 13.0% | 14.0% |
|---|---|---|---|---|---|---|---|---|---|---|
| 90 | 885.93 | 815.33 | 791.12 | 768.39 | 747.03 | 726.03 | 708.00 | 690.14 | 673.29 | 657.35 |
| 89 | 880.59 | 804.82 | 779.61 | 756.03 | 733.95 | 713.23 | 693.77 | 675.47 | 658.25 | 642.01 |
| 88 | 874.98 | 794.72 | 768.57 | 744.20 | 721.45 | 700.16 | 680.24 | 661.55 | 644.00 | 627.49 |
| 87 | 868.69 | 784.73 | 757.69 | 732.56 | 709.16 | 687.35 | 666.97 | 647.91 | 630.06 | 613.30 |
| 86 | 861.62 | 774.65 | 746.71 | 720.83 | 696.80 | 674.46 | 653.65 | 634.22 | 616.07 | 599.07 |
| 85 | 853.91 | 764.28 | 735.44 | 708.80 | 684.13 | 661.26 | 640.00 | 620.21 | 601.76 | 584.51 |
| 84 | 845.92 | 753.50 | 723.79 | 696.31 | 671.00 | 647.59 | 625.86 | 605.72 | 586.96 | 569.47 |
| 83 | 837.66 | 742.27 | 711.54 | 683.33 | 657.36 | 633.40 | 611.24 | 590.71 | 571.64 | 553.91 |
| 82 | 829.21 | 730.59 | 698.90 | 669.89 | 643.26 | 618.75 | 596.15 | 575.25 | 555.69 | 537.91 |
| 81 | 820.56 | 718.59 | 685.94 | 656.14 | 628.86 | 603.83 | 580.80 | 559.56 | 539.94 | 521.75 |
| 80 | 811.70 | 706.37 | 672.77 | 642.20 | 614.30 | 588.78 | 565.85 | 543.61 | 523.94 | 505.58 |
| 79 | 802.69 | 693.96 | 659.44 | 628.14 | 599.65 | 573.64 | 549.88 | 528.06 | 507.99 | 489.49 |
| 78 | 793.41 | 681.37 | 645.97 | 613.95 | 584.92 | 558.51 | 534.40 | 512.35 | 492.11 | 473.49 |
| 77 | 783.79 | 668.56 | 632.26 | 599.59 | 570.04 | 543.23 | 518.83 | 496.57 | 476.20 | 457.50 |
| 76 | 773.82 | 655.41 | 618.27 | 584.92 | 554.95 | 527.68 | 503.03 | 480.58 | 460.10 | 441.34 |
| 75 | 763.55 | 641.84 | 603.85 | 569.95 | 539.32 | 511.78 | 486.89 | 464.29 | 443.71 | 424.93 |
| 74 | 752.81 | 627.94 | 588.11 | 554.50 | 523.51 | 495.66 | 470.55 | 447.83 | 427.20 | 408.40 |
| 73 | 741.66 | 613.59 | 574.05 | 538.65 | 507.44 | 479.31 | 454.02 | 431.21 | 410.55 | 391.76 |
| 72 | 730.21 | 599.17 | 558.75 | 522.69 | 491.20 | 462.83 | 437.40 | 414.53 | 393.88 | 375.18 |
| 71 | 718.43 | 584.48 | 543.33 | 507.06 | 474.94 | 446.37 | 420.85 | 397.97 | 377.38 | 358.77 |
| 70 | 706.37 | 569.73 | 527.90 | 491.17 | 458.78 | 430.07 | 404.51 | 381.67 | 361.18 | 342.71 |
| 69 | 694.39 | 554.98 | 512.53 | 475.42 | 442.81 | 414.02 | 388.48 | 365.73 | 345.37 | 327.09 |
| 68 | 682.53 | 540.29 | 497.29 | 459.65 | 427.03 | 398.26 | 372.79 | 350.17 | 330.01 | 311.95 |
| 67 | 670.87 | 525.69 | 482.21 | 444.51 | 411.65 | 382.66 | 357.51 | 335.07 | 315.13 | 297.32 |
| 66 | 658.78 | 511.15 | 467.24 | 429.34 | 396.45 | 367.73 | 342.54 | 320.32 | 300.64 | 283.12 |
| 65 | 646.72 | 496.62 | 452.35 | 414.30 | 381.42 | 352.82 | 327.83 | 305.87 | 286.47 | 269.26 |
| 64 | 634.88 | 482.09 | 437.50 | 399.38 | 366.53 | 338.10 | 313.84 | 291.66 | 272.56 | 255.70 |
| 63 | 623.17 | 467.57 | 422.73 | 384.54 | 351.81 | 323.59 | 299.10 | 277.74 | 259.00 | 242.48 |
| 62 | 611.57 | 453.11 | 408.06 | 369.69 | 337.31 | 309.33 | 285.15 | 264.13 | 245.76 | 229.61 |
| 61 | 600.13 | 438.79 | 393.62 | 355.51 | 323.13 | 295.44 | 271.61 | 250.96 | 232.88 | 217.22 |
| 60 | 588.85 | 424.67 | 379.43 | 341.44 | 309.32 | 281.96 | 258.51 | 238.27 | 220.69 | 205.35 |
| 59 | 577.62 | 410.78 | 365.54 | 327.73 | 295.91 | 268.93 | 245.88 | 226.07 | 208.93 | 194.02 |
| 58 | 566.39 | 397.17 | 351.98 | 314.41 | 282.94 | 256.36 | 233.76 | 214.40 | 197.72 | 183.24 |
| 57 | 555.09 | 383.83 | 338.76 | 301.48 | 270.39 | 244.26 | 222.13 | 203.25 | 187.03 | 173.00 |
| 56 | 543.60 | 370.70 | 325.81 | 288.87 | 258.21 | 232.55 | 210.90 | 192.51 | 176.77 | 163.20 |
| 55 | 532.19 | 357.78 | 313.12 | 276.55 | 246.35 | 221.18 | 200.04 | 182.15 | 166.89 | 153.78 |
| 54 | 520.49 | 345.06 | 300.67 | 264.52 | 234.80 | 210.15 | 189.53 | 172.14 | 157.37 | 144.72 |
| 53 | 508.70 | 332.52 | 288.46 | 252.75 | 223.55 | 199.43 | 179.35 | 162.48 | 148.19 | 136.00 |
| 52 | 496.89 | 320.19 | 276.49 | 241.28 | 212.61 | 189.05 | 169.51 | 153.16 | 139.34 | 127.63 |
| 51 | 485.11 | 308.11 | 264.82 | 230.13 | 202.02 | 179.03 | 160.04 | 144.22 | 130.92 | 119.64 |
| 50 | 473.30 | 296.30 | 253.47 | 219.33 | 191.81 | 169.40 | 150.97 | 135.68 | 122.87 | 112.05 |
| 49 | 461.47 | 284.79 | 242.48 | 208.89 | 181.99 | 160.17 | 142.32 | 127.56 | 115.24 | 104.87 |
| 48 | 449.58 | 273.58 | 231.79 | 198.84 | 172.55 | 151.35 | 134.07 | 119.84 | 108.01 | 98.09 |
| 47 | 437.73 | 262.68 | 221.47 | 189.15 | 163.50 | 142.92 | 126.22 | 112.52 | 101.18 | 91.69 |
| 46 | 425.94 | 252.08 | 211.48 | 179.82 | 154.83 | 134.87 | 118.74 | 105.57 | 94.71 | 85.65 |
| 45 | 414.26 | 241.79 | 201.83 | 170.85 | 146.52 | 127.18 | 111.63 | 98.98 | 88.59 | 79.96 |
| 44 | 402.70 | 231.78 | 192.48 | 162.20 | 138.54 | 119.83 | 104.84 | 92.71 | 82.78 | 74.56 |
| 43 | 391.28 | 222.06 | 183.45 | 153.88 | 130.90 | 112.81 | 98.39 | 86.77 | 77.29 | 69.47 |
| 42 | 379.99 | 212.61 | 174.73 | 145.87 | 123.57 | 106.10 | 92.25 | 81.12 | 72.08 | 64.65 |
| 41 | 368.85 | 203.47 | 166.33 | 139.20 | 116.57 | 99.72 | 86.42 | 75.76 | 67.17 | 60.12 |
| 40 | 357.89 | 194.61 | 158.23 | 130.83 | 109.88 | 93.85 | 80.89 | 70.73 | 62.54 | 55.86 |
| 39 | 347.11 | 186.05 | 150.43 | 123.77 | 103.51 | 87.88 | 75.66 | 65.96 | 58.18 | 51.85 |
| 38 | 336.50 | 177.79 | 142.96 | 117.04 | 97.45 | 82.43 | 70.72 | 61.49 | 54.10 | 48.11 |
| 37 | 326.11 | 169.84 | 135.81 | 110.64 | 91.72 | 77.28 | 66.10 | 57.30 | 50.30 | 44.64 |
| 36 | 315.93 | 162.20 | 129.97 | 104.55 | 86.30 | 72.44 | 61.75 | 53.39 | 46.75 | 41.41 |
| 35 | 306.04 | 154.88 | 122.46 | 98.79 | 81.19 | 67.90 | 57.71 | 49.76 | 43.48 | 38.44 |
| 34 | 296.42 | 147.67 | 116.28 | 93.35 | 76.40 | 63.57 | 53.95 | 46.40 | 40.46 | 35.71 |
| 33 | 287.14 | 141.19 | 110.43 | 88.23 | 71.92 | 59.73 | 50.47 | 43.31 | 37.70 | 33.23 |
| 32 | 278.17 | 134.82 | 104.88 | 83.41 | 67.73 | 56.07 | 47.25 | 40.47 | 35.17 | 30.98 |
| 31 | 269.57 | 128.76 | 99.64 | 78.90 | 63.83 | 52.69 | 44.30 | 37.87 | 32.87 | 28.92 |
| 30 | 261.27 | 123.01 | 94.72 | 74.68 | 60.21 | 49.57 | 41.59 | 35.51 | 30.80 | 27.08 |
| 29 | 253.31 | 117.57 | 90.09 | 70.75 | 56.86 | 46.70 | 39.13 | 33.37 | 28.92 | 25.43 |
| 28 | 245.67 | 112.43 | 85.76 | 67.10 | 53.79 | 44.09 | 36.89 | 31.45 | 27.26 | 23.98 |
| 27 | 238.35 | 107.59 | 81.72 | 63.73 | 50.97 | 41.72 | 34.89 | 29.74 | 25.79 | 22.70 |
| 26 | 231.34 | 103.06 | 77.98 | 60.65 | 48.42 | 39.60 | 33.11 | 28.25 | 24.52 | 21.62 |
| 25 | 224.61 | 98.84 | 74.53 | 57.84 | 46.12 | 37.72 | 31.57 | 26.96 | 23.45 | 20.72 |

*EXPLANATION–THE FIGURES SHOWN ABOVE ARE THE AMOUNTS WHICH, IF PAID AS A SINGLE PREMIUM AT THE STATED AGE AND IF THE ASSUMED RATE OF NET INTEREST IS EARNED THEREON, WILL BE SUFFICIENT TO PAY FOR $1000 OF PAID UP LIFE INSURANCE COVERAGE. THE COMPANY GUARANTEES ONLY THE AMOUNTS SHOWN UNDER THE COLUMN "GUARANTEED MAXIMUM." THE PAID UP AGE SHOWN IS THE AGE NEAREST BIRTHDAY. THE AMOUNTS SHOWN ABOVE ASSUME THAT THE RATE OF NET INTEREST EARNINGS WILL BE EARNED CONTINUOUSLY THROUGHOUT THE PERIOD NET OF ANY TAXES ON INCOME; DIRECT EXPENSES AND THE ADMINISTRATIVE CHARGE DEFINED UNDER THE POLICY. THE THEN CURRENT POLICY FEES WILL BE PAID OUT OF THE NET ACCUMULATED ACCOUNT VALUES UNLESS OTHERWISE PAID.

G-DRL 0150-12                                                                 [GSL MISC./W2]

3699-05-00-0000148-0014-0001693



GENERAL SERVICES LIFE INSURANCE COMPANY
DIRECT RECOGNITION LIFE I--SMOKER
SUFFICIENT VALUES PER $1000 INSURANCE AT SELECTED PAID UP AGES AND DIFFERENT ASSUMED
NET RATES OF INTEREST (SEE EXPLANATION BELOW*)

SMOKER SUFFICIENT VALUE PER $1000 INSURANCE ASSUMING INTEREST AT:

| Paid Up Age | 15.0% | 16.0% | 17.0% | 18.0% | 19.0% | 20.0% | 21.0% | 25.0% |
|---|---|---|---|---|---|---|---|---|
| 90 | 642.27 | 627.99 | 614.45 | 601.61 | 589.40 | 577.80 | 566.75 | 527.50 |
| 89 | 626.68 | 612.20 | 598.51 | 585.54 | 573.24 | 561.58 | 550.49 | 511.27 |
| 88 | 611.95 | 597.30 | 583.47 | 570.40 | 558.03 | 546.32 | 535.21 | 496.04 |
| 87 | 597.56 | 582.75 | 568.80 | 555.64 | 543.21 | 531.45 | 520.32 | 481.18 |
| 86 | 583.13 | 568.17 | 554.09 | 540.84 | 528.34 | 516.53 | 505.37 | 466.37 |
| 85 | 568.38 | 553.25 | 539.05 | 525.70 | 513.13 | 501.26 | 490.09 | 450.99 |
| 84 | 553.13 | 537.85 | 523.52 | 510.08 | 497.44 | 485.53 | 474.31 | 435.22 |
| 83 | 537.37 | 521.93 | 507.48 | 493.95 | 481.24 | 469.29 | 458.05 | 418.99 |
| 82 | 521.20 | 505.62 | 491.06 | 477.45 | 464.69 | 452.71 | 441.45 | 402.49 |
| 81 | 504.87 | 489.17 | 474.53 | 460.86 | 448.07 | 436.09 | 424.84 | 386.04 |
| 80 | 488.57 | 472.77 | 458.08 | 444.39 | 431.60 | 419.63 | 408.42 | 369.88 |
| 79 | 472.38 | 456.53 | 441.82 | 428.13 | 415.38 | 403.44 | 392.29 | 354.10 |
| 78 | 456.32 | 440.45 | 425.74 | 412.08 | 399.37 | 387.52 | 376.45 | 338.69 |
| 77 | 440.29 | 424.42 | 409.75 | 396.15 | 383.51 | 371.76 | 360.79 | 323.52 |
| 76 | 424.13 | 408.28 | 393.66 | 380.13 | 367.59 | 355.94 | 345.10 | 308.37 |
| 75 | 407.72 | 391.92 | 377.36 | 363.93 | 351.51 | 339.98 | 329.27 | 293.14 |
| 74 | 391.23 | 375.50 | 361.05 | 347.74 | 335.44 | 324.06 | 313.51 | 278.03 |
| 73 | 374.69 | 359.04 | 344.72 | 331.54 | 319.41 | 308.19 | 297.91 | 263.05 |
| 72 | 358.17 | 342.67 | 328.49 | 315.49 | 303.53 | 292.51 | 282.32 | 248.35 |
| 71 | 341.91 | 326.57 | 312.57 | 299.76 | 288.01 | 277.20 | 267.22 | 234.12 |
| 70 | 326.02 | 310.88 | 297.10 | 284.52 | 273.00 | 262.42 | 252.68 | 220.50 |
| 69 | 310.61 | 295.70 | 282.16 | 269.83 | 258.57 | 248.25 | 238.77 | 207.57 |
| 68 | 295.71 | 281.06 | 267.79 | 255.74 | 244.75 | 234.71 | 225.50 | 195.32 |
| 67 | 281.36 | 267.00 | 254.03 | 242.27 | 231.58 | 221.82 | 212.89 | 183.77 |
| 66 | 267.46 | 253.41 | 240.75 | 229.30 | 218.91 | 209.45 | 200.82 | 172.76 |
| 65 | 253.93 | 240.20 | 227.87 | 216.74 | 206.66 | 197.51 | 189.17 | 162.19 |
| 64 | 240.71 | 227.32 | 215.32 | 204.53 | 194.77 | 185.93 | 177.89 | 151.98 |
| 63 | 227.84 | 214.80 | 203.15 | 192.69 | 183.27 | 174.74 | 167.00 | 142.16 |
| 62 | 215.34 | 202.68 | 191.38 | 181.27 | 172.18 | 163.97 | 156.53 | 132.76 |
| 61 | 203.35 | 191.06 | 180.14 | 170.38 | 161.62 | 153.73 | 146.60 | 123.91 |
| 60 | 191.68 | 179.99 | 169.44 | 160.04 | 151.62 | 144.06 | 137.23 | 115.60 |
| 59 | 180.86 | 169.47 | 159.30 | 150.27 | 142.19 | 134.95 | 128.43 | 107.85 |
| 58 | 170.61 | 159.53 | 149.74 | 141.07 | 133.34 | 126.42 | 120.20 | 100.65 |
| 57 | 160.80 | 150.13 | 140.73 | 132.42 | 125.03 | 118.42 | 112.50 | 93.96 |
| 56 | 151.43 | 141.16 | 132.15 | 124.19 | 117.13 | 110.84 | 105.21 | 87.64 |
| 55 | 142.44 | 132.58 | 123.94 | 116.34 | 109.61 | 103.62 | 98.27 | 81.64 |
| 54 | 133.81 | 124.35 | 116.09 | 108.83 | 102.42 | 96.73 | 91.65 | 75.93 |
| 53 | 125.52 | 116.46 | 108.56 | 101.64 | 95.54 | 90.14 | 85.33 | 70.48 |
| 52 | 117.58 | 108.90 | 101.37 | 94.78 | 88.99 | 83.87 | 79.31 | 65.31 |
| 51 | 110.01 | 101.73 | 94.55 | 88.28 | 82.79 | 77.94 | 73.63 | 60.45 |
| 50 | 102.84 | 94.93 | 88.10 | 82.16 | 76.95 | 72.37 | 68.31 | 55.91 |
| 49 | 96.07 | 88.54 | 82.05 | 76.41 | 71.49 | 67.16 | 63.34 | 51.70 |
| 48 | 89.69 | 82.53 | 76.37 | 71.04 | 66.39 | 62.31 | 58.71 | 47.80 |
| 47 | 83.69 | 76.89 | 71.05 | 66.01 | 61.63 | 57.78 | 54.40 | 44.18 |
| 46 | 78.04 | 71.58 | 66.06 | 61.30 | 57.17 | 53.56 | 50.38 | 40.82 |
| 45 | 72.72 | 66.60 | 61.38 | 56.89 | 53.00 | 49.61 | 46.63 | 37.70 |
| 44 | 67.69 | 61.90 | 56.97 | 52.74 | 49.09 | 45.90 | 43.11 | 34.78 |
| 43 | 62.96 | 57.46 | 52.83 | 48.85 | 45.42 | 42.44 | 39.83 | 32.05 |
| 42 | 58.49 | 53.31 | 48.93 | 45.19 | 41.97 | 39.18 | 36.74 | 29.49 |
| 41 | 54.29 | 49.41 | 45.29 | 41.78 | 38.76 | 36.15 | 33.87 | 27.13 |
| 40 | 50.34 | 45.74 | 41.87 | 38.58 | 35.75 | 33.31 | 31.19 | 24.92 |
| 39 | 46.64 | 42.32 | 38.68 | 35.59 | 32.93 | 30.68 | 28.70 | 22.88 |
| 38 | 43.20 | 39.13 | 35.72 | 32.83 | 30.37 | 28.25 | 26.41 | 21.00 |
| 37 | 40.01 | 36.19 | 33.00 | 30.30 | 28.00 | 26.02 | 24.31 | 19.30 |
| 36 | 37.06 | 33.47 | 30.48 | 27.96 | 25.82 | 23.98 | 22.39 | 17.75 |
| 35 | 34.35 | 30.99 | 28.19 | 25.84 | 23.84 | 22.13 | 20.66 | 16.36 |
| 34 | 31.87 | 28.72 | 26.11 | 23.92 | 22.06 | 20.47 | 19.10 | 15.13 |
| 33 | 29.63 | 26.68 | 24.24 | 22.20 | 20.47 | 18.99 | 17.72 | 14.05 |
| 32 | 27.58 | 24.82 | 22.54 | 20.64 | 19.03 | 17.66 | 16.49 | 13.08 |
| 31 | 25.75 | 23.17 | 21.04 | 19.27 | 17.77 | 16.50 | 15.41 | 12.25 |
| 30 | 24.11 | 21.69 | 19.71 | 18.06 | 16.67 | 15.48 | 14.47 | 11.54 |
| 29 | 22.64 | 20.39 | 18.53 | 16.99 | 15.70 | 14.60 | 13.65 | 10.94 |
| 28 | 21.36 | 19.25 | 17.52 | 16.08 | 14.88 | 13.85 | 12.97 | 10.44 |
| 27 | 20.25 | 18.27 | 16.66 | 15.31 | 14.19 | 13.23 | 12.41 | 10.05 |
| 26 | 19.32 | 17.46 | 15.95 | 14.69 | 13.64 | 12.74 | 11.97 | 9.76 |
| 25 | 18.55 | 16.81 | 15.39 | 14.22 | 13.23 | 12.39 | 11.67 | 9.58 |

*EXPLANATION--THE FIGURES SHOWN ABOVE ARE THE AMOUNTS WHICH, IF PAID AS A SINGLE PREMIUM
AT THE STATED AGE AND IF THE ASSUMED RATE OF NET INTEREST IS EARNED THEREON, WILL BE SUFFICIENT TO
PAY FOR $1000 OF PAID UP LIFE INSURANCE COVERAGE. THE COMPANY GUARANTEES ONLY THE AMOUNTS
SHOWN UNDER THE COLUMN "GUARANTEED MAXIMUM." THE PAID UP AGE SHOWN IS THE AGE NEAREST
BIRTHDAY. THE AMOUNTS SHOWN ABOVE ASSUME THAT THE RATE OF NET INTEREST EARNINGS WILL BE
EARNED CONTINUOUSLY THROUGHOUT THE PERIOD NET OF ANY TAXES ON NCOME; DIRECT EXPENSES AND
THE ADMINISTRATIVE CHARGE DEFINED UNDER THE POLICY. THE THEN CURRENT POLICY FEES WILL BE PAID
OUT OF THE NET ACCUMULATED ACCOUNT VALUES UNLESS OTHERWISE PAID.

G-DRL 0150-13

[GSL MISC./W2]

3699-05-00-0000148-0015-0001894



**GENERAL SERVICES LIFE INSURANCE COMPANY**
DIRECT RECOGNITION LIFE I–NONSMOKER
SUFFICIENT VALUES PER $1000 INSURANCE AT SELECTED PAID UP AGES AND DIFFERENT ASSUMED
NET RATES OF INTEREST (SEE EXPLANATION BELOW*)

NONSMOKER SUFFICIENT VALUE PER $1000 INSURANCE ASSUMING INTEREST AT:

| Paid Up Age | Guaranteed Maximum | 6.0% | 7.0% | 8.0% | 9.0% | 10.0% | 11.0% | 12.0% | 13.0% | 14.0% |
|---|---|---|---|---|---|---|---|---|---|---|
| 90 | 885.93 | 812.50 | 787.94 | 764.90 | 743.24 | 722.87 | 703.69 | 685.60 | 668.52 | 652.39 |
| 89 | 880.58 | 800.79 | 775.09 | 751.07 | 728.58 | 707.49 | 687.69 | 669.08 | 651.57 | 635.06 |
| 88 | 874.98 | 789.19 | 762.40 | 737.45 | 714.16 | 692.39 | 672.02 | 652.93 | 635.01 | 618.17 |
| 87 | 868.69 | 777.50 | 749.84 | 723.78 | 699.70 | 677.28 | 656.38 | 636.80 | 618.50 | 601.34 |
| 86 | 861.62 | 765.54 | 736.60 | 709.81 | 684.98 | 661.82 | 640.46 | 620.45 | 601.78 | 584.31 |
| 85 | 653.91 | 753.16 | 723.14 | 695.44 | 669.84 | 646.13 | 624.13 | 603.68 | 584.64 | 566.88 |
| 84 | 645.92 | 740.29 | 709.16 | 680.53 | 654.16 | 629.81 | 607.29 | 586.40 | 567.00 | 548.95 |
| 83 | 837.66 | 726.91 | 694.65 | 665.09 | 637.95 | 612.97 | 589.92 | 568.61 | 548.88 | 530.55 |
| 82 | 829.21 | 713.04 | 679.65 | 649.18 | 621.28 | 595.58 | 572.13 | 550.43 | 530.37 | 511.80 |
| 81 | 820.56 | 698.81 | 664.32 | 632.94 | 604.31 | 578.13 | 554.12 | 532.06 | 511.72 | 492.95 |
| 80 | 811.70 | 684.33 | 648.76 | 616.52 | 587.21 | 560.49 | 536.07 | 513.68 | 493.12 | 474.18 |
| 79 | 802.69 | 668.66 | 633.05 | 599.99 | 570.04 | 542.84 | 518.05 | 495.40 | 474.66 | 455.60 |
| 78 | 793.41 | 654.82 | 617.21 | 583.38 | 552.65 | 525.21 | 500.11 | 477.25 | 456.37 | 437.25 |
| 77 | 783.79 | 639.77 | 601.20 | 566.65 | 535.58 | 507.56 | 482.20 | 459.17 | 438.20 | 419.08 |
| 76 | 773.82 | 624.45 | 584.96 | 549.73 | 518.17 | 489.90 | 464.22 | 441.07 | 420.05 | 400.92 |
| 75 | 763.55 | 608.81 | 568.43 | 532.55 | 500.54 | 471.87 | 446.11 | 422.88 | 401.86 | 382.78 |
| 74 | 752.81 | 592.81 | 551.58 | 515.10 | 482.68 | 453.75 | 427.86 | 404.58 | 383.59 | 364.59 |
| 73 | 741.68 | 576.51 | 534.47 | 497.42 | 464.64 | 435.51 | 409.52 | 386.24 | 365.32 | 346.45 |
| 72 | 730.21 | 560.00 | 517.18 | 479.63 | 446.54 | 417.26 | 391.23 | 368.00 | 347.20 | 328.49 |
| 71 | 718.43 | 543.38 | 499.87 | 461.88 | 428.55 | 399.17 | 373.17 | 350.05 | 329.41 | 310.92 |
| 70 | 706.37 | 526.78 | 482.65 | 444.30 | 410.80 | 381.39 | 355.47 | 332.51 | 312.10 | 293.88 |
| 69 | 694.39 | 510.28 | 465.60 | 426.96 | 393.37 | 364.01 | 338.23 | 315.48 | 295.34 | 277.41 |
| 68 | 682.53 | 493.91 | 448.77 | 409.93 | 376.31 | 347.06 | 321.49 | 299.02 | 279.19 | 261.51 |
| 67 | 670.67 | 477.68 | 432.17 | 393.19 | 359.62 | 330.55 | 305.24 | 283.09 | 263.61 | 246.41 |
| 66 | 658.76 | 461.59 | 415.77 | 376.74 | 343.28 | 314.44 | 289.43 | 267.65 | 248.56 | 231.76 |
| 65 | 646.72 | 445.63 | 399.59 | 360.56 | 327.28 | 298.72 | 274.07 | 252.68 | 234.02 | 217.66 |
| 64 | 634.68 | 429.83 | 383.64 | 344.69 | 311.63 | 283.41 | 259.16 | 238.20 | 219.99 | 204.06 |
| 63 | 623.17 | 414.21 | 367.94 | 329.13 | 296.37 | 268.52 | 244.71 | 224.22 | 206.48 | 191.05 |
| 62 | 611.57 | 398.82 | 352.54 | 313.94 | 281.52 | 254.11 | 230.76 | 210.77 | 193.53 | 178.59 |
| 61 | 600.13 | 383.70 | 337.49 | 299.18 | 267.14 | 240.19 | 217.36 | 197.68 | 181.17 | 166.74 |
| 60 | 588.85 | 368.89 | 322.82 | 284.93 | 253.25 | 226.81 | 204.52 | 185.59 | 169.41 | 155.50 |
| 59 | 577.62 | 354.40 | 308.55 | 270.95 | 239.67 | 213.98 | 192.25 | 173.89 | 158.26 | 144.87 |
| 58 | 566.00 | 340.25 | 294.69 | 257.54 | 226.99 | 201.88 | 180.55 | 162.77 | 147.70 | 134.84 |
| 57 | 555.09 | 326.45 | 281.23 | 244.58 | 214.61 | 189.91 | 169.38 | 152.19 | 137.69 | 125.36 |
| 56 | 543.69 | 313.00 | 268.19 | 232.08 | 202.73 | 178.56 | 158.76 | 142.17 | 128.23 | 116.44 |
| 55 | 532.19 | 299.90 | 255.58 | 220.04 | 191.33 | 167.91 | 148.64 | 132.68 | 119.29 | 108.02 |
| 54 | 520.49 | 287.17 | 243.34 | 208.45 | 180.41 | 157.58 | 139.04 | 123.66 | 110.86 | 100.11 |
| 53 | 508.70 | 274.83 | 231.50 | 197.33 | 169.98 | 147.82 | 129.95 | 115.18 | 102.94 | 92.71 |
| 52 | 496.69 | 262.88 | 220.23 | 186.69 | 160.08 | 138.69 | 121.37 | 107.20 | 95.52 | 85.79 |
| 51 | 485.11 | 251.35 | 209.33 | 176.55 | 150.64 | 129.98 | 113.30 | 99.74 | 88.60 | 79.37 |
| 50 | 473.30 | 240.24 | 188.95 | 166.89 | 141.73 | 121.78 | 105.75 | 92.78 | 82.18 | 73.43 |
| 49 | 461.47 | 229.57 | 169.02 | 157.73 | 133.32 | 114.06 | 98.69 | 86.32 | 76.24 | 67.98 |
| 48 | 449.58 | 219.31 | 179.53 | 149.03 | 125.38 | 106.82 | 92.10 | 80.30 | 70.73 | 62.90 |
| 47 | 437.73 | 209.47 | 170.48 | 140.79 | 117.89 | 100.04 | 85.94 | 74.70 | 65.63 | 58.24 |
| 46 | 425.94 | 200.02 | 161.84 | 132.96 | 110.83 | 93.66 | 80.19 | 69.49 | 60.90 | 53.92 |
| 45 | 414.26 | 190.94 | 153.61 | 125.54 | 104.17 | 87.68 | 74.81 | 64.64 | 56.51 | 49.94 |
| 44 | 402.70 | 182.24 | 145.76 | 118.52 | 97.89 | 82.08 | 69.80 | 60.14 | 52.46 | 46.27 |
| 43 | 391.29 | 173.90 | 138.29 | 111.86 | 91.98 | 76.82 | 65.12 | 55.85 | 48.70 | 42.87 |
| 42 | 379.99 | 165.91 | 131.17 | 105.58 | 86.41 | 71.90 | 60.75 | 52.06 | 45.21 | 39.74 |
| 41 | 368.85 | 158.25 | 124.40 | 99.60 | 81.18 | 67.29 | 56.68 | 48.45 | 41.99 | 36.85 |
| 40 | 357.89 | 150.92 | 117.96 | 93.97 | 76.25 | 62.98 | 52.88 | 45.10 | 39.01 | 34.18 |
| 39 | 347.11 | 143.91 | 111.83 | 88.64 | 71.62 | 58.94 | 49.34 | 41.98 | 36.25 | 31.72 |
| 38 | 336.50 | 137.21 | 106.01 | 83.60 | 67.26 | 55.16 | 46.05 | 39.09 | 33.69 | 29.44 |
| 37 | 326.11 | 130.81 | 100.48 | 78.85 | 63.16 | 51.63 | 42.99 | 36.41 | 31.33 | 27.35 |
| 36 | 315.93 | 124.70 | 95.25 | 74.38 | 59.35 | 48.35 | 40.15 | 33.94 | 29.17 | 25.44 |
| 35 | 306.04 | 118.88 | 90.30 | 70.18 | 55.76 | 45.30 | 37.53 | 31.67 | 27.18 | 23.69 |
| 34 | 296.42 | 113.35 | 85.63 | 66.25 | 52.46 | 42.47 | 35.11 | 29.59 | 25.37 | 22.10 |
| 33 | 287.14 | 108.09 | 81.22 | 62.56 | 49.36 | 39.86 | 32.89 | 27.68 | 23.72 | 20.68 |
| 32 | 278.17 | 103.09 | 77.06 | 59.10 | 46.48 | 37.44 | 30.84 | 25.93 | 22.21 | 19.35 |
| 31 | 269.57 | 98.37 | 73.16 | 55.88 | 43.82 | 35.22 | 28.98 | 24.35 | 20.86 | 18.18 |
| 30 | 261.27 | 93.89 | 69.49 | 52.88 | 41.35 | 33.18 | 27.27 | 22.92 | 19.64 | 17.13 |
| 29 | 253.31 | 89.67 | 66.06 | 50.10 | 39.09 | 31.33 | 25.74 | 21.64 | 18.56 | 16.20 |
| 28 | 245.67 | 85.70 | 62.87 | 47.54 | 37.02 | 29.64 | 24.36 | 20.49 | 17.60 | 15.40 |
| 27 | 238.35 | 61.97 | 59.90 | 45.18 | 35.14 | 28.13 | 23.14 | 19.49 | 16.78 | 14.71 |
| 26 | 231.34 | 78.47 | 57.15 | 43.02 | 33.43 | 26.78 | 22.06 | 18.62 | 16.07 | 14.12 |
| 25 | 224.61 | 75.20 | 54.81 | 41.05 | 31.90 | 25.29 | 21.11 | 17.87 | 15.47 | 13.54 |

*EXPLANATION–THE FIGURES SHOWN ABOVE ARE THE AMOUNTS WHICH, IF PAID AS A SINGLE PREMIUM AT THE STATED AGE AND IF THE ASSUMED RATE OF NET INTEREST IS EARNED THEREON, WILL BE SUFFICIENT TO PAY FOR $1000 OF PAID UP LIFE INSURANCE COVERAGE. THE COMPANY GUARANTEES ONLY THE AMOUNTS SHOWN UNDER THE COLUMN "GUARANTEED MAXIMUM." THE PAID UP AGE SHOWN IS THE AGE NEAREST BIRTHDAY. THE AMOUNTS SHOWN ABOVE ASSUME THAT THE RATE OF NET INTEREST EARNINGS WILL BE EARNED CONTINUOUSLY THROUGHOUT THE PERIOD NET OF ANY TAXES ON INCOME; DIRECT EXPENSES AND THE ADMINISTRATIVE CHARGE DEFINED UNDER THE POLICY. THE THEN CURRENT POLICY FEES WILL BE PAID OUT OF THE NET ACCUMULATED ACCOUNT VALUES UNLESS OTHERWISE PAID.

G-DRL 0150-14                                    [GSL MISC./W2]

3699-05-00-0000148-0016-0001695



GENERAL SERVICES LIFE INSURANCE COMPANY
DIRECT RECOGNITION LIFE I–NONSMOKER
SUFFICIENT VALUES PER $1000 INSURANCE AT SELECTED PAID UP AGES AND DIFFERENT ASSUMED
NET RATES OF INTEREST (SEE EXPLANATION BELOW*)

NONSMOKER SUFFICIENT VALUE PER $1000 INSURANCE ASSUMING INTEREST AT:

| Paid Up Age | 15.0% | 16.0% | 17.0% | 18.0% | 19.0% | 20.0% | 21.0% | 25.0% |
|---|---|---|---|---|---|---|---|---|
| 90 | 637.13 | 622.68 | 608.98 | 595.98 | 583.64 | 571.91 | 560.75 | 521.11 |
| 89 | 619.50 | 604.79 | 590.89 | 577.73 | 565.26 | 553.44 | 542.21 | 502.50 |
| 88 | 602.32 | 587.39 | 573.31 | 560.01 | 547.43 | 535.52 | 524.23 | 484.48 |
| 87 | 585.24 | 570.10 | 555.84 | 542.41 | 529.73 | 517.74 | 506.41 | 466.64 |
| 86 | 567.95 | 552.61 | 538.20 | 524.64 | 511.87 | 499.82 | 488.44 | 448.67 |
| 85 | 550.28 | 534.75 | 520.18 | 506.51 | 493.65 | 481.55 | 470.13 | 430.38 |
| 84 | 532.12 | 516.41 | 501.70 | 487.93 | 475.00 | 462.65 | 451.41 | 411.72 |
| 83 | 513.51 | 497.63 | 482.81 | 468.95 | 455.98 | 443.78 | 432.33 | 392.75 |
| 82 | 494.58 | 478.56 | 463.64 | 449.72 | 436.71 | 424.52 | 413.09 | 373.78 |
| 81 | 475.57 | 459.45 | 444.48 | 430.53 | 417.52 | 405.38 | 393.98 | 354.97 |
| 80 | 456.70 | 440.53 | 425.53 | 411.60 | 398.63 | 386.54 | 375.24 | 336.67 |
| 79 | 438.06 | 421.87 | 406.90 | 393.03 | 380.14 | 368.14 | 356.95 | 318.95 |
| 78 | 419.69 | 403.54 | 388.63 | 374.84 | 362.06 | 350.20 | 339.15 | 301.80 |
| 77 | 401.53 | 385.44 | 370.63 | 356.98 | 344.33 | 332.62 | 321.75 | 285.14 |
| 76 | 383.45 | 367.46 | 352.78 | 339.27 | 326.80 | 315.20 | 304.59 | 268.79 |
| 75 | 365.40 | 349.54 | 335.02 | 321.68 | 309.41 | 298.08 | 287.61 | 252.67 |
| 74 | 347.35 | 331.64 | 317.31 | 304.17 | 292.12 | 281.02 | 270.77 | 236.76 |
| 73 | 329.37 | 313.86 | 299.74 | 286.84 | 275.02 | 264.17 | 254.17 | 221.14 |
| 72 | 311.62 | 296.34 | 282.46 | 269.82 | 258.27 | 247.69 | 237.97 | 205.99 |
| 71 | 294.29 | 279.28 | 265.68 | 253.33 | 242.03 | 231.79 | 222.36 | 191.51 |
| 70 | 277.52 | 262.81 | 249.53 | 237.50 | 226.57 | 216.60 | 207.48 | 177.81 |
| 69 | 261.40 | 247.03 | 234.09 | 222.41 | 211.81 | 202.18 | 193.39 | 164.84 |
| 68 | 245.95 | 231.95 | 219.38 | 208.07 | 197.83 | 188.55 | 180.11 | 152.80 |
| 67 | 231.14 | 217.53 | 205.36 | 194.42 | 184.56 | 175.64 | 167.54 | 141.60 |
| 66 | 216.91 | 203.71 | 191.95 | 181.40 | 171.93 | 163.38 | 155.63 | 130.95 |
| 65 | 203.24 | 190.47 | 179.12 | 168.98 | 159.89 | 151.72 | 144.32 | 120.89 |
| 64 | 190.12 | 177.79 | 166.86 | 157.14 | 148.44 | 140.63 | 133.60 | 111.40 |
| 63 | 177.55 | 165.67 | 155.18 | 145.87 | 137.58 | 130.13 | 123.46 | 102.47 |
| 62 | 165.57 | 154.19 | 144.19 | 135.21 | 127.29 | 120.23 | 113.89 | 94.11 |
| 61 | 154.20 | 143.25 | 133.64 | 125.16 | 117.64 | 110.94 | 104.95 | 86.34 |
| 60 | 143.46 | 132.58 | 123.81 | 115.74 | 108.61 | 102.27 | 96.62 | 79.14 |
| 59 | 133.33 | 123.32 | 114.58 | 106.93 | 100.17 | 94.19 | 88.87 | 72.50 |
| 58 | 123.79 | 114.25 | 105.95 | 98.70 | 92.32 | 86.69 | 81.68 | 66.37 |
| 57 | 114.82 | 105.74 | 97.87 | 91.01 | 84.99 | 79.69 | 75.00 | 60.71 |
| 56 | 106.38 | 97.78 | 90.31 | 83.83 | 78.17 | 73.20 | 68.80 | 55.48 |
| 55 | 98.46 | 90.28 | 83.24 | 77.13 | 71.82 | 67.15 | 63.04 | 50.65 |
| 54 | 91.02 | 83.28 | 76.54 | 70.90 | 65.91 | 61.54 | 57.71 | 46.19 |
| 53 | 84.09 | 76.77 | 70.51 | 65.12 | 60.45 | 56.37 | 52.80 | 42.12 |
| 52 | 77.63 | 70.72 | 64.84 | 59.78 | 55.42 | 51.62 | 48.29 | 38.40 |
| 51 | 71.65 | 65.15 | 59.62 | 54.89 | 50.81 | 47.27 | 44.18 | 35.03 |
| 50 | 66.15 | 60.03 | 54.84 | 50.42 | 46.62 | 43.32 | 40.46 | 32.00 |
| 49 | 61.09 | 55.34 | 50.48 | 46.35 | 42.81 | 39.75 | 37.09 | 29.29 |
| 48 | 56.43 | 51.03 | 46.49 | 42.64 | 39.35 | 36.51 | 34.05 | 26.85 |
| 47 | 52.15 | 47.09 | 42.85 | 39.26 | 36.20 | 33.57 | 31.29 | 24.65 |
| 46 | 48.20 | 43.47 | 39.50 | 36.16 | 33.32 | 30.88 | 28.77 | 22.65 |
| 45 | 44.57 | 40.14 | 36.44 | 33.33 | 30.69 | 28.43 | 26.48 | 20.84 |
| 44 | 41.23 | 37.09 | 33.64 | 30.75 | 28.30 | 26.21 | 24.40 | 19.20 |
| 43 | 38.15 | 34.28 | 31.07 | 28.38 | 26.11 | 24.17 | 22.50 | 17.71 |
| 42 | 35.32 | 31.70 | 28.71 | 26.21 | 24.11 | 22.31 | 20.77 | 16.35 |
| 41 | 32.71 | 29.34 | 26.55 | 24.23 | 22.28 | 20.02 | 19.20 | 15.12 |
| 40 | 30.31 | 27.16 | 24.57 | 22.41 | 20.60 | 19.07 | 17.75 | 13.99 |
| 39 | 28.09 | 25.16 | 22.75 | 20.75 | 19.07 | 17.65 | 16.43 | 12.96 |
| 38 | 26.08 | 23.32 | 21.08 | 19.22 | 17.67 | 16.35 | 15.22 | 12.02 |
| 37 | 24.19 | 21.64 | 19.55 | 17.83 | 16.39 | 15.17 | 14.13 | 11.17 |
| 36 | 22.48 | 20.10 | 18.17 | 16.57 | 15.23 | 14.10 | 13.14 | 10.40 |
| 35 | 20.93 | 18.71 | 16.91 | 15.43 | 14.19 | 13.14 | 12.25 | 9.71 |
| 34 | 19.52 | 17.46 | 15.78 | 14.40 | 13.26 | 12.29 | 11.46 | 9.11 |
| 33 | 18.25 | 16.33 | 14.77 | 13.49 | 12.42 | 11.52 | 10.76 | 8.58 |
| 32 | 17.10 | 15.31 | 13.86 | 12.67 | 11.67 | 10.84 | 10.13 | 8.10 |
| 31 | 16.08 | 14.41 | 13.06 | 11.95 | 11.03 | 10.25 | 9.59 | 7.70 |
| 30 | 15.16 | 13.61 | 12.35 | 11.31 | 10.45 | 9.73 | 9.11 | 7.35 |
| 29 | 14.37 | 12.91 | 11.74 | 10.77 | 9.97 | 9.30 | 8.72 | 7.07 |
| 28 | 13.68 | 12.32 | 11.22 | 10.32 | 9.57 | 8.94 | 8.40 | 6.85 |
| 27 | 13.10 | 11.82 | 10.80 | 9.95 | 9.25 | 8.66 | 8.15 | 6.69 |
| 26 | 12.61 | 11.42 | 10.45 | 9.66 | 9.00 | 8.44 | 7.97 | 6.59 |
| 25 | 12.22 | 11.10 | 10.19 | 9.45 | 8.82 | 8.30 | 7.84 | 6.53 |

*EXPLANATION–THE FIGURES SHOWN ABOVE ARE THE AMOUNTS WHICH, IF PAID AS A SINGLE PREMIUM AT THE STATED AGE AND IF THE ASSUMED RATE OF NET INTEREST IS EARNED THEREON, WILL BE SUFFICIENT TO PAY FOR $1000 OF PAID UP LIFE INSURANCE COVERAGE. THE COMPANY GUARANTEES ONLY THE AMOUNTS SHOWN UNDER THE COLUMN "GUARANTEED MAXIMUM." THE PAID UP AGE SHOWN IS THE AGE NEAREST BIRTHDAY. THE AMOUNTS SHOWN ABOVE ASSUME THAT THE RATE OF NET INTEREST EARNINGS WILL BE EARNED CONTINUOUSLY THROUGHOUT THE PERIOD NET OF ANY TAXES ON INCOME; DIRECT EXPENSES AND THE ADMINISTRATIVE CHARGE DEFINED UNDER THE POLICY. THE THEN CURRENT POLICY FEES WILL BE PAID OUT OF THE NET ACCUMULATED ACCOUNT VALUES UNLESS OTHERWISE PAID.

G-DRL 0150-15

[GSL MISC./W2]

3699-05-00-0000148-0017-0001696



GENERAL SERVICES LIFE INSURANCE COMPANY
DIRECT RECOGNITION LIFE I
JOINT AND LAST SURVIVOR SUFFICIENT VALUES PER $1000 INSURANCE AT SELECTED PAID UP
AGES AND DIFFERENT ASSUMED NET RATES OF INTEREST (SEE EXPLANATION BELOW*)

JOINT AND LAST SURVIVOR SUFFICIENT VALUE
PER $1000 INSURANCE ASSUMING INTEREST AT:

| Paid Up Age | Guaranteed Maximum | 6.0% | 7.0% | 8.0% | 9.0% | 10.0% | 11.0% | 12.0% | 13.0% | 14.0% |
|---|---|---|---|---|---|---|---|---|---|---|
| 90 | 885.03 | 812.12 | 788.31 | 765.22 | 743.51 | 723.07 | 703.81 | 685.63 | 668.47 | 652.24 |
| 89 | 880.58 | 799.90 | 774.17 | 749.98 | 727.32 | 706.03 | 688.01 | 667.32 | 649.65 | 632.99 |
| 88 | 874.98 | 787.19 | 760.23 | 734.89 | 711.44 | 689.42 | 668.60 | 649.48 | 631.34 | 614.29 |
| 87 | 868.69 | 774.41 | 746.24 | 719.99 | 695.57 | 672.83 | 651.60 | 631.76 | 613.19 | 595.79 |
| 86 | 861.62 | 761.38 | 732.02 | 704.77 | 679.52 | 656.07 | 634.25 | 613.92 | 594.94 | 577.21 |
| 85 | 853.91 | 747.98 | 717.42 | 689.19 | 663.10 | 638.96 | 616.57 | 595.76 | 576.40 | 558.35 |
| 84 | 845.92 | 733.64 | 701.93 | 672.56 | 645.60 | 620.74 | 597.75 | 576.49 | 556.59 | 538.31 |
| 83 | 837.66 | 718.41 | 685.31 | 654.96 | 627.12 | 601.53 | 577.93 | 556.15 | 535.99 | 517.29 |
| 82 | 829.21 | 702.39 | 667.96 | 636.54 | 607.81 | 581.49 | 557.31 | 535.05 | 514.51 | 495.52 |
| 81 | 820.56 | 685.69 | 649.95 | 617.48 | 587.87 | 560.65 | 536.12 | 513.43 | 492.56 | 473.32 |
| 80 | 811.70 | 668.49 | 631.45 | 597.92 | 567.51 | 539.85 | 514.63 | 491.56 | 470.41 | 450.93 |
| 79 | 802.69 | 650.88 | 612.59 | 578.09 | 546.91 | 518.87 | 493.01 | 469.63 | 448.26 | 429.70 |
| 78 | 793.41 | 632.95 | 593.46 | 558.03 | 526.17 | 497.41 | 471.38 | 447.78 | 426.25 | 406.52 |
| 77 | 783.79 | 614.72 | 574.09 | 537.81 | 505.32 | 476.12 | 449.80 | 426.01 | 404.42 | 384.79 |
| 76 | 773.82 | 596.20 | 554.49 | 517.42 | 484.37 | 454.81 | 428.27 | 404.37 | 382.77 | 363.20 |
| 75 | 763.55 | 577.38 | 534.65 | 496.86 | 463.34 | 433.47 | 406.78 | 382.84 | 361.29 | 341.84 |
| 74 | 752.81 | 558.26 | 514.57 | 476.14 | 442.20 | 412.11 | 385.34 | 361.42 | 339.99 | 320.71 |
| 73 | 741.68 | 538.90 | 494.34 | 455.33 | 421.06 | 390.82 | 364.04 | 340.22 | 318.96 | 299.92 |
| 72 | 730.21 | 519.40 | 474.04 | 434.55 | 400.03 | 369.72 | 343.00 | 319.35 | 298.33 | 279.57 |
| 71 | 718.43 | 499.88 | 453.80 | 413.92 | 379.25 | 348.96 | 322.36 | 298.96 | 278.25 | 259.84 |
| 70 | 706.37 | 480.41 | 433.75 | 393.59 | 358.84 | 328.68 | 302.31 | 279.20 | 258.65 | 240.85 |
| 69 | 694.39 | 461.14 | 413.99 | 373.64 | 338.93 | 308.94 | 282.89 | 260.16 | 240.24 | 222.70 |
| 68 | 682.53 | 442.11 | 394.53 | 354.15 | 319.59 | 289.86 | 264.19 | 241.90 | 222.46 | 205.43 |
| 67 | 670.67 | 423.38 | 375.58 | 335.17 | 300.82 | 271.46 | 246.23 | 224.44 | 205.53 | 189.05 |
| 66 | 658.76 | 404.97 | 357.02 | 316.72 | 282.68 | 253.75 | 229.00 | 207.79 | 189.46 | 173.55 |
| 65 | 646.72 | 386.91 | 338.90 | 298.82 | 265.16 | 236.73 | 212.56 | 191.94 | 174.21 | 158.91 |
| 64 | 634.68 | 369.34 | 321.39 | 281.62 | 248.43 | 220.56 | 197.02 | 177.02 | 159.93 | 145.26 |
| 63 | 623.17 | 352.27 | 304.48 | 265.11 | 232.46 | 205.21 | 182.31 | 163.01 | 146.59 | 132.55 |
| 62 | 611.57 | 335.71 | 288.16 | 249.29 | 217.25 | 190.68 | 168.50 | 149.87 | 134.13 | 120.75 |
| 61 | 600.13 | 319.68 | 272.51 | 234.17 | 202.79 | 176.94 | 155.49 | 137.58 | 122.53 | 109.81 |
| 60 | 588.85 | 304.20 | 257.46 | 219.75 | 189.09 | 163.99 | 143.29 | 126.12 | 111.77 | 99.70 |
| 59 | 577.62 | 289.28 | 243.05 | 206.02 | 176.12 | 151.80 | 131.88 | 115.44 | 101.79 | 90.38 |
| 58 | 566.39 | 274.88 | 229.26 | 192.97 | 163.87 | 140.36 | 121.22 | 105.53 | 92.57 | 81.79 |
| 57 | 555.09 | 261.04 | 216.09 | 180.59 | 152.32 | 129.63 | 111.28 | 96.33 | 84.05 | 73.91 |
| 56 | 543.69 | 247.74 | 203.51 | 168.84 | 141.42 | 119.57 | 102.01 | 87.79 | 76.19 | 66.66 |
| 55 | 532.19 | 234.96 | 191.52 | 157.71 | 131.16 | 110.15 | 93.38 | 79.89 | 68.95 | 60.01 |
| 54 | 520.49 | 222.77 | 180.15 | 147.23 | 121.58 | 101.41 | 85.42 | 72.64 | 62.35 | 53.98 |
| 53 | 508.70 | 211.13 | 169.39 | 137.33 | 112.63 | 93.31 | 78.09 | 66.01 | 56.33 | 48.52 |
| 52 | 496.89 | 200.03 | 159.20 | 128.14 | 104.29 | 85.79 | 71.34 | 59.90 | 50.96 | 43.58 |
| 51 | 485.11 | 189.46 | 149.57 | 119.45 | 96.50 | 78.84 | 65.13 | 54.38 | 45.89 | 39.11 |
| 50 | 473.30 | 179.38 | 140.47 | 111.32 | 89.28 | 72.42 | 59.43 | 49.32 | 41.37 | 35.08 |
| 49 | 461.47 | 169.80 | 131.88 | 103.69 | 82.53 | 66.48 | 54.19 | 44.68 | 37.28 | 31.44 |
| 48 | 449.58 | 160.69 | 123.78 | 96.55 | 76.27 | 61.00 | 49.39 | 40.48 | 33.57 | 28.16 |
| 47 | 437.73 | 152.03 | 116.13 | 89.86 | 70.44 | 55.93 | 44.88 | 36.63 | 30.20 | 25.20 |
| 46 | 425.94 | 143.80 | 108.93 | 83.61 | 65.04 | 51.27 | 40.85 | 33.13 | 27.16 | 22.53 |
| 45 | 414.26 | 135.98 | 102.13 | 77.76 | 60.02 | 46.96 | 37.25 | 29.94 | 24.39 | 20.13 |
| 44 | 402.70 | 128.58 | 95.76 | 72.31 | 55.38 | 43.01 | 33.88 | 27.06 | 21.92 | 17.99 |
| 43 | 391.29 | 121.58 | 89.78 | 67.26 | 51.11 | 39.41 | 30.84 | 24.48 | 19.71 | 16.10 |
| 42 | 379.99 | 114.98 | 84.18 | 62.55 | 47.17 | 36.11 | 28.06 | 22.14 | 17.73 | 14.41 |
| 41 | 368.85 | 108.69 | 78.92 | 58.17 | 43.53 | 33.09 | 25.54 | 20.03 | 15.95 | 12.90 |
| 40 | 357.89 | 102.76 | 73.99 | 54.09 | 40.18 | 30.32 | 23.26 | 18.13 | 14.37 | 11.57 |
| 39 | 347.11 | 97.15 | 69.36 | 50.31 | 37.08 | 27.79 | 21.18 | 16.41 | 12.94 | 10.37 |
| 38 | 336.50 | 91.84 | 65.02 | 46.78 | 34.22 | 25.47 | 19.28 | 14.86 | 11.66 | 9.31 |
| 37 | 326.11 | 86.82 | 60.95 | 43.51 | 31.59 | 23.35 | 17.57 | 13.47 | 10.52 | 8.36 |
| 36 | 315.93 | 82.08 | 57.14 | 40.46 | 29.16 | 21.40 | 16.01 | 12.20 | 9.48 | 7.51 |
| 35 | 306.04 | 77.59 | 53.56 | 37.62 | 26.91 | 19.62 | 14.59 | 11.06 | 8.56 | 6.76 |
| 34 | 296.42 | 73.35 | 50.21 | 34.99 | 24.85 | 18.00 | 13.30 | 10.04 | 7.74 | 6.09 |
| 33 | 287.14 | 69.34 | 47.06 | 32.54 | 22.94 | 16.51 | 12.13 | 9.11 | 6.99 | 5.49 |
| 32 | 278.17 | 65.55 | 44.13 | 30.28 | 21.20 | 15.15 | 11.08 | 8.29 | 6.34 | 4.97 |
| 31 | 269.57 | 61.97 | 41.38 | 28.17 | 19.58 | 13.91 | 10.12 | 7.53 | 5.75 | 4.50 |
| 30 | 261.27 | 58.59 | 38.80 | 26.22 | 18.10 | 12.79 | 9.25 | 6.87 | 5.23 | 4.08 |
| 29 | 253.31 | 55.41 | 36.40 | 24.42 | 16.75 | 11.76 | 8.47 | 6.27 | 4.76 | 3.72 |
| 28 | 245.67 | 52.40 | 34.14 | 22.73 | 15.49 | 10.82 | 7.76 | 5.73 | 4.35 | 3.39 |
| 27 | 238.35 | 49.58 | 32.04 | 21.18 | 14.34 | 9.97 | 7.12 | 5.24 | 3.98 | 3.11 |
| 26 | 231.34 | 46.88 | 30.03 | 19.75 | 13.29 | 9.20 | 6.56 | 4.82 | 3.66 | 2.86 |
| 25 | 224.61 | 44.36 | 28.25 | 18.42 | 12.34 | 8.50 | 6.05 | 4.44 | 3.38 | 2.65 |

*EXPLANATION—THE FIGURES SHOWN ABOVE ARE THE AMOUNTS WHICH, IF PAID AS A SINGLE PREMIUM AT THE STATED AGE AND IF THE ASSUMED RATE OF NET INTEREST IS EARNED THEREON, WILL BE SUFFICIENT TO PAY FOR $1000 OF PAID UP LIFE INSURANCE COVERAGE. THE COMPANY GUARANTEES ONLY THE AMOUNTS SHOWN UNDER THE COLUMN "GUARANTEED MAXIMUM." THE PAID UP AGE SHOWN IS THE AGE NEAREST BIRTHDAY. THE AMOUNTS SHOWN ABOVE ASSUME THAT THE RATE OF NET INTEREST EARNINGS WILL BE EARNED CONTINUOUSLY THROUGHOUT THE PERIOD NET OF ANY TAXES ON INCOME; DIRECT EXPENSES AND THE ADMINISTRATIVE CHARGE DEFINED UNDER THE POLICY. THE THEN CURRENT POLICY FEES WILL BE PAID OUT OF THE NET ACCUMULATED ACCOUNT VALUES UNLESS OTHERWISE PAID.

G-DRL 0150-16                                                                 [GSL MISC./W2]



3899-05-00-00001148-0018-0001697

GENERAL SERVICES LIFE INSURANCE COMPANY
DIRECT RECOGNITION LIFE I
JOINT AND LAST SURVIVOR SUFFICIENT VALUES PER $1000 INSURANCE AT SELECTED PAID UP
AGES AND DIFFERENT ASSUMED NET RATES OF INTEREST (SEE EXPLANATION BELOW*)

JOINT AND LAST SURVIVOR SUFFICIENT VALUE
PER $1000 INSURANCE ASSUMING INTEREST AT:

| Paid Up Age | 15.0% | 16.0% | 17.0% | 18.0% | 19.0% | 20.0% | 21.0% | 25.0% |
|---|---|---|---|---|---|---|---|---|
| 90 | 638.88 | 622.33 | 608.53 | 595.44 | 582.99 | 571.18 | 559.90 | 519.88 |
| 89 | 617.26 | 602.41 | 588.38 | 575.05 | 562.45 | 550.49 | 539.13 | 498.96 |
| 88 | 598.24 | 583.12 | 568.86 | 555.39 | 542.65 | 530.59 | 519.16 | 478.92 |
| 87 | 579.45 | 564.09 | 549.64 | 536.02 | 523.17 | 511.03 | 499.55 | 459.30 |
| 86 | 560.50 | 545.03 | 530.41 | 516.66 | 503.72 | 491.51 | 479.99 | 439.77 |
| 85 | 541.49 | 525.73 | 510.95 | 497.10 | 484.07 | 471.82 | 460.27 | 420.13 |
| 84 | 521.20 | 505.22 | 490.29 | 476.32 | 463.21 | 450.90 | 439.33 | 399.24 |
| 83 | 499.92 | 483.75 | 468.68 | 454.60 | 441.42 | 429.06 | 417.49 | 377.54 |
| 82 | 477.93 | 461.60 | 446.41 | 432.25 | 419.04 | 406.68 | 395.10 | 355.39 |
| 81 | 455.55 | 439.09 | 423.83 | 409.64 | 396.43 | 384.10 | 372.58 | 333.25 |
| 80 | 433.08 | 416.55 | 401.27 | 387.10 | 373.93 | 361.68 | 350.26 | 311.47 |
| 79 | 410.74 | 394.20 | 378.95 | 364.85 | 351.79 | 339.67 | 328.39 | 290.30 |
| 78 | 388.66 | 372.18 | 357.02 | 343.05 | 330.14 | 318.18 | 307.10 | 269.86 |
| 77 | 366.88 | 350.51 | 335.50 | 321.70 | 308.99 | 297.25 | 286.40 | 250.14 |
| 76 | 345.41 | 329.20 | 314.38 | 300.81 | 288.34 | 276.86 | 266.26 | 231.10 |
| 75 | 324.22 | 308.22 | 293.65 | 280.34 | 268.15 | 256.96 | 246.66 | 212.69 |
| 74 | 303.32 | 287.58 | 273.29 | 260.26 | 248.41 | 237.54 | 227.55 | 194.87 |
| 73 | 282.80 | 267.37 | 253.41 | 240.74 | 229.21 | 218.69 | 209.07 | 177.73 |
| 72 | 262.79 | 247.71 | 234.12 | 221.83 | 210.68 | 200.54 | 191.29 | 161.38 |
| 71 | 243.44 | 228.76 | 215.58 | 203.70 | 192.97 | 183.23 | 174.38 | 148.95 |
| 70 | 224.68 | 210.64 | 197.91 | 186.47 | 176.18 | 166.87 | 158.44 | 131.54 |
| 69 | 207.20 | 193.44 | 181.19 | 170.23 | 160.39 | 151.53 | 143.53 | 118.20 |
| 68 | 190.44 | 177.19 | 165.44 | 154.97 | 145.62 | 137.22 | 129.66 | 105.60 |
| 67 | 174.60 | 161.90 | 150.67 | 140.71 | 131.84 | 123.91 | 116.79 | 94.59 |
| 66 | 159.68 | 147.53 | 136.84 | 127.40 | 119.02 | 111.55 | 104.88 | 84.23 |
| 65 | 145.63 | 134.05 | 123.90 | 114.98 | 107.09 | 100.10 | 93.87 | 74.72 |
| 64 | 132.58 | 121.58 | 111.99 | 103.59 | 96.20 | 89.66 | 83.86 | 66.18 |
| 63 | 120.50 | 110.08 | 101.04 | 93.16 | 86.25 | 80.16 | 74.78 | 58.52 |
| 62 | 109.31 | 99.48 | 90.99 | 83.61 | 77.17 | 71.53 | 66.56 | 51.64 |
| 61 | 98.99 | 89.74 | 81.78 | 74.90 | 68.92 | 63.70 | 59.12 | 45.49 |
| 60 | 89.49 | 80.81 | 73.37 | 66.97 | 61.44 | 56.62 | 52.41 | 39.99 |
| 59 | 80.77 | 72.64 | 65.71 | 59.77 | 54.66 | 50.23 | 46.37 | 35.09 |
| 58 | 72.76 | 65.18 | 58.74 | 53.25 | 48.54 | 44.48 | 40.95 | 30.73 |
| 57 | 65.48 | 58.38 | 52.41 | 47.36 | 43.02 | 39.30 | 36.09 | 26.85 |
| 56 | 58.77 | 52.19 | 46.67 | 42.00 | 38.04 | 34.64 | 31.73 | 23.39 |
| 55 | 52.65 | 46.54 | 41.45 | 37.16 | 33.54 | 30.45 | 27.80 | 20.31 |
| 54 | 47.13 | 41.49 | 36.79 | 32.67 | 29.56 | 26.78 | 24.36 | 17.64 |
| 53 | 42.16 | 36.95 | 32.64 | 29.05 | 26.04 | 23.50 | 21.34 | 15.33 |
| 52 | 37.68 | 32.88 | 28.93 | 25.65 | 22.92 | 20.62 | 18.68 | 13.31 |
| 51 | 33.66 | 29.24 | 25.62 | 22.64 | 20.16 | 18.09 | 16.34 | 11.55 |
| 50 | 30.04 | 25.98 | 22.68 | 19.97 | 17.73 | 15.86 | 14.29 | 10.04 |
| 49 | 26.80 | 23.07 | 20.06 | 17.60 | 15.58 | 13.90 | 12.49 | 8.71 |
| 48 | 23.89 | 20.48 | 17.73 | 15.51 | 13.68 | 12.17 | 10.92 | 7.57 |
| 47 | 21.27 | 18.15 | 15.66 | 13.64 | 12.00 | 10.65 | 9.53 | 6.56 |
| 46 | 18.93 | 16.08 | 13.82 | 12.00 | 10.52 | 9.31 | 8.31 | 5.68 |
| 45 | 16.82 | 14.23 | 12.18 | 10.53 | 9.21 | 8.13 | 7.24 | 4.92 |
| 44 | 14.96 | 12.60 | 10.74 | 9.26 | 8.07 | 7.11 | 6.32 | 4.27 |
| 43 | 13.33 | 11.16 | 9.50 | 8.17 | 7.10 | 6.24 | 5.54 | 3.74 |
| 42 | 11.88 | 9.93 | 8.41 | 7.21 | 6.26 | 5.49 | 4.87 | 3.28 |
| 41 | 10.59 | 8.82 | 7.45 | 6.38 | 5.53 | 4.84 | 4.29 | 2.89 |
| 40 | 9.46 | 7.86 | 6.62 | 5.65 | 4.89 | 4.29 | 3.80 | 2.56 |
| 39 | 8.45 | 7.00 | 5.89 | 5.02 | 4.34 | 3.80 | 3.37 | 2.28 |
| 38 | 7.56 | 6.24 | 5.24 | 4.46 | 3.86 | 3.38 | 2.99 | 2.03 |
| 37 | 6.77 | 5.58 | 4.68 | 3.98 | 3.44 | 3.01 | 2.67 | 1.83 |
| 36 | 6.07 | 4.99 | 4.18 | 3.55 | 3.07 | 2.69 | 2.39 | 1.64 |
| 35 | 5.45 | 4.47 | 3.74 | 3.18 | 2.75 | 2.41 | 2.14 | 1.48 |
| 34 | 4.89 | 4.01 | 3.36 | 2.86 | 2.47 | 2.17 | 1.93 | 1.35 |
| 33 | 4.41 | 3.61 | 3.02 | 2.57 | 2.23 | 1.96 | 1.75 | 1.23 |
| 32 | 3.98 | 3.26 | 2.73 | 2.33 | 2.02 | 1.78 | 1.59 | 1.13 |
| 31 | 3.60 | 2.95 | 2.47 | 2.11 | 1.84 | 1.62 | 1.46 | 1.04 |
| 30 | 3.27 | 2.68 | 2.25 | 1.93 | 1.68 | 1.49 | 1.34 | 0.98 |
| 29 | 2.98 | 2.45 | 2.06 | 1.77 | 1.55 | 1.38 | 1.25 | 0.92 |
| 28 | 2.72 | 2.24 | 1.89 | 1.63 | 1.44 | 1.28 | 1.16 | 0.87 |
| 27 | 2.50 | 2.06 | 1.75 | 1.51 | 1.34 | 1.20 | 1.09 | 0.82 |
| 26 | 2.31 | 1.92 | 1.63 | 1.42 | 1.26 | 1.14 | 1.04 | 0.80 |
| 25 | 2.15 | 1.79 | 1.54 | 1.35 | 1.20 | 1.09 | 1.00 | 0.78 |

*EXPLANATION--THE FIGURES SHOWN ABOVE ARE THE AMOUNTS WHICH, IF PAID AS A SINGLE PREMIUM AT THE STATED AGE AND IF THE ASSUMED RATE OF NET INTEREST IS EARNED THEREON, WILL BE SUFFICIENT TO PAY FOR $1000 OF PAID UP LIFE INSURANCE COVERAGE. THE COMPANY GUARANTEES ONLY THE AMOUNTS SHOWN UNDER THE COLUMN "GUARANTEED MAXIMUM." THE PAID UP AGE SHOWN IS THE AGE NEAREST BIRTHDAY. THE AMOUNTS SHOWN ABOVE ASSUME THAT THE RATE OF NET INTEREST EARNINGS WILL BE EARNED CONTINUOUSLY THROUGHOUT THE PERIOD NET OF ANY TAXES ON INCOME; THESE EXPENSES AND THE ADMINISTRATIVE CHARGE DEFINED UNDER THE POLICY. THE THEN CURRENT POLICY FEES WILL BE PAID OUT OF THE NET ACCUMULATED ACCOUNT VALUES UNLESS OTHERWISE PAID.

G-DRL 0150-17                                                                 [GSL MISC./W2]

3699-05-00-0000148-0019-0001698



## TABLE B

The amount of Group Universal Insurance determined under Table B at any time shall be equal to the Policy Value times the appropriate factor from this table.

| Attained Age | Factor | Attained Age | Factor |
|---|---|---|---|
| 0-40 | 2.50 | 60 | 1.30 |
| 41 | 2.43 | 61 | 1.28 |
| 42 | 2.36 | 62 | 1.26 |
| 43 | 2.29 | 63 | 1.24 |
| 44 | 2.22 | 64 | 1.22 |
| 45 | 2.15 | 65 | 1.20 |
| 46 | 2.09 | 66 | 1.19 |
| 47 | 2.03 | 67 | 1.18 |
| 48 | 1.97 | 68 | 1.17 |
| 49 | 1.91 | 69 | 1.16 |
| 50 | 1.85 | 70 | 1.15 |
| 51 | 1.78 | 71 | 1.13 |
| 52 | 1.71 | 72 | 1.11 |
| 53 | 1.64 | 73 | 1.09 |
| 54 | 1.57 | 74 | 1.07 |
| 55 | 1.50 | 75-90 | 1.05 |
| 56 | 1.46 | 91 | 1.04 |
| 57 | 1.42 | 92 | 1.03 |
| 58 | 1.38 | 93 | 1.02 |
| 59 | 1.34 | 94 | 1.01 |
|  |  | 95-99 | 1.00 |

Attained age means age of participant at the beginning of each accounting year.

3689-05-00-0000148-0020-0001699

G-DRL 0150-18

(D10)  [GSL Misc./MSW]



## TABLE OF MAXIMUM RISK RATES PER $1,000

| Age | Monthly Rate | Age | Monthly Rate | Age | Monthly Rate | Age | Monthly Rate |
|-----|--------------|-----|--------------|-----|--------------|-----|--------------|
| Under 30 | 0.24475 | 47 | 0.85617 | 65 | 3.37792 | 83 | 13.65833 |
| 30 | 0.24475 | 48 | 0.94417 | 66 | 3.65200 | 84 | 14.74275 |
| 31 | 0.25208 | 49 | 1.04775 | 67 | 3.92975 | 85 | 15.92708 |
| 32 | 0.25300 | 50 | 1.15317 | 68 | 4.20933 | 86 | 17.38550 |
| 33 | 0.26033 | 51 | 1.26225 | 69 | 4.48433 | 87 | 18.96492 |
| 34 | 0.26950 | 52 | 1.36858 | 70 | 4.79325 | 88 | 20.51683 |
| 35 | 0.28600 | 53 | 1.48775 | 71 | 5.23783 | 89 | 21.82125 |
| 36 | 0.30433 | 54 | 1.62433 | 72 | 5.72275 | 90 | 22.86808 |
| 37 | 0.33275 | 55 | 1.78750 | 73 | 6.24800 | 91 | 24.17366 |
| 38 | 0.36392 | 56 | 1.93875 | 74 | 6.82642 | 92 | 25.65710 |
| 39 | 0.40333 | 57 | 2.09550 | 75 | 7.46900 | 93 | 27.36850 |
| 40 | 0.44275 | 58 | 2.25317 | 76 | 8.09050 | 94 | 29.36207 |
| 41 | 0.48583 | 59 | 2.40625 | 77 | 8.76425 | 95 | 31.90878 |
| 42 | 0.53533 | 60 | 2.55933 | 78 | 9.48292 | 96 | 35.63698 |
| 43 | 0.58942 | 61 | 2.69408 | 79 | 10.22358 | 97 | 42.53636 |
| 44 | 0.64808 | 62 | 2.84625 | 80 | 10.96333 | 98 | 56.93408 |
| 45 | 0.70950 | 63 | 3.01675 | 81 | 11.79567 | 99 | 83.33333 |
| 46 | 0.77733 | 64 | 3.19642 | 82 | 12.68575 | | |

9899-05-00-0000148-0021-0001700



**GENERAL SERVICES LIFE INSURANCE COMPANY**
Home Office: Washington, DC
Regional Office: 475 Gate Five Road, #A-215, Sausalito, California 94965
(the "Company" or "We"/"Us"/"Our")

### JOINT AND LAST SURVIVOR BENEFIT ENDORSEMENT TO POLICY

The purpose of the Joint and Last Survivor benefit is to provide the amount shown in the Certificate at the death of the last insured to die. No insurance benefit will be provided on the first death and premiums must be paid until the earlier of: the last death; or the targeted Paid-Up Date.

When we receive due proof of the last death occurring among the two insureds, the life insurance Death Benefits will be payable to the Beneficiary. We must be notified of the death of each insured, whether it is the first or last death, and the causes of death.

This Endorsement modifies the language contained in the Policy to which this is attached so that references to insured are now to include the joint insured(s). Some modifications that follow are examples of our intent in this regard.

**INCONTESTIBILITY:** If premiums are paid when due, the Company will not contest the benefits provided by any Certificate after it has been in force during the lifetime of both insureds for two years from the Certificate Issue Date. In addition, any evidence of insurability voluntarily submitted by the Participant to obtain an increase in coverage or a more favorable Risk Premium after the Certificate Issue Date will be incontestable after the increase in coverage or more favorable Risk Premiums has been in effect during the lifetime of both insureds for two years.

**SUICIDE:** The suicide provision applies to both insureds.

**REINSTATEMENT:** The reinstatement provisions will apply except that evidence of insurability satisfactory to us must be presented on both insureds so that we may determine that the persons are insurable.

**CONVERSION:** Coverage may be converted to any similar Joint and Last Survivor policy then issued by the Company. The premium for the new policy will be based on the then attained joint equal age and the duration of the original coverage. The Conversion Privilege of the Policy and its Riders will not be available to each insured Participant and Joint Life on an individual basis without evidence of insurability satisfactory to the Company.

**OWNERSHIP:** If the Owner is one of the joint insureds and such Owner dies, upon that Owner's death ownership will pass to the surviving insured.

If a Waiver of Premium and/or Waiver of Risk charge benefit is in effect as to any Certificate issued in conjunction with this Endorsement, such waiver benefit will only be applicable to the Insured Participant. The other person insured under the Joint and Last Survivor Benefit will not have waiver of premium or risk charge coverage. Therefore, only the person named on the Certificate as the Insured Participant will be eligible for disability waiver coverage.

If an Accidental Death Benefit is in effect as to any Certificate issued in conjunction with this Endorsement, such Accidental Death Benefit will only be applicable to the last death occurring among the two insureds.

IIN WITNESS WHEREOF, General Services Life Insurance Company has, by its President and Secretary, executed this Endorsement and caused the same to be countersigned as of the Master Policy Effective Date.

SECRETARY

PRESIDENT

G-DRL 0114 (5/86) [GSL001/W2]



**GENERAL SERVICES LIFE INSURANCE COMPANY**
Home Office: Washington, DC
Regional Office: 475 Gate Five Road, #A-215, Sausalito, California 94965
(the "Company" or "We"/"Us"/"Our")

### GROUP ACCIDENTAL DEATH BENEFIT RIDER

**ACCIDENTAL DEATH BENEFIT.** We will pay the Accidental Death Benefit amount shown in the Certificate as soon as we receive proof that the Participant's death was accidental and that the accidental death of the Participant occurred while this Rider was in force. Death must occur after age one and before the Accounting Year Anniversary nearest the 70th birthday of the Participant. This benefit does not extend to other members of the family (if any) who may be insured by supplemental Riders added to and made part of the Certificate of the Participant.

**ACCIDENTAL DEATH.** Accident means injury (not sickness). The accident must cause death within 90 days from the date of accident, independently of all other causes.

**EXCLUSIONS.** We will not pay if death is from: (1) suicide while sane; or (2) voluntarily taking poison; or (3) voluntarily inhaling gas or fumes; or (4) voluntarily taking an overdose of drugs, narcotics or hallucinogens, except as prescribed by a physician; or (5) illness or disease or medical treatment thereof; or (6) injury while committing a felony; or (7) aircraft accident (unless as a fare paying passenger); or (8) parachuting or hang gliding; or (9) war (declared or not) or acts of war.

**PREMIUM.** The premium for this Rider is shown in the Certificate. Premiums may be deducted from any Group Permanent Certificate Account Values as Risk Charge deductions if agreed to by the Owners or may be waived under any applicable waiver of Risk Charge Rider.

**TERMINATION.** This Rider terminates: (1) on the Accounting Year anniversary nearest the 70th birthday of the Participant; or (2) on the continuance of the Participant's coverage as paid-up life insurance; or (3) on the lapse, surrender or termination of the Policy or the Participant's Certificate; or (4) anytime that the premium for this Rider is not paid.

**GENERAL.** All provisions of the Policy also apply to this Rider. This Rider starts on the same date as the Certificate unless a different date is shown in the Certificate.

We will have the right and opportunity to examine the insured's body and make an autopsy at our expense unless prohibited by law.

IN WITNESS WHEREOF, General Services Life Insurance Company has, by its President and Secretary, executed this Rider and caused the same to be countersigned as of the Master Policy Effective Date.


*George R. Lambert*
SECRETARY

*Robert D. Ray*
PRESIDENT

G-DRL 0110 (5/86) [GSL001/W2]



**GENERAL SERVICES LIFE INSURANCE COMPANY**
Home Office: Washington, DC
Regional Office: 475 Gate Five Road, #A-215, Sausalito, California 94965
(the "Company" or "We"/"Us"/"Our")

### GROUP COST OF LIVING RIDER

Where so designated by a Participating Employer, Eligible Individuals and/or Dependents who have applied for and are approved by the Company, and have paid the applicable premiums, will be provided guaranteed Cost of Living increases in life insurance coverage(s) as indicated on the Face Page of the Certificate to which it is attached in accordance with the following terms and conditions:

1. The benefits under this Rider may apply before and/or after the Paid-Up Date.

2. If this Rider applies to the Group Permanent Coverage, the initial face amount will be automatically increased in terms of this Rider. If the Rider applies to other coverages the initial amount of coverage shown on the Face Page of the Certificate will be automatically increased.

3. The coverage increase percentage indicated in the Participant's application (Initial Percent) will automatically be effective on each Accounting Year anniversary unless the Company has received written instructions from the Owner to cancel, suspend, or change the coverage increases as of any Accounting Year at least thirty days prior to the beginning of said Accounting Year.

4. Any increase other than the Initial Percent must be at least 2%, but cannot be more than 10% in any Accounting Year; and in no event can the amount of increase exceed the amount that would have been provided by continuous election of the Initial Percent.

5. If fully discontinued for three consecutive Accounting Years, or if the Death Benefit is decreased at the request of the Owner, the automatic increases will not be effective for any subsequent Accounting Year unless applied for in writing by the Owner and written evidence of insurability, satisfactory to the Company is submitted on behalf of, or by, the Participant.

6. The automatic coverage increases under this Rider will terminate the earlier of (a) the date specified on the Face Page of the Certificate, or (b) when the Death Benefit is equal to the dollar amount specified as the maximum on the Face Page of the Certificate.

7. If the Certificate was issued by the Company with a special class rating, any automatic Cost of Living increase provided under this Rider will carry the same special class rating.

8. Any increases desired by the Owner other than those provided in this Rider will be based on underwriting rules then in effect and written evidence of insurability satisfactory to the Company.

IN WITNESS THEREOF, General Services Life Insurance Company has, by its President and Secretary, executed this Rider and caused the same to be countersigned as of the Master Policy Effective Date.

SECRETARY

PRESIDENT

G-DRL 0113 (5/86) [GSL001/W2]



**GENERAL SERVICES LIFE INSURANCE COMPANY**
Home Office: Washington, DC
Regional Office: 475 Gate Five Road, #A-215, Sausalito, California 94965
(the "Company" or "We"/"Us"/"Our")

**GROUP TOTAL DISABILITY**
**WAIVER OF RISK CHARGE RIDER**

**WAIVER OF RISK CHARGE BENEFIT.** During a period of total disability we will waive the Risk Charges that are covered by this Rider. The Risk Charges covered by the Rider are shown on the Certificate Face Page. The insurance covered by this Rider will not exceed the amount in force at the date of disability.

When the Owner claims waiver of Risk Charge, Risk Charges are due for at least 4 months or until we approve the claim. If we waive a Risk Charge that has been paid, we will refund it, or include it in the proceeds payable. No Risk Charge will be waived the due date of which is more than one year prior to our receipt of notice of the disability.

No Risk Charge will be waived after the later of the sixty-fifth birthday of the Participant or twenty-eight months of total disability, if the disablement occurred after the sixtieth birthday of the Participant.

This benefit does not extend to other members of the family (if any) who may be insured by supplemental Riders or coverages added to and made part of the Certificate of the Participant.

**TOTAL DISABILITY.** The Participant is totally disabled: (1) if the cause is an injury or sickness which happens while the Participant is covered by this Rider; and (2) if the disablement occurs after age 15 and before the first annual date after the Participant attains age 65; and (3) if the disability lasts four months or more; and (4) if the disability prevents the Participant from performing: (a) the material and substantial duties of his or her occupation or; (b) the material and substantial duties of a job based upon past education, training or experience after two years since disablement; or (c) going back to school if the Participant is a student.

We will consider it to be Total Disability if the Participant: (1) has lost the use of both legs; or (2) has lost the use of both arms; or (3) has lost the use of one leg and one arm; or (4) has lost the sight of both eyes.

**EXCLUSIONS.** This benefit does not cover disability from: (1) war (declared or not) or acts of war; or (2) from intentional self-inflicted injury; or (3) an injury sustained by the Participant while committing, or as a result of committing, an assault or felony.

**CHANGE IN COVERAGE.** The coverage for which Risk Charges will be waived by the Rider may be increased or decreased by written request from the Owner, subject to the following conditions: (1) any decrease will become effective on the monthly anniversary day that falls on or next follows the receipt of the written request; and (2) any request for an increase must be applied for on a supplemental application. An increase shall be subject to evidence of insurability satisfactory to the Company.

**PROOF.** We must receive due proof within one year after the disablement that the Participant is totally disabled. We must have such proof during the lifetime of the Participant and during the continuance of total disability, unless there is good reason the proof could not be sent.

**PROOF OF CONTINUANCE.** While benefits are being paid during total disability we may at reasonable times require: (1) due proof that the Participant is totally disabled; and (2) an examination by one or more physicians selected by us. After total disability has continued for two full years we will not require proof or an examination more often than once a year. We will not waive any risk charges if: (a) proof is not furnished upon request; or (b) the Participant fails to submit to a medical examination.

**TERMINATION.** Coverage under this Rider will terminate automatically: (1) on lapse, surrender, or termination of the Certificate; (2) on the Paid-Up Date, if any; (3) on the Accounting Year anniversary nearest the 65th birthday of the Participant; or (4) on any monthly anniversary that the premium for this Rider is not paid.

Any extension of this Rider due to a change in the Paid-Up Date may be subject to evidence of insurability satisfactory to us.

The Owner may cancel this Rider at any time by filing written notice with us accompanied by the Certificate for endorsement.

**PREMIUM.** The premium for this Rider is shown in the Certificate. Premiums may be deducted from any Group Permanent Certificate Account Values as Risk Charge deductions if agreed to by the Owner(s).

G-DRL 0116 -1     (5/86) [GSL001/W2]



if, during any time that the Risk Charges are being waived, the Current Cash Value under the Group Permanent Certificate is not large enough to cover the monthly Risk Charge deductions that are not being waived, the Owner may elect one of the following options:

Option A - To pay a premium large enough to cover the Risk Charge deductions; or

Option B - To decrease the insurance coverage under the Certificate and any Riders to the Amount for which Risk Charge deductions are being waived.

if no Option is elected, Option B will automatically apply.

**GENERAL.** All provisions of the Policy also apply to this Rider. The Rider starts on the same date as the Certificate unless a different date is shown on the Rider to the Certificate.

**IN WITNESS WHEREOF,** General Services Life Insurance Company has, by its President and Secretary, executed this Rider and caused the same to be countersigned as of the Master Policy Effective Date.

SECRETARY

PRESIDENT

G-DRL 0116 -2      (5/86) [GSL001/W2]



**GENERAL SERVICES LIFE INSURANCE COMPANY**
Home Office: Washington, DC
Regional Office: 475 Gate Five Road, #A-215, Sausalito, California 94965
(the "Company" or "We"/"Us"/"Our")

### GROUP TOTAL DISABILITY
### WAIVER OF PREMIUM RIDER

**WAIVER OF PREMIUM BENEFIT.** During a period of total disability we will pay the "Premium Waived" shown on the Certificate. It will be credited as if it were a premium paid by the Owner.

When the Owner claims waiver of premiums, premiums are due for at least 4 months or until we approve the claim. If we waive a premium that has been paid, we will refund it, or include it in the proceeds payable. No premium will be waived the due date of which is more than one year prior to our receipt of notice of the disability.

No disability benefit will be paid by this Rider after the later of the Participant's sixty-fifth birthday or twenty-eight months of total disability if the disablement occurred after the sixtieth birthday of the Participant.

No disability benefit will be paid by this Rider after the Paid-Up Date shown on the Participant's Certificate at the commencement of disability. No disability benefit will be paid by this Rider after the end of the planned premium payment period as shown on the illustration attached to the Participant's Certificate.

This benefit does not extend to other members of the family (if any) who may be insured by supplemental Riders or coverages added to and made part of the Certificate of the Participant.

**TOTAL DISABILITY.** The Participant is totally disabled: (1) if the cause is an injury or sickness which happens while the Participant is covered by this Rider; and (2) if the disablement occurs after age 15 and before the first annual date after the Participant attains age 65; and (3) if the disability lasts four months or more; and (4) if the disability prevents the Participant from performing: (a) the material and substantial duties of his or her occupation or; (b) the material and substantial duties of a job based upon past education, training or experience after two years since disablement; or (c) going back to school if the Participant is a student.

We will consider it to be Total Disability if the Participant: (1) has lost the use of both legs; or (2) has lost the use of both arms; or (3) has lost the use of one leg and one arm; or (4) has lost the sight of both eyes.

**EXCLUSIONS.** This benefit does not cover disability from: (1) war (declared or not) or acts of war; or (2) from intentional self-inflicted injury; or (3) an injury sustained by the Participant while committing, or as a result of committing, an assault or felony.

**CHANGE IN COVERAGE.** The Premium Waived may be increased or decreased by written request from the Owner, subject to the following conditions: (1) any decrease will become effective on the monthly anniversary day that falls on or next follows the receipt of the written request; and (2) any request for an increase must be applied for on a supplemental application. An increase shall be subject to evidence of insurability satisfactory to the Company.

**PROOF.** We must receive due proof within one year after the disablement that the Participant is totally disabled. We must have such proof during the lifetime of the Participant and during the continuance of total disability, unless there is good reason the proof could not be sent.

**PROOF OF CONTINUANCE.** While benefits are being paid during total disability we may at reasonable times require: (1) due proof that the Participant is totally disabled; and (2) an examination by one or more physicians selected by us. After total disability has continued for two full years we will not require proof or an examination more often than once a year. We will not pay any Premium Waived if: (a) proof is not furnished upon request; or (b) the Participant fails to submit to a medical examination.

**TERMINATION.** Coverage under this Rider will terminate automatically: (1) on lapse, surrender, or termination of the Certificate; (2) on the Paid-Up Date, if any; (3) on the Accounting Year anniversary nearest the 65th birthday of the Participant; (4) on any scheduled premium due date that the premium for this Rider and/or its Group Permanent and/or Group Annuity premium(s) is not paid; or (5) at the end of the planned premium payment period as shown on the illustration attached to the Participant's Certificate.

Any extension of this Rider due to a change in the Paid-Up Date may be subject to evidence of insurability satisfactory to us.

The Owner may cancel this Rider at any time by filing written notice with us accompanied by the Certificate for endorsement.

G-DRL 0119-1     (5/86) [GSL001/W2]



**PREMIUM.** The premium for this Rider is shown in the Certificate. Premiums may be deducted from any Group Permanent Certificate Account Values as Risk Charge deductions if agreed to by the Owner(s).

If, during any time that the Premium Waiver is being credited, the Current Cash Value under the Group Permanent Certificate is not large enough to cover the monthly Risk Charge deductions, the Owner may elect one of the following options:

Option A - To pay a premium large enough to cover the Risk Charge deductions; or
Option B - To decrease the insurance coverage under the Certificate and any Riders to the amount that will be continued in force by the Premium Waived.

If no Option is elected, Option B will automatically apply.

**GENERAL.** All provisions of the Policy also apply to this Rider. The Rider starts on the same date as the Certificate unless a different date is shown on the Rider to the Certificate.

**IN WITNESS WHEREOF,** General Services Life Insurance Company has, by its President and Secretary, executed this Rider and caused the same to be countersigned as of the Master Policy Effective Date.

SECRETARY

PRESIDENT

G-DRL 0119 -2      (5/86) [GSL001/W2]

3889-05-00-0000148-0028-0001707



**GENERAL SERVICES LIFE INSURANCE COMPANY**
Home Office: Washington, DC
Regional Office: 475 Gate Five Road, #A-215, Sausalito, California 94965
(the "Company" or "We"/"Us"/"Our")

## GROUP TERM INSURANCE RIDER

Subject to the provisions of this Rider the Company agrees to pay upon receipt of due and satisfactory proof of the death, the Death Benefit for which a Participant is insured as stated in the Certificates and Illustrations issued hereunder. The insurance is provided in consideration of the individual applications of the insured Participants and the payment of premiums on the due date. This Rider provides for benefits that will become payable only on the death of the Participant and Sections IV and V of the master Policy relating to Account Values and Policy Loans respectively do not apply to this Rider.

### GENERAL PROVISIONS

**ELIGIBILITY FOR INSURANCE AND EFFECTIVE DATE OF COVERAGE.** Individuals are eligible for insurance on or after the Program Effective Date upon completion of any eligibility period of continuous active employment or other requirements specified in the Participating Employer's Program of insurance on the terms and conditions and premium rates applicable on the day following the completion of such period.

Each Eligible Individual or eligible Dependent who makes written application will become insured on the Coverage Effective Date if he or she furnishes evidence of insurability satisfactory to the Company and has complied with all the requirements of the Company for new entrants.

**TERMINATION OF COVERAGE.** A Participant's insurance will terminate on the earlier of: (1) the end of the period for which premiums have been paid for his or her insurance; and (2) the date he or she ceases to be employed, unless continuation of insurance coverage following cessation of employment is elected; or he or she was a member of a class of Eligible Individuals for whom continued employment or continued membership in an association was not required; or he or she was an eligible Dependent for whom employment was not required.

**DEATH BENEFIT.** The Death Benefit in respect of this Rider is the life insurance coverage amount defined and stated in the Certificate and the Participant's Illustration. Upon receipt of due proof of the insured Participant's death, the Company will pay the Death Benefit if the insured Participant dies while the benefits provided by this Rider are in force and no premium is unpaid beyond its grace period.

**CERTIFICATES.** An individual Certificate will be issued for each insured Participant stating the insurance benefits to which he or she is entitled, to whom benefits are payable, and the manner in which benefits are payable to the Beneficiary.

**OWNERSHIP PROVISION.** The Owner of the rights and benefits provided by this Rider is the person designated as Primary Owner. If the Primary Owner dies or becomes legally incompetent, the Contingent Owner will become the Owner. If the Contingent Owner dies or becomes legally incompetent, the Beneficiary will become the Owner. If the Beneficiary in turn dies or becomes legally incompetent the insured Participant will become the Owner. If there is no one named as Owner in the Application, the Beneficiary will be the Owner.

**BENEFICIARY.** The death benefits shall be paid to the Primary Beneficiary designated by the Owner. If no Beneficiary has been designated by the Owner or if the Primary Beneficiary does not survive the insured Participant, the death benefits shall be paid to the surviving person or persons in the first of the following classes of successive preference beneficiaries of which a member survives the insured Participant: (1) the Contingent Beneficiary; (2) the insured Participant's; (a) spouse; (b) children including legally adopted children; (c) parents; (d) brothers and sisters; (e) executor or administrator.

Unless the Company is told otherwise in writing, it will follow these rules: (1) the Company will pay equal shares when more than one Beneficiary will share the funds; (2) if any Beneficiary dies at the same time as the insured Participant, or within 30 days after and before the Company makes any payments, it will pay as if that Beneficiary did not live as long as the insured Participant, however, the Company will not be required to delay payment for more than 30 days after an insured Participant's death; (3) when Beneficiaries are not shown by name (such as "children"), the Company may determine who they are from sworn statements and not wait for court records; (4) the word "child" means only a child born to or adopted by the insured Participant.

G-DRL 0118 -1    (5/86) [GSL001/W2]



**TRUSTEES AS OWNERS OR BENEFICIARY.** The fact that the Owner or the Beneficiary is a designated trust will not make any difference in the way the Company deals with the Rider. If there is any conflict between the terms of the Rider and the terms of the trust, the Company will follow the terms of this Rider. Payment of any money to the trustee of the designated trust will release the Company from any liability for that money.

**CHANGE OF OWNER AND BENEFICIARY.** The Owner can name someone else as Owner at any time, as long as the insured Participant is still alive, or as Beneficiary at any time, as long as the insured Participant is still alive and subject to any irrevocable beneficiary designation. The Owner must write to the Company and notify the Company of the change. After the Company receives the change, it will be effective as of the date that the Owner signed the request, even if the insured Participant died in the meantime. However, the Company will not be liable for any payments it makes, or actions it takes before it receives and acknowledges the request.

**ASSIGNMENT OF BENEFITS.** The Owner may assign the benefits at any time. The Owner must notify us in writing of the assignment. After we have acknowledged the assignment, it will become effective as of the date of the assignment. The Company is not responsible for the validity of any assignment. The rights of the Owner and the Beneficiary may be restricted or ended if these benefits are assigned.

**PREMIUM PROVISIONS.** The first premium must be paid on the Participant's Coverage Effective Date while the health of the insured Participant is as stated in the application. If it is not, the coverage will not go into force. The Company will ignore the difference in health, however, if it does not put the Company at any greater risk. After that, each premium is due at the end of the period for which the premium before it was paid. If the insured Participant dies on or before the date a premium is due, that particular premium does not have to be paid.

All premiums are payable in advance by check made payable to the Company at the Company's Regional Office. Premiums may be deducted from any Group Permanent Certificate Account Values as Risk Charge deductions if agreed to by the Owners, or may be waived under any applicable Waiver of Risk Charge Rider.

If a Certificate under this Rider is issued in any jurisdiction in which a limitation of employee contribution is required, then, in that event, the contribution by an employee toward the cost of his or her insurance may not exceed forty (40) cents per one thousand dollars insured amount per month.

**GRACE PERIOD AND REINSTATEMENT PROVISIONS.** If any premium except the first premium is not paid on or before the due date, the Company will allow a period of 31 days after such due date during which time the Certificate(s) under this Rider will remain in force. This is called the grace period. If the premium is not paid by anyone before the end of the grace period, the coverage under this Rider will terminate. If the coverage terminates because a premium was not paid, the Owner may apply to have it reinstated. The Company will reinstate the coverage on three conditions: (1) reinstatement must be requested; and (2) evidence of insurability that is satisfactory to the Company must be supplied by the Participant; and (3) all of the overdue premiums, with interest, compounded yearly, must be paid.

**CONVERSION PRIVILEGE.** Within 31 days following termination of coverage for a Participant, the Owner may convert the benefits provided by this Rider on the Participant as indicated in the Certificate of insurance without evidence of insurability to any plan of life or endowment insurance on the Participant that the Company is then authorized to routinely issue. The Company has restrictions on the minimum amounts of insurance it will issue. These vary from plan to plan and may limit the Owner's choice of policies. However, they will not be used to deny conversion.

The Company will not issue a policy which has the effect of placing it at any greater risk than existed under this Rider. An accidental death benefit may be included if the insured Participant enjoyed that benefit. A waiver of premium benefit may be included if a Waiver of Risk Charge Benefit applied to the Participant's coverage being converted, but in that event, the Company will not include a waiver of premium rider in the new policy if the insured is over age 55 on the Conversion Date.

**EXTENSION OF COVERAGE.** If a Participant insured under this Rider dies during the period within which the individual would have been entitled in terms of the section headed "Conversion Privilege" to have an individual policy issued under this Rider and before such individual policy becomes effective, the amount of life insurance which he would have been entitled to under such individual policy shall be payable as a claim under this Rider whether or not application for the individual policy or payment of the first premium has been made.

**SUICIDE.** If the Policy is issued to a Missouri citizen, suicide is no defense to the payment of life insurance benefits nor is suicide, while insane, a defense to payment of accidental death benefits, if any, unless the Company can show that the insured Participant intended suicide when he applied for coverage under this Rider.

G-DRL 0118 -2     (5/86) [GSL001/W2]

3889-05-00-0001148-0030-0001709

**INCONTESTABILITY.** If premiums are paid when due, the Company will not contest the benefits described in any Certificate after it has been in force during the lifetime of the Insured Participant for two years from the Certificate Issue Date as to each such Insured Participant. In addition, any evidence of insurability voluntarily submitted by the Participant to obtain an increase in coverage or a more favorable Risk Premium after the Certificate Issue Date will be incontestable after the increase in coverage or more favorable Risk Premiums has been in effect during the lifetime of the Participant for two years.

**AGE.** "Age" of the Insured Participant referred to in this Rider, means his or her age on his or her nearest birthday.

**MISSTATEMENT OF AGE.** If the Insured Participant's age is incorrectly stated, the Company will adjust all benefits under this Rider to what the premiums paid would have bought at his or her correct age. The adjustment will be based on the same rates the Company would have used had there been no misstatement of age.

**RENEWAL PROVISIONS FOR THE PARTICIPATING EMPLOYER.** The period of insurance of this Rider is the life of each Insured Participant. The Participating Employer does not have to ask the Company to renew this Rider, renewal is automatic. The only condition is that premiums for all renewal periods be paid no more than 31 days after the day they become due. The Company may, however, at its option decline to issue Certificates under this Rider for additional Participating Employers or additional Eligible Individuals or eligible Dependents of Participating Employers at any time upon at least 30 days written notice to the Policyholder.

**IN WITNESS WHEREOF,** General Services Life Insurance Company has, by its President and Secretary executed this Rider and caused the same to be countersigned as of the Master Policy Effective Date.

SECRETARY

PRESIDENT




**GENERAL SERVICES LIFE INSURANCE COMPANY**
Home Office: Washington, DC
Regional Office: 475 Gate Five Road, #A-215, Sausalito, California 94965
(the "Company" or "We"/"Us"/"Our")

## GROUP LIFE INSURANCE RIDER

Subject to the provisions of this Rider the Company agrees to pay upon receipt of due and satisfactory proof of the death, the Death Benefit for which a Participant is insured as stated in the Certificates and Illustrations issued hereunder. The Insurance is provided in consideration of the individual applications of the insured Participants and the payment of premiums on the due date. This Rider provides for benefits that will become payable only on the death of the Participant and Sections IV and V of the master Policy relating to Account Values and Policy Loans respectively do not apply to this Rider.

### GENERAL PROVISIONS

**ELIGIBILITY FOR INSURANCE AND EFFECTIVE DATE OF COVERAGE.** Individuals are eligible for insurance on or after the Program Effective Date upon completion of any eligibility period of continuous active employment or other requirements specified in the Participating Employer's Program of insurance on the terms and conditions and premium rates applicable on the day following the completion of such period.

Each Eligible Individual or eligible Dependent who makes written application will become insured on the Coverage Effective Date if he or she furnishes evidence of insurability satisfactory to the Company and has complied with all the requirements of the Company for new entrants.

**TERMINATION OF COVERAGE.** A Participant's insurance will terminate on the earlier of: (1) the end of the period for which premiums have been paid for his or her insurance; and (2) the date he or she ceases to be employed, unless continuation of insurance coverage following cessation of employment is elected; or he or she was a member of a class of Eligible Individuals for whom continued employment or continued membership in an association was not required; or he or she was an eligible Dependent for whom employment was not required.

**DEATH BENEFIT.** The Death Benefit in respect of this Rider is the life insurance coverage amount defined and stated in the Certificate and the Participant's Illustration. Upon receipt of due proof of the insured Participant's death, the Company will pay the Death Benefit if the insured Participant dies while the benefits provided by this Rider are in force and no premium is unpaid beyond its grace period.

**CERTIFICATES.** An individual Certificate will be issued for each insured Participant stating the insurance benefits to which he or she is entitled, to whom benefits are payable, and the manner in which benefits are payable to the Beneficiary.

**OWNERSHIP PROVISION.** The Owner of the rights and benefits provided by this Rider is the person designated as Primary Owner. If the Primary Owner dies or becomes legally incompetent, the Contingent Owner will become the Owner. If the Contingent Owner dies or becomes legally incompetent, the Beneficiary will become the Owner. If the Beneficiary in turn dies or becomes legally incompetent the insured Participant will become the Owner. If there is no one named as Owner in the Application, the Beneficiary will be the Owner.

**BENEFICIARY.** The death benefits shall be paid to the Primary Beneficiary designated by the Owner. If no Beneficiary has been designated by the Owner or if the Primary Beneficiary does not survive the insured Participant, the death benefits shall be paid to the surviving person or persons in the first of the following classes of successive preference beneficiaries of which a member survives the insured Participant: (1) the Contingent Beneficiary; (2) the insured Participant's; (a) spouse; (b) children including legally adopted children; (c) parents; (d) brothers and sisters; (e) executor or administrator.

Unless the Company is told otherwise in writing, it will follow these rules: (1) the Company will pay equal shares when more than one Beneficiary will share the funds; (2) if any Beneficiary dies at the same time as the insured Participant, or within 30 days after and before the Company makes any payments, it will pay as if that Beneficiary did not live as long as the insured Participant, however, the Company will not be required to delay payment for more than 30 days after an insured Participant's death; (3) when Beneficiaries are not shown by name (such as "children"), the Company may determine who they are from sworn statements and not wait for court records; (4) the word "child" means only a child born to or adopted by the insured Participant.

G-DRL 0122-1    (5/86) [GSL001/W2]



**TRUSTEES AS OWNERS OR BENEFICIARY.** The fact that the Owner or the Beneficiary is a designated trust will not make any difference in the way the Company deals with the Rider. If there is any conflict between the terms of the Rider and the terms of the trust, the Company will follow the terms of this Rider. Payment of any money to the trustee of the designated trust will release the Company from any liability for that money.

**CHANGE OF OWNER AND BENEFICIARY.** The Owner can name someone else as Owner at any time, as long as the insured Participant is still alive, or as Beneficiary at any time, as long as the insured Participant is still alive and subject to any irrevocable beneficiary designation. The Owner must write to the Company and notify the Company of the change. After the Company receives the request, it will be effective as of the date that the Owner signed the request, even if the insured Participant died in the meantime. However, the Company will not be liable for any payments it makes, or actions it takes before it receives and acknowledges the request.

**ASSIGNMENT OF BENEFITS.** The Owner may assign the benefits at any time. The Owner must notify us in writing of the assignment. After we have acknowledged the assignment, it will become effective as of the date of the assignment. The Company is not responsible for the validity of any assignment. The rights of the Owner and the Beneficiary may be restricted or ended if these benefits are assigned.

**PREMIUM PROVISIONS.** The first premium must be paid on the Participant's Coverage Effective Date while the health of the insured Participant is as stated in the application. If it is not, the coverage will not go into force. The Company will ignore the difference in health, however, if it does not put the Company at any greater risk. After that, each premium is due at the end of the period for which the premium before it was paid. If the insured Participant dies on or before the date a premium is due, that particular premium does not have to be paid.

All premiums are payable in advance by check made payable to the Company at the Company's Regional Office. Premiums may be deducted from any Group Permanent Certificate Account Values as Risk Charge deductions if agreed to by the Owners, or may be waived under any applicable Waiver of Risk Charge Rider.

If a Certificate under this Rider is issued in any jurisdiction in which a limitation of employee contribution is required, then, in that event, the contribution by an employee toward the cost of his or her insurance may not exceed forty (40) cents per one thousand dollars insured amount per month.

**GRACE PERIOD AND REINSTATEMENT PROVISIONS.** If any premium except the first premium is not paid on or before the due date, the Company will allow a period of 31 days after such due date during which time the Certificate(s) under this Rider will remain in force. This is called the grace period. If the premium is not paid by anyone before the end of the grace period, the coverage under this Rider will terminate. If the coverage terminates because a premium was not paid, the Owner may apply to have it reinstated. The Company will reinstate the coverage on three conditions: (1) reinstatement must be requested; and (2) evidence of insurability that is satisfactory to the Company must be supplied by the Participant; and (3) all of the overdue premiums, with interest, compounded yearly, must be paid.

**CONVERSION PRIVILEGE.** Within 31 days following termination of coverage for a Participant, the Owner may convert the benefits provided by this Rider on the Participant as indicated in the Certificate of Insurance without evidence of insurability to any plan of life or endowment insurance on the Participant that the Company is then authorized to routinely issue. The Company has restrictions on the minimum amounts of insurance it will issue. These vary from plan to plan and may limit the Owner's choice of policies. However, they will not be used to deny conversion.

The Company will not issue a policy which has the effect of placing it at any greater risk than existed under this Rider. An accidental death benefit may be included if the insured Participant enjoyed that benefit. A waiver of premium benefit may be included if a Waiver of Risk Charge Benefit applied to the Participant's coverage being converted, but in that event, the Company will not include a waiver of premium rider in the new policy if the insured is over age 55 on the Conversion Date.

**EXTENSION OF COVERAGE.** If a Participant insured under this Rider dies during the period within which the individual would have been entitled in terms of the section headed "Conversion Privilege" to have an individual policy issued under this Rider and before such individual policy becomes effective, the amount of life insurance which he would have been entitled to under such individual policy shall be payable as a claim under this Rider whether or not application for the individual policy or payment of the first premium has been made.

**SUICIDE.** If the Policy is issued to a Missouri citizen, suicide is no defense to the payment of life insurance benefits nor is suicide, while insane, a defense to payment of accidental death benefits, if any, unless the Company can show that the insured Participant intended suicide when he applied for coverage under this Rider.

G-DRL 0122-2    (5/86) [GSL001/W2]

3899-05-00-0001148-0033-0001712



**INCONTESTABILITY.** If premiums are paid when due, the Company will not contest the benefits described in any Certificate after it has been in force during the lifetime of the insured Participant for two years from the Certificate Issue Date as to each such insured Participant. In addition, any evidence of insurability voluntarily submitted by the Participant to obtain an increase in coverage or a more favorable Risk Premium after the Certificate Issue Date will be incontestable after the increase in coverage or more favorable Risk Premiums has been in effect during the lifetime of the Participant for two years.

**AGE.** "Age" of the insured Participant referred to in this Rider, means his or her age on his or her nearest birthday.

**MISSTATEMENT OF AGE.** If the insured Participant's age is incorrectly stated, the Company will adjust all benefits under this Rider to what the premiums paid would have bought at his or her correct age. The adjustment will be based on the same rates the Company would have used had there been no misstatement of age.

**RENEWAL PROVISIONS FOR THE PARTICIPATING EMPLOYER.** The period of insurance of this Rider is the life of each insured Participant. The Participating Employer does not have to ask the Company to renew this Rider, renewal is automatic. The only condition is that premiums for all renewal periods be paid no more than 31 days after the day they become due. The Company may, however, at its option decline to issue Certificates under this Rider for additional Participating Employers or additional Eligible Individuals or eligible Dependents of Participating Employers at any time upon at least 30 days written notice to the Policyholder.

**IN WITNESS WHEREOF,** General Services Life Insurance Company has, by its President and Secretary executed this Rider and caused the same to be countersigned as of the Master Policy Effective Date.

SECRETARY

PRESIDENT

3689-05-00-0000148-0034-0001713

G-DRL 0122-3     (5/86) [GSL001/W2]



**GENERAL SERVICES LIFE INSURANCE COMPANY**
Home Office: Washington, DC
Regional Office: 475 Gate Five Road, #A-215, Sausalito, California 94965

**GROUP ANNUITY RIDER
WITH GUARANTEED INTEREST CREDITS**

Subject to the provisions of the Policy and this Rider, the Company agrees to pay the Annuity Benefits to the Annuitant if he is living on the Maturity Date. The benefits are provided in consideration of the individual application(s) of the insured Participants and the payment of premiums for this Rider.

**GENERAL PROVISIONS**

**ELIGIBILITY FOR COVERAGE AND EFFECTIVE DATE OF COVERAGE.** Each Eligible Individual or Eligible Dependent specified in the Participating Employer's Program of Insurance who makes written application will become covered on the Coverage Effective Date if he or she has complied with all the requirements of the Company for new entrants.

**TERMINATION OF COVERAGE.** A Participant's coverage will terminate on the date he or she ceases to be employed, unless: continuation of coverage following cessation of employment is elected; or he or she was a member of a class of Eligible Individuals for whom continued employment or continued membership in an association was not required; or he or she was an Eligible Dependent for whom employment was not required.

**ANNUITANT.** The Participant stated on the Certificate FACE PAGE issued under this Rider.

**ANNUITY BENEFITS.** A sum to be determined by applying the then available Annuity Cash Value at the Maturity Date to the payment method selected under the Annuity Settlement Option provisions of this Rider.

**MARKET VALUE EQUITY CONCEPT.** The Market Value Equity Concept adjustment is a factor equal to the weighted average value of the ratio of the Market Value Factor in the month of a surrender, withdrawal or a transfer due to a change in an interest earning strategy to the Market Value Factor in the month premiums were paid, on a First-In-First-Out basis. The Market Value Factors are calculated by dividing the market value of the managed assets at the end of each month by the corresponding book value. The Market Value Factors are available from the Company upon request.

**MATURITY DATE.** The Owner may elect any anniversary of the Coverage Effective Date as a Maturity Date, provided that if no election is made, this Rider will mature on the later of: (1) the anniversary of the Annuitant's Coverage Effective Date nearest the Annuitant's 70th birthday; or (2) ten years after the Coverage Effective Date. No change in the Maturity Date may be made by the Owner, unless approved by the Company. The current Annuity Cash Value may be adjusted by the Company by an amount equal to the Market Value Equity Concept adjustment when the Maturity Date is changed.

**REFUND UPON DEATH PRIOR TO MATURITY DATE.** We will pay the Beneficiary upon death of the Annuitant prior to the Maturity Date a refund equal to the Annuity Cash Value of this Rider including Excess Interest thereon to the date of death provided: (1) no annuity payments have been made thereunder; and (2) due proof of the Annuitant's death is received at the Regional Office.

**CERTIFICATES.** An individual Certificate will be issued for each insured Participant stating the benefits to which he or she is entitled, to whom benefits are payable and the manner in which benefits are payable to the Beneficiary.

**OWNERSHIP PROVISION.** The Owner of the rights and benefits provided by this Rider is the person designated as Primary Owner. If the Primary Owner dies or becomes legally incompetent, the Contingent Owner will become the Owner. If the Contingent Owner dies or becomes legally incompetent, the Annuitant will become the Owner. If there is no one named as Owner in the Application, the Annuitant will be the Owner.

**BENEFICIARY.** The amounts refunded or payable upon death shall be paid to the Primary Beneficiary designated by the Owner. If no Beneficiary has been designated by the Owner or if the Primary Beneficiary does not survive the Annuitant, the amounts shall be paid to the surviving person or persons in the first of the following classes of successive preference beneficiaries of which a member survives the Annuitant: (1) the Contingent Beneficiary; (2) the Annuitant's: (a) spouse; (b) children, including legally adopted children; (c) parents; (d) brothers and sisters; (e) executor or administrator.

G-DRL 0165-1    (5/86) [GSL004/W2]

Unless the Company is told otherwise in writing, it will follow these rules: (1) the Company will pay equal shares when more than one Beneficiary will share the funds; (2) if any Beneficiary dies at the same time as the Annuitant, or within 30 days after and before the Company makes any payments, it will pay as if that Beneficiary did not live as long as the Annuitant, however, the Company will not be required to delay payment for more than 30 days after an Annuitant's death; (3) when Beneficiaries are not shown by name (such as "children"), the Company may determine who they are from sworn statements and not wait for court records; (4) the word "child" means only a child born to or adopted by the Annuitant.

**TRUSTEES AS OWNER OR BENEFICIARY.**  The fact that the Owner or the Beneficiary is a designated trust will not make any difference in the way the Company deals with the Rider.  If there is any conflict between the terms of the Rider and the terms of a trust, the Company will follow the terms of this Rider.  Payment of any money to the trustee of the designated trust will release the Company from any liability for that money.

**CHANGE OF OWNER, ANNUITANT AND BENEFICIARY.**  Any time prior to the Maturity Date, the Owner can name someone else as Owner or Annuitant, as long as the Annuitant is still alive, or as Beneficiary at any time, as long as the Annuitant is still alive and subject to any irrevocable beneficiary designation.  The Owner must write to the Company and notify the Company of the change.  After the Company receives the change, it will be effective as of the date that the Owner signed the request, even if the Annuitant died in the meantime.  However, the Company will not be liable for any payments it makes, or actions it takes before it receives and acknowledges the request.

**ASSIGNMENT OF BENEFITS.**  Any written assignment by the Owner shall be effective after it has been received and acknowledged by the Company.  The Company is not responsible for the validity of any assignment.  The rights of the Owner and the Beneficiary may be restricted or ended if these benefits are assigned.

**PREMIUM PROVISION.**  The first premium must be paid on the Participant's Coverage Effective Date.  After the first, premiums may vary at the option of the Owner provided: (1) no premium payment is less than $100; (2) premiums paid in any Accounting Year may not exceed $50,000 unless the Company consents to a different arrangement.

All premiums are payable in advance by check made payable to the Company at the Company's Regional Office unless waived under any applicable waiver of premium Rider.

**CONVERSION PRIVILEGE.**  Within 31 days following termination of coverage for a Participant, the Owner may convert the benefits provided by this Rider without evidence of insurability to any comparable annuity policy or annuity rider then currently in use by the Company.

The Company will not issue a policy or rider which contains a provision which puts it at any greater risk than the similar provision in this Rider.  A waiver of premium benefit may be included if the insured Participant enjoyed that benefit, but in that event, the Company will not include a waiver of premium rider in the new policy if the Annuitant is over age 55 on the Conversion Date.

**AGE.**  "Age" of the Insured Participant referred to in this Rider, means his or her age on his or her nearest birthday.

**MISSTATEMENT OF AGE.**  If the insured Participant's age is incorrectly stated, the Company will adjust all benefits under this Rider to an amount that the premiums paid would have bought at the Participant's correct age.  The adjustment will be based on the same rates the Company would have used had there been no misstatement of age.

**ANNUITY CASH VALUE.**  The Annuity Cash Value of this Rider at the Maturity Date will be: (1) the net premiums paid on this Rider net of any charges for marketing and other costs ("Loading Charges"); plus (2) interest at the guaranteed rates shown on the Face Page of the Certificate; less (3) current policy fees and any premium taxes and other taxes the Company may be required to deduct or withhold; and less (4) any amounts that have been surrendered or withdrawn, together with any surrender charge applicable to the amounts withdrawn or surrendered; and (5) adjusted by any Market Value Equity Concept adjustment.  However, the Company guarantees that in no event will the Annuity Cash Value, after application of the Market Value Equity Concept adjustment, but before deduction of any applicable surrender charges, be less than the sum of the Participant's Net Principal Payments corresponding to such Annuity Cash Value accumulated at 4% interest per annum.  For this purpose, Net Principal Payments are defined as premiums paid less any applicable Loading Charges, policy fees and deducted or withheld taxes, and any amounts which have been surrendered or withdrawn, including any applicable surrender charges.  A statement of the Annuity Cash Value under this Rider will be furnished to the Owner annually.

**ANNUITY SETTLEMENT OPTIONS AND GUARANTEE OF PRINCIPAL.**  The amount available for application on the Maturity Date to any of the payment alternatives referred to below will be the Annuity Cash Value at the date of such application.  The Company guarantees the principal value of that portion of the Annuity Cash Value which is applied on the Maturity Date to any of the interval payment alternatives below.  Unless the Owner has selected the Life Income Alternative below the Owner may request a change from one alternative to another at any time after the Maturity Date.

G-DRL 0165-2     (5/86) [GSL004/W2]

3699-05-00-00001149-0035-0001715



Unless we agree otherwise, the Annuity Cash Value which is applied to any of the interval payment alternatives referred to below must be at least Ten Thousand Dollars ($10,000), and periodic payments to any payee must be at least One Hundred Dollars ($100). If any of the proceeds refundable upon death are payable to an administrator, association, corporation, executor, partnership or trustee, a lump sum payment will be made unless we agree to an alternative payment. An assignee's portion of any death proceeds must be paid in a lump sum. The balance of proceeds may be paid under an alternative. If payment is being made under an alternative payment arrangement, no part of any payment may be alienated, anticipated, assigned, commuted, encumbered or withdrawn, unless we agree.

The following interval payment alternatives are available:

1. **Interest Alternative:** (a) interest is compounded annually on the proceeds held by us and principal and total interest are paid at the end of an agreed upon period; or (b) interest is paid at the end of each month on the proceeds held by us and the principal and any unpaid accrued interest are paid at the end of an agreed upon period.

2. **Installment Alternative:** (a) installments are paid at the beginning of each month of a fixed amount until the proceeds and compounded interest are all paid out; or (b) installments are paid at the beginning of each month for a fixed period.

3. **Life Income Alternative:** (a) installments are paid at the beginning of each month during the payee's lifetime; or (b) installments are paid at the beginning of each month during the payee's lifetime, and are continued during the balance of a 'period certain' if the payee dies within that 'period certain'; or (c) installments are paid at the beginning of each month during the payees' and the joint payee's lifetime.

Under this payment option, evidence of the payee's age satisfactory to us is required before the first installment is made. Also, we may require proof each time an installment is made that the payee is then alive. Payments under this option are based on the Mortality Tables and interest rates stated on the Certificate FACE PAGE.

4. **Other Alternatives:** any other alternative agreed to by us may be elected.

The amounts payable under any of the alternatives above will be determined by us upon written request by the Owner or Beneficiary. Unless otherwise agreed to by the Company, the minimum settlement period under Installment Alternatives 1 and 2 is 10 years. The guaranteed effective annual interest rate under Alternative 1, 2 and 3 is four percent (4%) or such greater rate as we may establish from time to time. Interest in excess of four percent (4%) may be declared by us, at our sole discretion, to be payable under 1 and 2, and during the 'period certain' under 3 (a). The Company may deduct Federal, State or Local taxes or income taxes as a withholding from any payments made hereunder.

If the Owner or Beneficiary does not want monthly installments, they may write and ask the Company to make quarterly, semi-annual or annual installments.

**REQUIRED DISTRIBUTIONS WHERE OWNER DIES BEFORE ENTIRE INTEREST IS DISTRIBUTED**
(1) if the Owner dies on or after the Annuity Starting Date and before the entire interest in such Annuity has been distributed, the remaining portion of such interest will be distributed at least as rapidly as under the method of distributions being used as of the date of death, and

(2) if the Owner of such Annuity dies before the Annuity Starting Date, the entire interest in such Annuity will be distributed within 5 years after the death of the Owner.

(3) Exception for certain amounts payable over life of Beneficiary. If:
    (A) any portion of the Owner's interest is payable to (or for the benefit of) a Designated Beneficiary,

    (B) such portion will be distributed (in accordance with regulations) over the life of such Designated Beneficiary (or over a period not extending beyond the life expectancy of such Beneficiary), and

    (C) such distributions begin not later than 1 year after the date of the Owner's death or such later date as Internal Revenue Code regulation(s) prescribe,

then for purposes of paragraph (1) the portion referred to therein shall be treated as distributed on the day on which such distributions begin.

(4) Special rule where Surviving Spouse is the Beneficiary: if the Designated Beneficiary referred to in paragraph (3)(A) is the Surviving Spouse of the Owner of the contract, paragraphs (1), (2) and (3) shall be applied by treating such Spouse as the Owner.

(5) Designated Beneficiary: for purposes of this subsection, the term "Designated Beneficiary" means any individual designated a Beneficiary by the Owner.

G-DRL 0165-3    (5/86) [GSL004/W2]



**SURRENDERS AND WITHDRAWAL OPTIONS.** Prior to the Maturity Date, the Owner may surrender or withdraw all or a part of the Annuity Cash Value, determined in accordance with the following options:

**Surrender Option 1.**

Under this option the amount which can be surrendered or withdrawn will be determined as the then current Annuity Cash Value subject to: (1) any Market Value Equity Concept adjustment; and (2) any taxes or early termination penalties which may be imposed in terms of any Federal, State or Local law. Market Value Equity Concept adjustments will be determined at the effective date of surrender or withdrawal.

This Option 1 will always be applied for any amounts surrendered or withdrawn before the expiration of five years after the date the premium was received by the Company.

**Surrender Option 2.**

The Owner must elect at the date of payment of the premium, for this Option 2 to apply to all amounts surrendered or withdrawn at any time after the expiration of five years from the date the premium was received by the Company. If this Option 2 applies the amount which can be surrendered will be subject to any taxes or early termination penalties which may be imposed in terms of any Federal, State or Local law; and determined as the Annuity Cash Value calculated by applying the following interest rates as a substitute for the guaranteed interest rates shown on the Certificate FACE PAGE, for the period from the date the premium was received by the Company to the date of surrender or withdrawal:

| Years 1 to 5 inclusive | - | 4% per annum. |
| Years 6 onward | - | 2 1/2% per annum less than the actual interest rates that would be credited to each Certificate as shown on the Certificate FACE PAGE. |

**Surrenders or Withdrawals After the Maturity Date.**

Any amounts surrendered on or after the Maturity Date will not be subject to any adjustment under Option 1 and Option 2 above. Any Annuity Cash Value which is not withdrawn or surrendered or is not immediately applied to any one of the Annuity Settlement Options will be automatically credited with interest at the rates declared by the Company at that time, subject to a minimum of 4% per annum. If the Life Income Alternative is selected, there is no Annuity Cash Value after the Maturity Date.

**RENEWAL PROVISION FOR THE PARTICIPATING EMPLOYER.** The period of this Rider is that period of the life of each insured Participant which commences on the Maturity Date and ends on the Participant's Death or on the date payments under the interval payment alternatives cease. The Participating Employer does not have to ask the Company to renew this Rider, renewal is automatic. The only condition is that premiums for all renewal periods be paid no more than 31 days after the day they become due. The Company, may, however, at its option decline to issue Certificates under this Rider for additional Participating Employers or additional Eligible Individuals or eligible Dependents of Participating Employers at any given time upon at least 30 days written notice to the Policyholder.

**IN WITNESS WHEREOF,** General Services Life Insurance Company has by its President and Secretary executed this Rider and caused the same to be countersigned as of the Master Policy Effective Date.

3689-05-00-0000148-0038-0001717

SECRETARY

PRESIDENT

G-DRL 0165-4    (5/86) [GSL004/W2]



**GENERAL SERVICES LIFE INSURANCE COMPANY**
Home Office: Washington, DC
Regional Office: 475 Gate Five Road, #A-215, Sausalito, California 94965

**GROUP FLEXIBLE PREMIUM DEFERRED ANNUITY RIDER
WITH GUARANTEED MINIMUM INTEREST CREDITS**

Subject to the provisions of the Policy and this Rider, the Company agrees to pay the Annuity Benefits to the Annuitant if he is living on the Maturity Date.  The benefits are provided in consideration of the individual application(s) of the insured Participants and the payment of premiums for this Rider.

**GENERAL PROVISIONS**

**ELIGIBILITY FOR COVERAGE AND EFFECTIVE DATE OF COVERAGE.**  Each Eligible Individual or Eligible Dependent specified in the Participating Employer's Program of Insurance who makes written application will become covered on the Coverage Effective Date if he or she has complied with all the requirements of the Company for new entrants.

**TERMINATION OF COVERAGE.**  A Participant's coverage will terminate on the date he or she ceases to be employed, unless: continuation of coverage following cessation of employment is elected; or he or she was a member of a class of Eligible Individuals for whom continued employment or continued membership in an association was not required; or he or she was an Eligible Dependent for whom employment was not required.

**ANNUITANT.**  The Participant stated on the Certificate FACE PAGE issued under this Rider.

**ANNUITY BENEFITS.**  A sum to be determined by applying the then available Annuity Cash Value at the Maturity Date to the payment method selected under the Annuity Settlement Option provisions of this Rider.

**MARKET VALUE EQUITY CONCEPT.**  The Market Value Equity Concept adjustment is a factor equal to the weighted average value of the ratio of the Market Value Factor in the month of a surrender, withdrawal or a transfer due to a change in an interest earning strategy to the Market Value Factor in the month premiums were paid, on a First-In-First-Out basis.  The Market Value Factors are calculated by dividing the market value of the managed assets at the end of each month by the corresponding book value.  The Market Value Factors are available from the Company upon request.

**MATURITY DATE.**  The Owner may elect any anniversary of the Coverage Effective Date as a Maturity Date, provided that if no election is made, this Rider will mature on the later of:  (1) the anniversary of the Annuitant's Coverage Effective Date nearest the Annuitant's 70th birthday; or (2) ten years after the Coverage Effective Date.  No change in the Maturity Date may be made by the Owner, unless approved by the Company.  The current Annuity Cash Value may be adjusted by the Company by an amount equal to the Market Value Equity Concept adjustment when the Maturity Date is changed.

**REFUND UPON DEATH PRIOR TO MATURITY DATE.**  We will pay the Beneficiary upon death of the Annuitant prior to the Maturity Date a refund equal to the Annuity Cash Value of this Rider including Excess Interest thereon to the date of death provided:  (1) no annuity payments have been made thereunder; and (2) due proof of the Annuitant's death is received at the Regional Office.

**CERTIFICATES.**  An Individual Certificate will be issued for each insured Participant stating the benefits to which he or she is entitled, to whom benefits are payable and the manner in which benefits are payable to the Beneficiary.

**OWNERSHIP PROVISION.**  The Owner of the rights and benefits provided by this Rider is the person designated as Primary Owner.  If the Primary Owner dies or becomes legally incompetent, the Contingent Owner will become the Owner.  If the Contingent Owner dies or becomes legally incompetent, the Annuitant will become the Owner.  If there is no one named as Owner in the Application, the Annuitant will be the Owner.

**BENEFICIARY.**  The amounts refunded or payable upon death shall be paid to the Primary Beneficiary designated by the Owner.  If no Beneficiary has been designated by the Owner or if the Primary Beneficiary does not survive the Annuitant, the amounts shall be paid to the surviving person or persons in the first of the following classes of successive preference beneficiaries of which a member survives the Annuitant:  (1) the Contingent Beneficiary; (2) the Annuitant's:  (a) spouse; (b) children, including legally adopted children; (c) parents; (d) brothers and sisters; (e) executor or administrator.

Unless the Company is told otherwise in writing, it will follow these rules:  (1) the Company will pay equal shares when more than one Beneficiary will share the funds; (2) if any Beneficiary dies at the same time as the Annuitant, or within 30 days after and before the Company makes any payments, it will pay as if that Beneficiary did not live as long as the Annuitant, however, the Company will not be required to delay payment for more than 30 days after an Annuitant's death; (3) when Beneficiaries are not shown by name (such as "children"), the Company may determine who they are from sworn statements and not wait for court records; (4) the word "child" means only a child born to or adopted by the Annuitant.

G-DRR 30007-1     (5/86) [GSL004/W2]



**TRUSTEES AS OWNER OR BENEFICIARY.** The fact that the Owner or the Beneficiary is a designated trust will not make any difference in the way the Company deals with the Rider. If there is conflict between the terms of the Rider and the terms of a trust, the Company will follow the terms of this Rider. Payment of any money to the trustee of the designated trust will release the Company from any liability for that money.

**CHANGE OF OWNER, ANNUITANT AND BENEFICIARY.** Any time prior to the Maturity Date, the Owner can name someone else as Owner or Annuitant, as long as the Annuitant is still alive, or as Beneficiary at any time, as long as the Annuitant is still alive and subject to any irrevocable beneficiary designation. The Owner must write to the Company and notify the Company of the change. After the Company receives the change, it will be effective as of the date that the Owner signed the request, even if the Annuitant died in the meantime. However, the Company will not be liable for any payments it makes, or actions it takes before it receives and acknowledges the request.

**ASSIGNMENT OF BENEFITS.** Any written assignment by the Owner shall be effective after it has been received and acknowledged by the Company. The Company is not responsible for the validity of any assignment. The rights of the Owner and the Beneficiary may be restricted or ended if these benefits are assigned.

**PREMIUM PROVISION.** The first premium must be paid on the Participant's Coverage Effective Date. After the first, premiums may vary at the option of the Owner provided: (1) no premium payment is less than $100; (2) premiums paid in any Accounting Year may not exceed $50,000 unless the Company consents to a different arrangement.

All premiums are payable in advance by check made payable to the Company at the Company's Regional Office unless waived under any applicable Waiver of Premium Rider.

**CONVERSION PRIVILEGE.** Within 31 days following termination of coverage for a Participant, the Owner may convert the benefits provided by this Rider without evidence of insurability to any comparable annuity policy or annuity rider then currently in use by us.

The Company will not issue a policy or rider which contains a provision which puts it at any greater risk than the similar provision in this Rider. A waiver of premium benefit may be included if the Insured Participant enjoyed that benefit, but in that event, the Company will not include a waiver of premium rider in the new policy if the Annuitant is over age 55 on the Conversion Date.

**AGE.** "Age" of the Insured Participant referred to in this Rider, means his or her age on his or her nearest birthday.

**MISSTATEMENT OF AGE.** If the Insured Participant's age is incorrectly stated, the Company will adjust all benefits under this Rider to an amount that the premiums paid would have bought at the Participant's correct age. The adjustment will be based on the same rates the Company would have used had there been no misstatement of age.

**ANNUITY CASH VALUE.** The Annuity Cash Value of this Rider at the Maturity Date will be: (1) the net premiums paid on this Rider net of any charges for marketing and other costs ("Loading Charges"); plus (2) interest at a guaranteed minimum annual rate of 4% or such greater rate as the Company establishes from time to time; plus (3) Excess Interest, if any; less (4) the Company's "Administrative Charge" (not to exceed the greater of 1.5% per annum of the Annuity Cash Value or 10% of the interest earnings); less (5) current policy fees and any premium taxes and other taxes the Company may be required to deduct or withhold; and less (6) any amounts that have been surrendered or withdrawn, together with any surrender charge applicable to the amounts withdrawn or surrendered; and (7) adjusted by any Market Value Equity Concept adjustment. However, the Company guarantees that in no event will the Annuity Cash Value, after application of the Market Value Equity Concept adjustment, but before deduction of any applicable surrender charges, be less than the sum of the Participant's Net Principal Payments corresponding to such Annuity Cash Value accumulated at 4% interest per annum. For this purpose, Net Principal Payments are defined as premiums paid less any applicable Loading Charges, Administrative Charges, policy fees and deducted or withheld taxes, and any amounts which have been surrendered or withdrawn, including any applicable surrender charges. A statement of the Annuity Cash Value under this Rider will be furnished to the Owner annually.

**ANNUITY EARNINGS AND INTEREST EARNINGS.** The Interest Earnings Rate credited on the Annuity Cash Value will vary depending upon the interest earning strategy selected by the Owner. The company will declare the interest rates to be credited for each interest earning strategy available. The rates declared are within the Company's sole discretion and do not directly reflect earnings on any particular pool of assets. Nevertheless, the Company expects the rates declared for the different interest earning strategies to correlate to market rates on the respective types of instruments. The rates may be changed at any time; however, the Company guarantees that the interest earnings rate applicable to any particular premium paid in accordance with this policy shall be guaranteed for a period of one year from the date such premium is paid, except that such guarantee shall be limited to six months in the case of any premium paid when the money market interest earning strategy has been selected by the Owner. The rate declared for each interest earning strategy will never be less than 4% per annum.

G-DRR 30007-2     (5/86) [GSL004/W2]



The assets held under the Policy will at all times remain the sole property of the Company and will be invested at the sole discretion of the Company. Neither the Policyholder, nor the Participating Employee, nor the Participant, nor the owner, will have any right to direct the Company concerning any investments owned by the Company.

The Interest Earnings Rate will be credited in full, first to the 4% minimum guarantees or such higher guaranteed rate as the Company may declare from time to time, and then to Excess Interest for that Participant's Certificate. The payment of Excess Interest (in excess of the guaranteed rates) for any period does not guarantee that such Excess Interest will be credited in future periods.

**LIMITATION ON CHANGES IN INTEREST EARNINGS STRATEGY.** The Owner may upon giving thirty-one (31) days' notice advise the Company of a change in preference for the Interest Earnings strategy of their Annuity Cash Values. No change in Interest Earnings strategy used by the Company will be made more than twice in any Accounting Year as to each particular Participant's Certificate. The Company may cease to accept premiums for a particular Interest Earnings strategy upon giving of written notice to that effect whereupon any new premiums on behalf of the Participant will be accepted subject to the same terms and conditions in existence for other new premiums received by the Company in respect of the Interest Earnings strategy(ies) available at that time. When a change in Interest Earnings strategy is effected, as a result of the Owner's change in preference, the Company reserves the right to adjust the amount of the Annuity Cash Values being transferred to a different Interest Earnings strategy by the Market Value Equity Concept. Any Market Value Equity Concept adjustment will be determined at the effective date of the change in Interest Earnings strategy.

**ANNUITY SETTLEMENT OPTIONS AND GUARANTEE OF PRINCIPAL.** The amount available for application on the Maturity Date to any of the payment alternatives referred to below will be the Annuity Cash Value at the date of such application. The Company guarantees the principal value of that portion of the Annuity Cash Value which is applied on the Maturity Date to any of the interval payment alternatives below. Unless the Owner has selected the Life Income Alternative below the Owner may request a change from one alternative to another at any time after the Maturity Date.

Unless we agree otherwise, the Annuity Cash Value which is applied to any of the interval payment alternatives referred to below must be at least Ten Thousand Dollars ($10,000), and periodic payments to any payee must be at least One Hundred Dollars ($100). If any of the proceeds refundable upon death are payable to an administrator, association, corporation, executor, partnership or trustee, a lump sum payment will be made unless we agree to an alternative payment. An assignee's portion of any death proceeds must be paid in a lump sum. The balance of proceeds may be paid under an alternative. If payment is being made under an alternative payment arrangement, no part of any payment may be alienated, anticipated, assigned, commuted, encumbered or withdrawn, unless we agree.

The following interval payment alternatives are available:

1. **Interest Alternative:** (a) interest is compounded annually on the proceeds held by us and principal and total interest are paid at the end of an agreed upon period; or (b) interest is paid at the end of each month on the proceeds held by us and the principal and any unpaid accrued interest are paid at the end of an agreed upon period.

2. **Installment Alternative:** (a) installments are paid at the beginning of each month of a fixed amount until the proceeds and compounded interest are all paid out; or (b) installments are paid at the beginning of each month for a fixed period.

3. **Life Income Alternative:** (a) installments are paid at the beginning of each month during the payee's lifetime; or (b) installments are paid at the beginning of each month during the payee's lifetime, and are continued during the balance of a 'period certain' if the payee dies within that 'period certain'; or (c) installments are paid at the beginning of each month during the payees' and the joint payee's lifetime.

Under this payment option, evidence of the payee's age satisfactory to us is required before the first installment is made. Also, we may require proof each time an installment is made that the payee is then alive. Payments under this option are based on the Mortality Tables and interest rates stated on the Certificate FACE PAGE.

4. **Other Alternatives:** any other alternative agreed to by us may be elected.

The amounts payable under any of the alternatives above will be determined by us upon written request by the Owner or Beneficiary. Unless otherwise agreed to by the Company, the minimum settlement period under Installment Alternatives 1 and 2 is 10 years. The guaranteed effective annual interest rate under Alternative 1, 2 and 3 is four percent (4%) or such greater rate as we may establish from time to time. Interest in excess of four percent (4%) may be declared by us, at our sole discretion, to be payable under 1 and 2, and during the 'period certain' under 3 (a). The Company may deduct Federal, State or Local taxes or income taxes as a withholding from any payments made hereunder.

If the Owner or Beneficiary does not want monthly installments, they may write and ask the Company to make quarterly, semi-annual or annual installments.

G-DRR 30007-3    (5/86) [GSL004/W2]



**REQUIRED DISTRIBUTIONS WHERE OWNER DIES BEFORE ENTIRE INTEREST IS DISTRIBUTED**

(1) If the Owner dies on or after the Annuity Starting Date and before the entire interest in such Annuity has been distributed, the remaining portion of such interest will be distributed at least as rapidly as under the method of distributions being used as of the date of death,  and

(2) if the Owner of such Annuity dies before the Annuity Starting Date, the entire interest in such Annuity will be distributed within 5 years after the death of the Owner.

(3) Exception for certain amounts payable over life of Beneficiary.  If:

    (A) any portion of the Owner's interest is payable to (or for the benefit of) a Designated Beneficiary,

    (B) such portion will be distributed (in accordance with regulations) over the life of such Designated Beneficiary (or over a period not extending beyond the life expectancy of such Beneficiary), and

    (C) such distributions begin not later than 1 year after the date of the Owner's death or such later date as Internal Revenue Code regulation prescribe,

then for purposes of paragraph (1) the portion referred to therein shall be treated as distributed on the day on which such distributions begin.

(4) Special rule where Surviving Spouse is the Beneficiary:  if the Designated Beneficiary referred to in paragraph (3)(A) is the Surviving Spouse of the holder of the contract, paragraphs (1), (2) and (3) shall be applied by treating such Spouse as the Owner of such contract.

(5) Designated Beneficiary:  for purposes of this subsection, the term "Designated Beneficiary" means any individual designated a Beneficiary by the Owner of the contract.

**SURRENDERS AND WITHDRAWALS.**   Prior to the Maturity Date, the Owner may surrender or withdraw from the Certificate under this Rider the then current Annuity Cash Value subject to: (1) any Market Value Equity Concept adjustment on the date of surrender or withdrawal; and (2) any taxes or early termination penalties which may be imposed in terms of any Federal, State or Local law; and (3) any surrender charge(s) that may be applicable in accordance with the Table of Surrender Charges attached to the Certificate, and/or as shown in the Participant's illustration.

No surrender charge or any Market Value Equity Concept adjustment will be made on withdrawals which do not exceed 10% of the Annuity Cash Value on an annual basis.  The Company may require that such withdrawals be made within 30 days of any anniversary of the Coverage Effective Date.  Partial withdrawals will result in a corresponding reduction in the Annuity Cash Value, and unless otherwise agreed to by the Company all withdrawal payments will be given effect to under this rider on a "First-In First-Out" basis; for example, but without limitation, any applicable Market Value Equity Concept adjustment and/or surrender charge will be so applied.

**RENEWAL PROVISION FOR THE PARTICIPATING EMPLOYER.**   The period of this Rider is that period of the life of each insured Participant which commences on the Maturity Date and ends on the Participant's Death or on the date payments under the interval payment alternatives cease.  The Participating Employer does not have to ask the Company to renew this Rider, renewal is automatic.  The only condition is that premiums for all renewal periods be paid no more than 31 days after the day they become due.  The Company, may, however, at its option decline to issue Certificates under this Rider for additional Participating Employers or additional Eligible Individuals or eligible Dependents of Participating Employers at any given time upon at least 30 days written notice to the Policyholder.

**IN WITNESS WHEREOF,** General Services Life Insurance Company has by its President and Secretary executed this Rider and caused the same to be countersigned as of the Master Policy Effective Date.

SECRETARY

PRESIDENT

G-DRR 30007-4     (5/86) [GSL004/W2]



EXHIBIT B

**GENERAL SERVICES LIFE INSURANCE COMPANY**
Home Office: Washington, DC
Regional Office: P. O. Box 7952, San Francisco, California 94120-9722
("We"/"Us"/"Our")

**Direct Recognition Life I**
**GROUP INSURANCE CERTIFICATE**
To Group Policy No.    D-1B            ("Policy")

Name of Participating Employer ("Employer"):

GOLD COAST INSURANCE SERVICES INC

Group No.:        G7147

Certificate No.:        G012767

Name of Insured Participant(s) ("You or Your")

ROBERT F HEGARTY

Certificate Issue Date:   August    8, 1989

Coverage Effective Date:   August   27, 1989

Age (nearest birthday) on Coverage Effective Date:  48

Paid-Up Date: The anniversary of your Coverage Effective Date
nearest your    90TH      birthday

(Joint Life)    N/A

| Beneficiary as designated by Owner: | Applicant Owner (if any): |
|---|---|
| (Primary)  ARLENE L HEGARTY | (Primary)   ROBERT F HEGARTY |
| (Contingent)  SEE APPLICATION | (Contingent) |

| Type of Life Insurance Coverage | | Initial Mode Premium | Death Benefit Face Amount |
|---|---|---|---|
| Initial Group Permanent Coverage | | $   3,327.02 /AN | $      600,000.00 |
| (Waiver of Premium Rider | [ ] Yes [x] No | | ................................. |
| Premium Waived $          per | ) | $ | |
| Initial Group Life Rider | | | |
| (Waiver of Risk Charge Rider | [ ] Yes [X] No) | $ | $ |
| | | | ................................. |
| Initial Group Term Rider Coverage | | | |
| (Waiver of Risk Charge Rider | [ ] Yes [X] No) | $ | $ |
| | | | ................................. |
| Initial Group Accidental Death Rider Coverage | | | |
| (Waiver of Risk Charge Rider | [ ] Yes [X] No) | $ | $ |
| | | | ................................. |
| Group Deferred Annuity Rider Coverage | | | |
| (Waiver of Risk Charge Rider | [X] Yes [ ] No) | $ | $ |
| | | | ................................. |

Cost of Living Benefit Rider        [ ] Yes [X] No        % applies to:
and terminates:

Other Conditions and Riders:

This Certificate is issued as evidence of insurance under the Policy and its Riders.  It replaces and supersedes any Certificate issued previously under the Policy bearing the same number.  The Certificate contains a summary of the essential features of the insurance coverage.  It is subject to, and is to be read in conjunction with, the terms of the Policy and its Riders.  The Policy and its Riders apply to the insurance whether set out in this Certificate or not.  The entire contract consists of the Policy and its Riders providing group permanent, group term and other insurance and/or annuity coverage(s); the application of the Policyholder; and the applications, health questionnaires, and medical examinations, a copy each of which is included in and made a part of each Certificate provided to the Owner of such rights and benefits.  The Policy and its Riders may be examined at any reasonable time at the head office of the Participating Employer or the Trustee.

Any changes to the provisions of this Certificate will be shown on the SPECIAL INFORMATION SECTION.

G-DRL 0199 (5/86) [GSL005/W2]                                                          FACE PAGE

Group No.   : G7147                    Participating Employer: GOLD COAST INSURANCE SERVICES INC
Certificate No. : G012767             Insured Participant: ROBERT F HEGARTY
Male-Non-Smoker  Age 48 Nearest Birthday Targeted for Paid Up Status at Age 90
Date of Birth :                                                                Coverage Effective Date: 08/27/1989
                                                                              Certificate Issue Date : 08/08/1989

PROJECTED FACE AMOUNTS:  $600,000 Before Age 90 and $600,000 After Age 90

| YEAR | AGE | PREMIUMS PAYABLE | TOTAL ULTIMATE CASH VALUE | DEATH BENEFITS FACE AMOUNT | CURRENT CASH VALUE (B) ILLUSTRATED INTEREST | MINIMUM INTEREST(A) |
|------|-----|------------------|---------------------------|----------------------------|---------------------------------------------|---------------------|
| 1 | 48 | 3,327.02 | 2,463 | 600,000 | 0 | 0 |
| 2 | 49 | 3,327.02 | 3,267 | 600,000 | 0 | 0 |
| 3 | 50 | 6,654.05 | 9,818 | 600,000 | 0 | 0 |
| 4 | 51 | 6,654.05 | 13,445 | 600,000 | 0 | 0 |
| 5 | 52 | 6,654.05 | 17,182 | 600,000 | 0 | 0 |
| 6 | 53 | 6,654.05 | 22,223 | 600,000 | 0 | 0 |
| 7 | 54 | 6,654.05 | 27,603 | 600,000 | 0 | 0 |
| 8 | 55 | 6,654.05 | 34,827 | 600,000 | 0 | 0 |
| 9 | 56 | 6,654.05 | 42,481 | 600,000 | 0 | 0 |
| 10 | 57 | 6,654.05 | 50,528 | 600,000 | 3,292 | 0 |
| 11 | 58 | 0.00 | 52,574 | 600,000 | 5,338 | 0 |
| 12 | 59 | 0.00 | 54,590 | 600,000 | 7,354 | 0 |
| 13 | 60 | 0.00 | 56,499 | 600,000 | 9,263 | 0 |
| 14 | 61 | 0.00 | 58,166 | 600,000 | 10,930 | 0 |
| 15 | 62 | 0.00 | 59,639 | 600,000 | 12,403 | 0 |
| 16 | 63 | 0.00 | 60,733 | 600,000 | 22,944 | 0 |
| 17 | 64 | 0.00 | 61,396 | 600,000 | 33,054 | 0 |
| 18 | 65 | 0.00 | 61,480 | 600,000 | 42,585 | 0 |
| 19 | 66 | 0.00 | 60,958 | 600,000 | 51,510 | 0 |
| 20 | 67 | 0.00 | 79,659 | 600,000 | 79,659 | 0 |
| 21 | 68 | 0.00 | 79,681 | 600,000 | 79,681 | 0 |
| 22 | 69 | 0.00 | 79,035 | 600,000 | 79,035 | 0 |
| 23 | 70 | 0.00 | 77,560 | 600,000 | 77,560 | 0 |
| 24 | 71 | 0.00 | 75,036 | 600,000 | 75,036 | 0 |
| 25 | 72 | 0.00 | 71,169 | 600,000 | 71,169 | 0 |
| 26 | 73 | 0.00 | 65,689 | 600,000 | 65,689 | 0 |
| 27 | 74 | 0.00 | 58,288 | 600,000 | 58,288 | 0 |
| 28 | 75 | 0.00 | 48,798 | 600,000 | 48,798 | 0 |
| 29 | 76 | 0.00 | 36,297 | 600,000 | 36,297 | 0 |
| 30 | 77 | 0.00 | 219,695 | 600,000 | 219,695 | 0 |
| 31 | 78 | 0.00 | 225,981 | 600,000 | 225,981 | 0 |
| 32 | 79 | 0.00 | 231,446 | 600,000 | 231,446 | 0 |
| 33 | 80 | 0.00 | 235,841 | 600,000 | 235,841 | 0 |
| 34 | 81 | 0.00 | 239,028 | 600,000 | 239,028 | 0 |
| 35 | 82 | 0.00 | 240,596 | 600,000 | 240,596 | 0 |
| 36 | 83 | 0.00 | 240,101 | 600,000 | 240,101 | 0 |
| 37 | 84 | 0.00 | 236,906 | 600,000 | 236,906 | 0 |
| 38 | 85 | 0.00 | 230,321 | 600,000 | 230,321 | 0 |
| 39 | 86 | 0.00 | 220,259 | 600,000 | 220,259 | 0 |
| 40 | 87 | 0.00 | 405,470 | 600,000 | 405,470 | 0 |
| 41 | 88 | 0.00 | 425,796 | 600,000 | 425,796 | 0 |
| 42 | 89 | 0.00 | 448,717 | 600,000 | 448,717 | 0 |
| TOTAL | 42 | 89 | 59,886.44 | 448,717 | 600,000 | 448,717 | 0 |

THE FINAL CASH VALUE WILL PROVIDE THE CERTIFICATE OWNER WITH THE ILLUSTRATED DEATH BENEFIT AT THE TARGETED PAID UP DATE
--AND--EITHER $8,976 IN EXCESS CASH RETURNED, OR $12,248 IN ADDITIONAL DEATH BENEFIT SUBJECT TO PROVIDING
SATISFACTORY EVIDENCE OF INSURABILITY AT THAT TIME.
UNDER GUARANTEED INTEREST ASSUMPTIONS THE POLICY WILL LAPSE IN YEAR 13.

Vers.: 10.2   -Prep'd by: SYY    CERT - G012767    UP.L - 10.00    CP.L - 10.00    LDTBL - BO    RE= 0    RTS: REG    WANG(07/13/89)

ASSUMPTIONS FOR ILLUSTRATIONS:

The values illustrated above assume that net interest (net of administrative charge and other deductions under the policy) of 9.50% before the targeted paid up date and 9.50% thereafter and that the illustrated premiums (including any unscheduled premiums shown) are paid ANNUALLY in advance. (A) assumes guaranteed minimum interest credits of 4% and current mortality charges.

The above illustrates an increase in cash values. The amount of the increase is a percentage of all due premiums paid in the first ten years (excluding unscheduled premiums), according to the following schedule: End of the 20th year  30%; End of the 30th year 300%; End of the 40th year 300%. (The minimum interest column illustrates  22% 20th year; 150% 30th year; 150% 40th year. These are the amounts which are guaranteed.)

(B) These values are the adjusted current cash values net of any applicable surrender charges, which is the amount on which we will base any loans and surrenders. The surrender charges, which apply only to current cash values arising from regular scheduled premiums, including CVPIS, are equal to the lesser of the current cash values or the following amounts per thousand of initial face amount: Years 1 to 15 $ 79;Year 16 $ 63;Year 17 $ 47;Year 18 $ 31;Year 19 $ 16;Years 20 on - zero.

The maximum amounts available for surrender, withdrawal, or loan in accordance with the provisions of your certificate will be your current cash value subject to any applicable Market Value Equity Concept Adjustment which guarantees that you will always receive the full value of the assets underlying your cash values on that date which may produce greater values than those illustrated, but will never produce less than your net principal payments (gross premium - net of loading, premature withdrawal and surrender charges, policy fees and monthly deductions under the policy) plus 4% minimum guaranteed interest. Because the company's practice is to generally hold longer dated assets in the Long Term High Current Yield and Long Term Investment Grade High Current Yield strategies, the potential for Market Value Equity Concept Adjustment will be greater in those strategies.

This illustration is to be read in conjunction with the attached explanatory notes on the proposal cover.

I hereby acknowledge receipt of a copy of this illustration and the explanatory notes on the proposal cover, and confirm that the relation of deposits and premiums to the account values and costs and benefits under the policy have been explained to me, have been fully disclosed to my satisfaction, are acceptable, and that I have been advised to consult with independent tax counsel regarding the tax treatment of this policy.

I have reviewed this illustration, been given an opportunity to ask any questions about it, and accept it.

_____        _____
Certificate Owner                                Date

-Vers.: 10.2    -Prep'd by: SYY    CERT - G012767    UP.L - 10.00    CP.L - 10.00    LDTBL - B0    RE= 0    RTS: REG    WANG(07/13/89)

Account Values; Interest and Excess Interest Credited to Account Values

Use of Surplus Interest; Changes in Interest Earnings Strategy ................................ 5-6
Administrative Error. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Assignment of Benefits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Beneficiary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Change of Death Benefit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Change of Owner and Beneficiary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Continuation Privilege. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Conversion Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Definitions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2
Extension of Coverage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Grace Period, Automatic Premium Loan and Reinstatement Provisions . . . . . . . . . . . . . . . . . . . . . . . . 3
Group Permanent Insurance Death Benefit and Premium Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Incontestability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Insurance Benefits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Non-Alienation of Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Policy Loans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Special Information Section. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Suicide. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Taxes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Termination of Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Trustees as Owners or Beneficiary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Withdrawals and Settlement Options. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-8

## DEFINITIONS

ACCOUNT - An Account established under the Policy and administered by us for you.  The Account encompasses the Ultimate and Current Cash Values (which include the Excess Account Values) available from time to time to the Owner, all of which constitute the "Account Values" for your Group Permanent Certificate.

ACCOUNTING YEAR - A 12-month period beginning on your Coverage Effective Date.  Each subsequent Accounting Year shall be a 12-month period beginning on the respective anniversary(ies) of your Coverage Effective Date.

BENEFICIARY - The person or entity so designated by an Owner of any Certificate to receive the benefits payable upon the death of a Participant.

CERTIFICATE - The respective Certificate(s) of insurance, including any Illustrations, applications, medical statements, endorsements and riders, issued for each Participant.  The Certificate states and defines:  (1) the benefits to which each Certificate Owner is entitled;  (2) to whom benefits are payable;  and (3) the manner in which benefits are payable to Beneficiary.  This document in hand is your Certificate.

CONVERSION DATE - The date (within 31 days after your insurance ceases) that the Owner may convert to individual coverage.

COVERAGE EFFECTIVE DATE - The date the Certificate is effective for a Participant as to any benefits described thereunder.

DEPENDENT - An Eligible Individual's spouse, parent, or descendant.

EVIDENCE - Evidence of insurability satisfactory to us.

ILLUSTRATION - The Illustration(s) attached to this Certificate or otherwise furnished to the Owner.  It shows the premiums and assumptions required to provide the benefits and Account Values specified herein.

G-DRL 0160-1     (5/86) [GSL004/W2]

MARKET VALUE EQUITY CONCEPT. The Market Value Equity Concept adjustment is a factor equal to the weighted average value of the ratio of the Market Value Factor in the month of a surrender, withdrawal or a transfer due to a change in an interest earning strategy to the Market Value Factor in the month premiums were paid, on a First-In-First-Out basis. The Market Value Factors are calculated by dividing the market value of the managed assets at the end of each month by the corresponding book value. The Market Value Factors are available from the Company upon request.

OWNER - The Owner of the rights and benefits described by the Certificate.

PARTICIPANT/YOU/YOUR - An Eligible Individual or Dependent who has applied to and been accepted by us under the Policy.

POLICY - The group Master Policy under which this Certificate is issued.

REGIONAL OFFICE - General Services Life Insurance Company's regional office located in Sausalito, California.

RIDERS - The agreement(s) providing additional benefits by us and made a part of the Policy.

TARGETED PAID-UP DATE - The anniversary of the Coverage Effective Date which completes a period of full Accounting Years between your age on the Coverage Effective Date and the paid-up age specified in your application for insurance, or such earlier date elected by the Owner.

WE/US/OUR - General Services Life Insurance Company

## INSURANCE BENEFITS

You are insured for the benefits described on the FACE PAGE and the Illustration(s), if the required premiums for the described benefits have been paid on time. All premiums are payable in advance by check made payable only to us. Any changes will be shown on the FACE PAGE, or SPECIAL INFORMATION SECTION.

The initial face amount of the Death Benefits is the amount shown on the FACE PAGE. Upon receipt of due proof of death, we will pay the Death Benefit if the insured Participant dies while the benefits described by this Certificate are in force and no premium is unpaid beyond its grace period.

## TERMINATION OF COVERAGE

Your insurance will terminate on the earlier of: (1) the date of surrender of your Certificate; and (2) the Coverage Effective Date for a new Participant requested by the Owner under the "Change of Participant" provision of the Policy; and (3) the end of the period for which premiums have been paid for your insurance; and (4) the date the Current Cash Value would be insufficient to pay any Risk Charge due; and (5) the date that any indebtedness exceeds the Amount Available For Loans; and (6) the date you cease to be employed, unless: (a) continuation of insurance coverage following cessation of employment is elected; or (b) you are a member of a class of Eligible Individuals for whom continued employment or continued membership in an association is not required; or (c) you are an eligible Dependent for whom employment was not required.

## BENEFICIARY

The death benefits shall be paid to the Primary Beneficiary named by the Owner. If no Beneficiary has been so named or if the Primary Beneficiary does not survive you, the death benefits shall be paid to the surviving person or persons in the first of the following classes of successive preference beneficiaries of which a member survives you: (1) the Contingent Beneficiary; (2) your: (a) spouse; (b) children, including legally adopted children; (c) natural parents; (d) full brothers and sisters; (e) executor or administrator.

Unless we are told otherwise in writing, we will follow these rules: (1) we will pay equal shares when more than one Beneficiary will share the funds; (2) if any Beneficiary dies at the same time as you, or within 30 days after and before we make any payments, we will pay as if that Beneficiary did not live as long as you; (3) when Beneficiaries are not shown by name (such as "children"), we may determine who they are from sworn statements and not wait for court records; (4) the word "child" means only a child born to or adopted by you.

## TRUSTEES AS OWNERS OR BENEFICIARY

The fact that the Owner or the Beneficiary is a designated trust will not make any difference in the way we deal with this Certificate. If there is any conflict between the terms of the Policy and its Riders and the terms of a designated trust, we will follow the terms of the Policy and its Riders. Payment of any money to the trustee of the designated trust will release us from any liability for that money.

The Owner may assign the benefits at any time. The Owner must notify us in writing of the assignment. After we have acknowledged the assignment, it will become effective as of the date of the assignment. We are not responsible for the validity of any assignment. The rights of the Owner and the Beneficiary may be restricted or ended if these benefits are assigned.

## NON-ALIENATION OF BENEFITS

The fact that the Owner or the Beneficiary is a Designated trust will not make any difference in the way we deal with this Certificate. If there is any conflict between the terms of the Policy and its Riders and the terms of a designated trust, we will follow the terms of the Policy and its Riders. Payment of any money to the trustee of the designated trust will release us from any liability for that money.

The Owner may assign the benefits at any time. The Owner must notify us in writing of the assignment. After we have acknowledged the assignment, it will become effective as of the date of the assignment. We are not responsible for the validity of any assignment. The rights of the Owner and the Beneficiary may be restricted or ended if these benefits are assigned.

## NON-ALIENATION OF BENEFITS

Amounts payable as described in this Certificate may not be pledged, commuted, encumbered or assigned by any person other than the Owner; and, to the extent permitted by law, no amount will be subject to any legal process to satisfy the payment of a claim against any such person.

## CHANGE OF OWNER AND BENEFICIARY

The Owner can name someone else as the Owner at any time before you die by notice to us. Or, subject to the rights of any irrevocable Beneficiary, he can name someone else as Beneficiary at any time before you die by notice to us. Any change must be acknowledged by us. If acknowledged, it will take effect on the date the notice was signed by the Owner. We will not be liable for any payments we make, or actions we take before the change is acknowledged.

## CHANGE OF DEATH BENEFIT

Any increase in the Death Benefit or any increases in the Risk Insurance Amount including increases resulting from a change in the Paid-Up Date requested by the Owner, will be subject to all our requirements for new applicants including Evidence.

## CONTINUATION PRIVILEGE

If you become ineligible for coverage under your employer's Program, we will allow your coverage described in the Certificate to continue unless the Owner has requested us not to do so; provided your Certificate is still in force and all premiums with respect to your Certificate have been and continue to be paid when due. The Certificate will continue to be subject to all the terms and conditions of the Policy, its Riders.

## GRACE PERIOD, AUTOMATIC PREMIUM LOAN AND REINSTATEMENT PROVISIONS

If any premium is not paid on or before the due date, we will allow a period of 31 days after such due date during which time the Certificate will remain in force. This is called the grace period. If a Group Permanent premium is not paid before the end of the grace period, the premium for such coverage(s) will be made as a policy loan from the Amount Available For Loans under the Certificate(s); however, the Amount Available For Loans must be sufficient so that all coverage will remain in full force and effect. This process will continue until the loan amount exceeds the Amount Available For Loans. When the loan amount exceeds the Amount Available For Loans, the coverage will lapse, and the Certificate will be of no force and effect; subject to 31 days' written notice being sent to the Owner at his last known address.

If the coverage lapses then the Owner may apply to us to have such coverage reinstated. We will reinstate such coverage on four conditions: (1) reinstatement must be requested; (2) Evidence must be supplied by the insured Participant; (3) payment of the overdue premiums, with interest, compounded yearly must be made; and (4) payment or reinstatement of indebtedness with interest compounded yearly must be made.

Any Policy Loan resulting from these provisions will be given effect to and accounted for on the same terms as any other Policy Loan under the Policy Loan section of this Certificate. The interest rate charged under this provision will not exceed the applicable policy loan interest rate. A portion of the Account Values equal to the amount loaned will be regarded as being in the Policy Loan Interest Earning Strategy for the period involved.

## CONVERSION PRIVILEGE

Within 31 days after your insurance ceases, the Owner may convert the benefits described in this Certificate. He must apply to us in writing. He must also surrender this Certificate if we request it to be surrendered; but you will not have to provide Evidence.

The new policy may be any plan of life or endowment insurance on you that we are then routinely issuing. We have limits on the minimum amount of insurance we will issue. These vary from plan to plan. These may limit the choice of policies; however, they will not be used to deny conversion.

We will not issue a policy which has a provision which puts us at any greater risk than a similar provision of the Policy and its Riders. A waiver of premium, waiver of risk charge, or accidental death benefit may be included only if such benefit(s) is provided under this Certificate and shown on the FACE PAGE. We will not include a waiver of premium benefit or waiver of risk charge benefit in the new policy if you are over age 55 on the conversion date.

G-DRL 0160-3    (5/86) [GSL004/W2]

## EXTENSION OF COVERAGE

If you die during that period in which the Owner is eligible to convert the insurance described by this Certificate to individual insurance, the amount of life insurance which the Owner was eligible to convert shall be payable as a claim under the Policy and its Riders; however, any individual policy applied for under the Conversion Privilege shall be of no effect.

## SUICIDE

If the Policy is issued to a Missouri citizen, suicide is no defense to the payment of life insurance benefits nor is suicide, while insane, a defense to payment of accidental death benefits, if any, under this Certificate, unless we can show that you intended suicide when you applied for coverage under the Policy.

## INCONTESTABILITY

If premiums are paid when due, we will not contest the benefits described in this Certificate after it has been in force during your lifetime for two years from the Certificate Issue Date. In addition, any Evidence voluntarily submitted by you to obtain an increase in coverage or a more favorable Risk Charge after the Certificate Issue Date will be incontestable after the increase in coverage or more favorable Risk Charge(s) has been in effect during your lifetime for two years.

## ADMINISTRATIVE ERROR

This Certificate states the amount of life insurance coverage and/or other benefits to be provided. No action by us, whether by mistake or otherwise, will convey any greater or lesser benefit or insurance protection other than that which is intended by this Certificate and the Policy, and for which you applied, and for which premiums have been paid.

## TAXES

We may deduct from amounts applied or held under this Certificate any applicable premium taxes or other taxes or assessments levied by the Federal Government or by any state or local government or taxing authority.

## GROUP PERMANENT INSURANCE DEATH BENEFIT AND PREMIUM PROVISIONS

GROUP PERMANENT INSURANCE DEATH BENEFIT: The face amount of the Group Permanent Death Benefit is equal to the face amount of Group Permanent Life Insurance plus the face amount of any Paid-Up Additions. OPTION A: The Group Permanent Death Benefit on you will be the greater of: (1) The face amount as shown on the Certificate; or (2) The amount determined in accordance with Table B. OPTION B: The Group Permanent Death Benefit on you will be the greater of: (1) The face amount as shown on the Certificate plus the Ultimate Cash Value (including any Excess Account Values); or (2) The amount determined in accordance with Table B. OPTION C: The Group Permanent Death Benefit on you will be the greater of: (1) the face amount as shown on the Certificate plus the Excess Account Values, if any; or (2) the amount determined in accordance with Table B.

DETERMINING GROUP PERMANENT PREMIUMS. We shall determine, based on the interest and/or other assumptions selected by the Owner, the premiums which shall be due and payable and which, if paid on a timely basis, should be sufficient in the aggregate to maintain the Account Values, net of any applicable taxes, Loading Charges and policy fees, at the levels necessary for: the payment of any applicable Risk Charges, Administrative Charges and monthly service charges; and the continuation of the life insurance and any other benefits provided to you as shown in the Certificate(s). The choice of any interest or other assumption(s) by the Owner in determining the premiums in no way assures that the Account Values will be adequate to provide for the applicable charges and/or the continuation of the life insurance or other benefits. We make no warranty or representation regarding the adequacy or the reasonableness of any of the assumptions selected by the Owner or the sufficiency of the premiums. Although all the anticipated annual premiums continue to be paid, the actual Death Benefits, and Account Values, may be more or less than those shown in your Illustration, if the Risk Charge deducted from, and/or actual rate of net interest earnings credited to, your Account Values are more or less than the assumed rate of return selected by the Owner or the assumed Risk Charge.

UNSCHEDULED GROUP PERMANENT PREMIUM PRIVILEGE. At any time the Owner may enrich your benefits through the payment of an unscheduled premium subject to a minimum of $1,000 and our agreement. Such premium(s) is voluntary and in addition to any other premiums due. Any unscheduled premium may be used to: (1) shorten the premium payment period; and/or (2) lower future premiums; and/or (3) provide additional coverage before, after, or on the Targeted Paid-Up Date subject to Evidence and/or (4) increase the Account Values.

REFUSAL OF PREMIUMS. The Company reserves the right at any time to refuse to accept a premium if as a result of its acceptance the Death Benefit would not be in compliance with applicable Federal Law or Regulations of the Internal Revenue Service.

ESTABLISHING THE ACCOUNT. We shall establish for each Certificate an Account which includes the Ultimate and Current Cash Values (which include the Excess Account Values). This Account will be credited with premiums paid, net of

**REFUSAL OF PREMIUMS.** The Company reserves the right at any time to refuse to accept a premium if as a result of its acceptance the Death Benefit would not be in compliance with applicable Federal Law or Regulations of the Internal Revenue Service.

**ESTABLISHING THE ACCOUNT.** We shall establish for each Certificate an Account which includes the Ultimate and Current Cash Values (which include the Excess Account Values). This Account will be credited with premiums paid, net of any applicable Loading Charges, policy fees, and taxes. We shall credit interest on the Account Values and shall deduct from the Account Values any applicable Administrative Charge, Risk Charge and monthly service charge, as reflected in the account values shown in the Illustration. The Ultimate Cash and Excess Account Values represent the accumulation of policy values assuming a levelized amortization of costs and expenses. In the event of early withdrawals the Ultimate Cash and Excess Account Values, will be adjusted by the Premature Withdrawal Penalty as shown in the Illustration or in the Table of Premature Withdrawal Penalties which are attached to and made part of the Certificate. Each year the Company may prepare a statement showing the balance of the Account Values for each Participant.

"Excess Account Values" are created by unscheduled premiums and are included in the Account Values. The Excess Account Values are an amount (not to exceed the Current Cash Value less loans outstanding) which equals (1)-(2) where (1) is the sum of any unscheduled premiums paid, net of any applicable taxes and Loading Charges, plus interest and Excess Interest thereon; and (2) is any applicable Administrative Charges, Risk Charges, monthly service charges, and any prior withdrawals of Excess Account Values or use of Surplus interest thereon other than option 4 (account value additions). Any Excess Account Values may be withdrawn by the Owner at any time upon 30-days' written notice to us subject to any applicable Market Value Equity Concept adjustment and/or Premature Withdrawal Penalty and/or Surrender Charge as specified in the Participant's Illustration and/or the Table of Premature Withdrawal and/or Surrender Charges which is attached to and made part of the Certificate. Any withdrawals of Excess Account Values which total less than 10% of the Excess Account Value on an annual basis are not subject to any Surrender Charge or Market Value Equity Concept adjustment. We may require that such withdrawals be taken within 30 days of any anniversary of a Coverage Effective Date. The Company has the right to automatically reduce the face amount of the Death Benefits by an amount equal to the Unscheduled Premium withdrawal if the Risk Insurance Amount would be increased by such withdrawal. If it is necessary to reduce the face amount as a result of withdrawals of Excess Account Values, such reductions in the face amount will be made on a first-in first-out basis.

**ACCOUNT VALUES; INTEREST AND EXCESS INTEREST CREDITED TO ACCOUNT VALUES.** We will invest the Policy reserves in our sole discretion but will attempt to recognize the Owner's preference as indicated in the Participant's application. The assets held under the Policy will at all times remain our sole property. The effective annual "Interest Earnings Rate" for a particular interest earnings strategy, shall be determined net of direct investment expenses and any taxes which may be levied on investment income, and shall be applied to the accumulated balance of your Account Values held in that interest earnings strategy. The Interest Earnings Rate will be related only to our overall portfolio performance for the particular interest earnings strategy(ies) underlying your Account Values, and shall have no individual investment characteristics whatsoever. Neither the Policyholder, nor you, nor the Owner, will have any right to direct us concerning any investments owned by us in any of the interest earnings strategies. The Interest Earnings Rate will be credited in full, first to the 4% minimum guarantees or such higher guaranteed rate as we may declare from time to time, and then to Excess Interest for your Certificate. The payment of Excess Interest (in excess of the guaranteed rates) for any period does not guarantee that such Excess Interest will be credited in future periods.

**USE OF INTEREST EARNINGS IN EXCESS OF PREMIUM ASSUMPTIONS.** On the anniversary of each Accounting Year prior to the Targeted Paid-Up Date, "Surplus" interest earnings on the Current Cash Value which are attributable to the immediately preceding Accounting Year, which are in excess of the interest earnings assumptions selected by the Owner to determine Group Permanent Premiums may be applied by the Owner on behalf of you under the Group Permanent Certificate in any of these ways:

1. **PREMIUM PAYMENT** - To pay part or all of the annual premium currently due. Any amounts in excess of the premium due will be added to your Account Values or may be withdrawn in cash.

2. **PAID-UP ADDITIONS** - To establish additions to the face amount of the Group Permanent Death Benefit prior to the Targeted Paid-Up Date. Such additions will be calculated from the table of Sufficient Values Per $1,000 Insurance at the then attained age and interest assumption chosen by the Owner for premiums before the Targeted Paid-Up Date. The values attributable to these additions will remain in your Account and share in Excess Interest and be available at the Targeted Paid-Up Date for application to the Paid-Up Option selected by the Owner.

3. **CASH** - To be paid in cash.

4. **ACCOUNT VALUE ADDITIONS** - To increase the Account Values and/or reduce the premium payment period.

5. **FIFTH INTEREST OPTION** - To purchase additional one year term insurance.

The Owner may change the use of Surplus Interest by giving us written notice at least 31 days prior to any Accounting Year Anniversary. Such change may be subject to evidence if such change would increase the Risk Insurance Amount. If no election is made, Surplus Interest will automatically be used to increase the Account Values.

**LIMITATION ON CHANGES IN INTEREST EARNING STRATEGY.** The Owner may request a change in interest earnings strategy for your Account Values by giving us thirty-one (31) days notice. No change in interest earnings strategy used by us for reserves under this Policy will be made more than twice in any Accounting Year as to your Certificate unless such change is the automatic result of a request for a policy loan. We may cease to accept premiums for a particular interest earnings strategy upon giving of written notice to that effect whereupon any new premiums submitted on your behalf, will be accepted subject to the terms and conditions in existence for other new premiums received by us in respect of the interest earnings strategy(ies) available at that time. When a change in interest earnings strategy is effected as a result of the Owner's request, or a change arises from transfers to the Policy Loan Interest Earnings Strategy, we reserve the right to adjust the amount of the Account Values being transferred to a different interest earnings strategy by the Market Value Equity Concept adjustment.

## POLICY LOANS

**AMOUNT AVAILABLE FOR LOANS.** The amount available to the Owner for loans will be at least 95% of the adjusted Current Cash Value, which includes the Current Cash Value of any paid up additions and any Excess Account Values. The adjusted Current Cash Value will be determined as an amount after the Account Value has been transferred to the Policy Loan Interest Earnings Strategy, less: (1) any due and unpaid premium as of the loan date to pay the Certificate to its next Accounting Year anniversary, which shall become a loan subject to loan interest; and (2) any loan interest to the next Accounting Year anniversary; and (3) any monthly charges to the next Accounting Year anniversary.

**TERMS OF POLICY LOANS.** We will give a Policy Loan on the sole security of the your Certificate if: (1) written request is made for a loan by the Owner of your Certificate; (2) your Certificate is in force; (3) the Account has a Current Cash Value; and (4) the Owner has completed the documentation required by us.

Any portion of the Current Cash Values which is loaned will automatically be regarded as a request to transfer a sufficient portion of the Account Value from the selected interest earnings strategy to the "Policy Loan Interest Earnings Strategy", subject to the conditions on "Limitation On Changes In Interest Earnings Strategy". The resulting net amount, equal to the loan, will be held in the Policy Loan Interest Earnings Strategy until such loan is repaid. Policy loans will be regarded as applying to any Current Cash Values attributable to premiums other than unscheduled premiums; and thereafter to any Account Values under a Participant's Certificate. Any Policy loans outstanding will be deducted from any Death Benefits payable.

**LOAN INTEREST.** Interest, payable in advance, will be charged on a loan, and shall be due and payable on each Accounting Year anniversary; subject however to the restriction that the maximum rate charged will not exceed the greater of Moody's Corporate Bond Yield Average or the Interest Earnings Rate credited to that portion of the Account Values held under the Policy Loan Interest Earnings Strategy, which will never be less than fifteen percent (15%). The interest rate charged, and credited to loaned Account Values, may be changed from time to time, but not more often than once every three (3) months. Interest not paid when due will be treated as an automatic request for an additional loan and accounted for under the terms of this section in the same way as a request for a new loan.

**LOAN REPAYMENT.** All or any part of a loan may be repaid by payments of at least $100 at any time while you are alive and the Certificate is in force.

**DEFERMENT.** We have the right to delay making any loan, except for a loan to pay a premium, for up to six months after the date the loan is requested.

**RIGHT OF TERMINATION.** If indebtedness at any time exceeds the amount available for Loans, we will have the right to terminate the Certificate without further value 31 days after notice of termination has been mailed to the last known address of the Owner and of any assignee of record.

## WITHDRAWALS AND SETTLEMENT OPTIONS

**VALUE AVAILABLE FOR APPLICATION TO PAID-UP/SETTLEMENT OPTIONS.** The amount available for application to any Paid-Up/Settlement Option will be the Death Benefit proceeds, or the Current Cash Value calculated as of the date of such application. If not paid in a lump sum, Death Benefit proceeds may only be applied to Option 4. Current Cash Values may be applied by the Owner to any of the Paid-Up/Settlement Options, and the Owner may request a change from one option to another for the application of your Current Cash Values at any time prior to the Paid-Up Date. Values under Option 1 and Option 2 will be subject to existing indebtedness and assignment.

G-DRL 0160-6    (5/86) [GSL004/W2]

such application. If not paid in a lump sum, Death Benefit proceeds may only be applied to Option 4. Current Cash Values may be applied by the Owner to any of the Paid-Up/Settlement Options, and the Owner may request a change from one option to another for the application of your Current Cash Values at any time prior to the Paid-Up Date. Values under Option 1 and Option 2 will be subject to existing indebtedness and assignment.

OPTION 1 - Universal Option: If Option 1 is selected by the Owner, we will withdraw from your Account Values such amount as may be required in accordance with the Company's Risk Rates in effect at that time to pay the Risk Charge on the Risk Insurance Amount attributable to the Group Permanent life insurance on you, including the face amount of any Paid-Up Additions and term Riders. If agreed to by the Owner(s), the Risk Charge attributable to any term Certificate on you or any other family member of yours may be deducted from your Account Values. If your Current Cash Value at any withdrawal date is insufficient to fully pay our then required Risk Charge, policy fees and loan interest, if any, for the following year, we will notify the Owner of the amount of the deficiency and request payment. If the deficiency is paid within 31 days after the date of request, the coverage will remain in force in the same manner and with the same effect as if there had been no deficiency. If the deficiency amount is not paid within the stated time, the Certificate will terminate without further value 31 days after notice of termination have been mailed to the last known address of the Owner and any assignee of record.

OPTION 2 - Interest Sufficiency Option: If Option 2 is selected by the Owner, we will apply to Paid-Up Status a level "Amount" of life insurance coverage based on the Current Cash Values, the interest assumptions selected by the Owner and the table of Sufficient Values Per $1,000 Insurance. The maximum Amount of life insurance coverage placed on Paid-Up Status will be (1) + (2), where (1) is the Risk Insurance Amount provided by the Certificate(s) on you on the Targeted Paid-Up Date including the face amount of any Paid-Up Additions and term Riders; and (2) is the Current Cash Value applied under this Option. If in any Accounting Year the cumulative net interest earnings credited on the Current Cash Values (net of the Administrative Charge and the applicable policy fees), expressed as a net rate of return thereon, is equal to or greater than the interest rate assumption selected by the Owner for the purpose of calculating such Amount, then the Current Cash Values will remain sufficient to maintain such Amount in Paid-Up Status. If in any subsequent Accounting Year the cumulative net interest earnings is less than the interest earnings resulting from the assumption selected, the Owner must pay the shortfall determined by us, or else:

(1) the life insurance coverage will be multiplied by a fraction, the numerator of which is the Current Cash Value, and the denominator of which is the amount required in the table of Sufficient Values Per $1,000 Insurance at the age applicable on the beginning of the next Accounting year based on the interest assumption selected by the Owner; or

(2) if requested by the Owner, we will switch your Current Cash Values to another Paid-Up Option.

OPTION 3 - Full Guaranteed Option: If Option 3 is selected by the Owner, we will apply to Paid-Up Status a level Amount no greater than (1) + (2), where (1) is the Risk Insurance Amount provided by the Certificate(s) on you on the Targeted Paid-Up Date, including the face amount of any Paid-Up Additions and term Riders; and (2) is the Current Cash Value applied under this Option. The Current Cash Value applied under this Option will be net of any outstanding indebtedness unless otherwise agreed to by us. The Amount will be based on our rates at that time and the Current Cash Value available at the time this Option is elected and given effect.

The table of Sufficient Values Per $1,000 Insurance, attached to your Certificate, shows in the column headed "GUARANTEED MAXIMUM" the maximum amount which is guaranteed by us to be sufficient if paid as a single sum under Option 3 to pay up $1,000 (one thousand U.S. dollars) of life insurance coverage at the respective ages shown in the table. After this Option has been exercised Current Cash Values, and any Amount Available For Loans will be determined by our actuary.

If the Amount calculated under the preceding options includes all or a portion of the life insurance coverage provided under any of the Riders, the Death Benefit under those Riders will be reduced to such Amount as will ensure that we do not have any greater Risk Insurance Amount than existed prior to the exercise of these options.

OPTION 4 - Payments at Intervals: The death proceeds or Current Cash Value which is withdrawn from the Account and applied to any interval payment alternative must be at least $10,000 and periodic payments to any payee must be at least $100. If proceeds are payable to an administrator, association, corporation, executor, partnership or trustee, a lump sum payment will be made unless we agree to an alternative payment. An assignee's portion of proceeds must be paid in a lump sum. The balance of proceeds may be paid under an alternative. If payment is being made under an alternative payment arrangement no part of any payment may be alienated, anticipated, assigned, commuted, encumbered or withdrawn, unless we agree.

The following interval payment alternatives are available:

1. **Interest Alternative:** (a) interest is compounded annually on the proceeds held by us and principal and total interest are paid at the end of an agreed upon period; or (b) interest is paid at the end of each month on the proceeds held by us and the principal and any unpaid accrued interest are paid at the end of an agreed upon period.

2. **Installment Alternative:** (a) installments are paid at the beginning of each month of a fixed amount until the proceeds and compounded interest are all paid out; or (b) installments are paid at the beginning of each month for a fixed period.

3. **Life Income Alternative:** (a) installments are paid at the beginnning of each month during the payee's lifetime; or (b) installments are paid at the beginning of each month during the payee's lifetime, and are continued during the balance of the period certain; or (c) installments are paid at the beginning of each month during the payee's and the joint payee's lifetime. Under this option, evidence of each payee's age satisfactory to us is required before the first installment is made. Also, we may require proof each time an installment is to be made that the payee(s) is then alive. Payments under this option are based on 1971 Group Annuity Mortality Tables at 4% interest.

4. **Other Alternatives:** any other alternative agreed to by us may be elected.

The amounts payable under any of the alternatives above will be determined by us upon written request by the Owner or Beneficiary. The guaranteed effective annual interest rate under alternative 1, 2 and 3 is 4% or such greater guaranteed rate as we may establish from time to time. Interest in excess of 4% may be declared by us, at our sole discretion, to be payable under any of the interval payment alternatives. Should we declare interest in excess of 4% on interval payment alternatives for any group of policies or certificate holders, at any time, certificate holders under this group Master Policy will receive at least such greater amount of interest.

Upon written request before payments begin, any alternative paying monthly installments may be changed to make quarterly, semi-annual or annual installments.

**OPTION 5 - Surrender for Cash.** Any Group Permanent Certificate may be surrendered for its Current Cash Value less any Policy Loans outstanding and applicable surrender charges. We reserve the right to adjust the Current Cash Value, in the event of such surrender, by the amount of any Market Value Equity Concept adjustment. However, we guarantee that in no event will the Current Cash Value, after application of the Market Value Equity Concept adjustment, but before deduction of any Policy Loans or applicable surrender charges, be less than the sum of the participant's Net Principal Payments corresponding to such Current Cash Value accumulated at 4% interest per annum. For this purpose, Net Principal Payments are defined as premiums paid less applicable Loading Charges, Administrative Charges, Taxes, and a proportionate share of applicable Risk Charges, monthly service charges, and annual policy fees. The Owner must return the Certificate to our Regional Office and complete our requirements for surrendered Certificates. We have the right to delay making any payments for up to six months from the date surrender is requested and in accordance with established rules have the right to deduct a surrender charge as shown in the Participant's Illustration and/or Table of Surrender Charges which is a part of the Group Permanent Certificate being surrendered.

## SPECIAL INFORMATION SECTION

IN WITNESS WHEREOF, General Services Life Insurance Company, has, by its President and Secretary, executed this Certificate and caused the same to be effective as of the Coverage Effective Date.

SECRETARY

PRESIDENT

EXHIBIT C

12/06/96  FRI 14:57 FAX                                                                    @002

DIRECT RECOGNITION LIFE ·················································· BANKERS UNITED LIFE ASSURANCE COMPANY
DEATH BENEFIT OPTION 'A'                                                      GROUP PERMANENT INSURANCE ILLUSTRATION
VARYING PREMIUMS

THIS IS A SALES ILLUSTRATION.  AN ISSUE ILLUSTRATION WILL BE ATTACHED AND MADE PART OF THE CERTIFICATE WHICH YOU RECEIVE AS EVIDENCE
OF INSURANCE UNDER THE GROUP MASTER POLICY AND ITS RIDERS.

PREPARED FOR: Robert Hogarty              PREPARED BY: Bob Hegarty              DATE OF ILLUSTRATION: 12/06/96
MALE-NON-SMOKER  AGE 48 NEAREST BIRTHDAY TARGETED FOR PAID-UP STATUS AT AGE 95       CONTRACT NUMBER:   G012767

PROJECTED INITIAL FACE AMOUNT: $600,000      PROJECTED FACE AMOUNT AFTER AGE 95: $119,174

| YEAR | AGE | PREMIUMS PAYABLE | ULTIMATE CASH VALUE | DEATH BENEFIT | CURRENT CASH VALUE ILLUSTRATED | GUARANTEED |
|---|---|---|---|---|---|---|
| 8 | 55 | 6,654.04 | 30,443 | 600,000 | 0 | 0 |
| 9 | 56 | 6,654.04 | 35,641 | 600,000 | 0 | 0 |
| 10 | 57 | 6,654.04 | 41,734 | 600,000 | 2,836 | 0 |
| 11 | 58 | 6,654.04 | 47,934 | 600,000 | 9,016 | 0 |
| 12 | 59 | 6,654.04 | 54,298 | 600,000 | 15,381 | 0 |
| 13 | 60 | 6,654.04 | 60,792 | 600,000 | 21,875 | 0 |
| 14 | 61 | 6,654.04 | 67,310 | 600,000 | 28,392 | 0 |
| 15 | 62 | 6,654.04 | 73,929 | 600,000 | 35,011 | 0 |
| 16 | 63 | 6,654.04 | 80,508 | 600,000 | 49,374 | 0 |
| 17 | 64 | 6,654.04 | 87,040 | 600,000 | 63,690 | 0 |
| 18 | 65 | 6,654.04 | 93,441 | 600,000 | 77,874 | 0 |
| 19 | 66 | 0.00 | 93,397 | 600,000 | 85,613 | 0 |
| 20 | 67 | 0.00 | 110,683 | 600,000 | 110,683 | 0 |
| 21 | 68 | 0.00 | 110,620 | 600,000 | 110,620 | 0 |
| 22 | 69 | 0.00 | 109,931 | 600,000 | 109,931 | 0 |
| 23 | 70 | 0.00 | 108,489 | 600,000 | 108,489 | 0 |
| 24 | 71 | 0.00 | 106,115 | 600,000 | 106,115 | 0 |
| 25 | 72 | 0.00 | 102,971 | 600,000 | 102,971 | 0 |
| 26 | 73 | 0.00 | 97,658 | 600,000 | 97,658 | 0 |
| 27 | 74 | 0.00 | 91,150 | 600,000 | 91,150 | 0 |
| 28 | 75 | 0.00 | 82,970 | 600,000 | 82,970 | 0 |
| 29 | 76 | 0.00 | 72,356 | 600,000 | 72,356 | 0 |
| 30 | 77 | 0.00 | 238,447 | 600,000 | 238,447 | 0 |
| 31 | 78 | 0.00 | 239,632 | 600,000 | 239,632 | 0 |
| 32 | 79 | 0.00 | 239,339 | 600,000 | 239,339 | 0 |
| 33 | 80 | 0.00 | 237,231 | 600,000 | 237,231 | 0 |
| 34 | 81 | 0.00 | 233,060 | 600,000 | 233,060 | 0 |
| 35 | 82 | 0.00 | 226,278 | 600,000 | 226,278 | 0 |
| 36 | 83 | 0.00 | 216,271 | 600,000 | 216,271 | 0 |
| 37 | 84 | 0.00 | 202,184 | 600,000 | 202,184 | 0 |
| 38 | 85 | 0.00 | 183,061 | 600,000 | 183,061 | 0 |
| 39 | 86 | 0.00 | 158,582 | 600,000 | 158,592 | 0 |
| 40 | 87 | 0.00 | 307,183 | 600,000 | 307,183 | 0 |
| 41 | 88 | 0.00 | 297,782 | 600,000 | 297,782 | 0 |
| 42 | 89 | 0.00 | 284,063 | 600,000 | 284,063 | 0 |
| 43 | 90 | 0.00 | 265,142 | 600,000 | 265,142 | 0 |
| 44 | 91 | 0.00 | 240,146 | 600,000 | 240,146 | 0 |
| 45 | 92 | 0.00 | 207,438 | 600,000 | 207,438 | 0 |
| 46 | 93 | 0.00 | 164,114 | 600,000 | 164,114 | 0 |
| 47 | 94 | 0.00 | 105,212 | 600,000 | 105,212 | 0 |
| TOTALS | | | | | | |
| 47 | 94 | 73,194 | 105,212 | 600,000 | 105,212 | 0 |

Please see page 2 of this illustration for important explanatory material and disclosure information.

RECEIVED
DEC 1 9 1996
RECORDS DEPT.

12-6-96
4%

PREMIUMS: The illustration assumes that premiums are paid quarterly in advance.
ULTIMATE CASH VALUE: The Ultimate Cash Value represents the accumulation of policy values assuming a levelized amortization of costs and expenses. It is not the amount available for loans, withdrawals or surrenders.
CASH VALUE: This is the amount which, subject to any Market Value Equity Concept adjustment, is available for loans, withdrawals, or surrenders. It is calculated by (I) crediting Premiums Paid, (II) deducting applicable Loads and Policy Fees, (III) crediting interest, and (IV) deducting the Administrative Charge and applicable Risk Charge. Loads include provisions for commissions paid to agents and premium taxes paid to the state of issue. Policy fees are determined by the company and are $30 annually. The Administrative charge is defined in the certificate and will not exceed the greater of 10% of interest earnings or 1.5% per annum of account values. The Risk Charge is deducted monthly and will not exceed the amount shown in the table of maximum risk rates per $1,000 attached to the group master policy.
INTEREST RATE ASSUMPTIONS: The Ultimate Cash Values and current Cash Values assume a hypothetical net interest rate (after the Administrative Charge) of 6.25% before the targeted paid-up date and guaranteed minimum thereafter. The guaranteed Cash Values assume a net interest rate of 4% (after the Administrative Charge).
CASH VALUE INCREASE: This illustration assumes an increase in Cash Values equal to the following percentages of premiums (excluding unscheduled premiums and recurring unscheduled premiums) paid during the first ten years: end of 20th year 30%; end of 30th year 300%; end of 40th year 300%.
MORTALITY ASSUMPTIONS: The Ultimate Cash Values and Current Cash Values assume the Risk Charge currently being used by the company. The Guaranteed Cash Values assume the maximum Risk Charge allowed under the group master policy.
WITHDRAWALS AND SURRENDERS: Upon a surrender your Cash Values will be adjusted by a surrender charge equal to the lesser of the Cash Values or the following amounts per thousand of initial face amount: years 1 to 15 $64.86; year 16 $51.89; year 17 $38.92; year 18 $25.95; year 19 $12.97; years 20 on - zero. The surrender charge applies only to Cash Value created by scheduled premiums. The Cash Value illustrated is net of the surrender charge.
GUARANTEE: You are guaranteed that your Cash Values, subject to any Market Value Equity Concept adjustment, will never be less than those illustrated in the column headed Current Cash Value-Guaranteed. Under guaranteed assumptions the certificate will lapse in year 17.

I hereby acknowledge receipt of a copy of this sales illustration, and confirm that the guarantees, benefits and the relation between deposits and premiums to the account values, costs and benefits under the group master policy and its riders have been explained to me, have been fully disclosed to my satisfaction, are acceptable and that I have been given an opportunity to ask any questions about it. I acknowledge that I have been advised to consult with independent tax counsel regarding the tax treatment of the life insurance coverage evidenced by this certificate.

Signed by: _____  Date: 12-10-96  Witness: _____
VERSION:DRL A10.2(IBM 6/1/92) MODEM PREPARED BY:SCR                    CASE:GREGARTY  EMP BY  STOLD  UP.L:10  /CP.L:10  /RATREG NS QLP:1

EXHIBIT D

```
DIRECT RECOGNITION LIFE  ........................................ 000045-30 ........ LIFE INVESTORS INSURANCE COMPANY
DEATH BENEFIT OPTION 'A'                                                           GROUP PERMANENT INSURANCE ILLUSTRATION

NON-LEVEL FACE AMOUNTS

THIS IS AN IN-FORCE ILLUSTRATION WHICH PROJECTS CASH VALUES AND BENEFITS BASED ON CERTAIN ASSUMPTIONS DETAILED BELOW.

PREPARED FOR: ROBERT F. HEGARTY                   PREPARED BY: Life Investors Insurance Co  DATE OF ILLUSTRATION:  05/09/2005
              MALE-NON-SMOKER  AGE 48  NEAREST BIRTHDAY                                      CONTRACT NUMBER:        G012767
              INITIAL FACE AMOUNT: $600,000
```

| | | | NET | CURRENT | CASH VALUE |
| | | PREMIUMS | DEATH | | |
| YEAR | AGE | PAYABLE | BENEFIT | ILLUSTRATED | GUARANTEED |
|------|-----|---------|--------|-------------|------------|
| 16 | 63 | 6,654.04 | 600,000 | 38,566 | 0 |
| 17 | 64 | 6,654.04 | 600,000 | 52,060 | 0 |
| 18 | 65 | 6,654.04 | 600,000 | 66,811 | 0 |
| 19 | 66 | 0.00 | 620,000 | 74,159 | 0 |
| 20 | 67 | 0.00 | 600,000 | 90,715 | 0 |
| 21 | 68 | 0.00 | 600,000 | 96,027 | 0 |
| 22 | 69 | 0.00 | 600,000 | 92,541 | 0 |
| 23 | 70 | 0.00 | 600,000 | 89,002 | 0 |
| 24 | 71 | 0.00 | 600,000 | 84,528 | 0 |
| 25 | 72 | 0.00 | 600,000 | 78,988 | 0 |
| 26 | 73 | 0.00 | 600,000 | 72,227 | 0 |
| 27 | 74 | 0.00 | 600,000 | 64,055 | 0 |
| 28 | 75 | 0.00 | 600,000 | 54,238 | 0 |
| 29 | 76 | 0.00 | 600,000 | 42,662 | 0 |
| 30 | 77 | 0.00 | 600,000 | 208,723 | 0 |
| 31 | 78 | 0.00 | 600,000 | 206,362 | 0 |
| 32 | 79 | 0.00 | 600,000 | 202,896 | 0 |
| 33 | 80 | 0.00 | 600,000 | 198,219 | 0 |
| 34 | 81 | 0.00 | 600,000 | 192,098 | 0 |
| 35 | 82 | 0.00 | 600,000 | 184,299 | 0 |
| 36 | 83 | 0.00 | 600,000 | 174,529 | 0 |
| 37 | 84 | 0.00 | 600,000 | 162,304 | 0 |
| 38 | 85 | 0.00 | 600,000 | 147,447 | 0 |
| 39 | 86 | 0.00 | 600,000 | 128,900 | 0 |
| 40 | 87 | 0.00 | 600,000 | 265,688 | 0 |
| 41 | 88 | 0.00 | 600,000 | 278,000 | 0 |
| 42 | 89 | 0.00 | 600,000 | 258,076 | 0 |

```
TOTALS                                                                            258,076              0
42   89              19,962              600,000
```

Please see page 1 of this illustration for important explanatory material and disclosure information.

PREMIUMS: The illustration assumes that premiums are paid quarterly in advance.
CASH VALUE: This is the amount which, subject to any Market Value Equity Concept adjustment, is available for loans, withdrawals,
or surrenders. It is calculated by (I) crediting Premiums Paid, (II) deducting applicable Loads and Policy Fees, (III) crediting
Interest, and (IV) deducting the Administrative Charge and applicable Risk Charge. Loads include provisions for commissions paid
to agents and premium taxes paid to the state of issue. Policy fees are determined by the company and are $30 annually. The
Administrative Charge is defined in the certificate and will not exceed the greater of 10% of Interest earnings or 1.5% per annum
of account values. The Risk Charge is deducted monthly and will not exceed the amount shown in the table of maximum risk rates per
$1,000 attached to the group master policy.
INTEREST RATE ASSUMPTIONS: The Ultimate Cash Values and current Cash Values assume a hypothetical net interest rate (after the
Administrative Charge) of 4.47% before the targeted paid-up date and guaranteed minimum thereafter. The guaranteed Cash Values
assume a net interest rate of 4% (after the Administrative Charge).
CASH VALUE INCREASE: This illustration assumes an increase in Cash Values equal to the following percentages of premiums
(excluding unscheduled premiums and recurring unscheduled premiums) paid during the first ten years: end of 20th year 30%; end of
30th year 300%; end of 40th year 300%.
MORTALITY ASSUMPTIONS: The Ultimate Cash Values and Current Cash Values assume the Risk Charge currently being used by the
company. The Guaranteed Cash Values assume the maximum Risk Charge allowed under the group master policy.

WITHDRAWALS AND SURRENDERS: Upon a surrender, your Cash Values will be adjusted by a surrender charge equal to the lesser of the
Cash Values or the following amounts per thousand of initial face amount: years 1 to 15 $78.73; year 16 $62.98; year 17 $47.24;
year 18 $31.49; year 19 $15.75; years 20 on - zero. The surrender charge applies only to Cash Value created by scheduled premiums.
The Cash Value illustrated is net of the surrender charge.
GUARANTEE: You are guaranteed that your Cash Values, subject to any Market Value Equity Concept adjustment, will never be less
than those illustrated in the column headed Current Cash Value-Guaranteed. Under guaranteed assumptions the certificate will
lapse in year 10.

THIS ILLUSTRATION APPROXIMATES DEATH BENEFITS AND CASH VALUES. THE ACTUAL DEATH BENEFIT AND CASH VALUE MAY DIFFER FROM
THAT ILLUSTRATED. FOR THE ACTUAL DEATH BENEFIT AND CASH VALUE, PLEASE REFER TO THE ANNUAL STATEMENT OR CONTACT OUR CUSTOMER
SERVICE DEPARTMENT AT 1-800-934-3007. YOU ARE ADVISED TO CONSULT WITH INDEPENDENT TAX COUNSEL REGARDING THE TAX TREATMENT
OF THIS LIFE INSURANCE CONTRACT.

VERSION:DRL A11.8(IEM 6/1/1992) PREPARED BY:Life Investors Insurance Co CASE: STOLD UP.L:10 CP.L:0 RR:REG NS
: CLP:1

# EXHIBIT E

DIRECT RECOGNITION LIFE .................................................................... LIFE INVESTORS
DEATH BENEFIT OPTION 'A'                                                     145 GROUP PERMANENT INSURANCE ILLUSTRATION

NON-LEVEL FACE AMOUNTS

THIS IS AN IN-FORCE ILLUSTRATION WHICH PROJECTS CASH VALUES AND BENEFITS BASED ON CERTAIN ASSUMPTIONS DETAILED BELOW.

PREPARED FOR: Robert F Hegarty                    PREPARED BY: Life Investors         DATE OF ILLUSTRATION: 03/17/2006
   MALE-NON-SMOKER  AGE 48  NEAREST BIRTHDAY                                        CONTRACT NUMBER:      G012767
   INITIAL FACE AMOUNT: $600,000

| | | | NET | CURRENT CASH VALUE | |
| | PREMIUMS | | DEATH | ILLUSTRATED | GUARANTEED |
| YEAR AGE | PAYABLE | | BENEFIT | | |
|---|---|---|---|---|---|
| 17 64 | 3,327.04 | | 600,000 | 49,946 | 0 |
| 18 65 | 0.00 | | 600,000 | 57,600 | 0 |
| 18 65 | 0.00 | | 600,000 | 64,565 | 0 |
| 19 66 | 0.00 | | 600,000 | 88,707 | 0 |
| 20 67 | 0.00 | | | | |
| | | | 600,000 | 85,585 | 0 |
| 21 68 | 0.00 | | 600,000 | 81,630 | 0 |
| 22 69 | 0.00 | | 500,000 | 77,581 | 0 |
| 23 70 | 0.00 | | 600,000 | 72,543 | 0 |
| 24 71 | 0.00 | | 600,000 | 66,376 | 0 |
| 25 72 | 0.00 | | | | |
| | | | 600,000 | 58,914 | 0 |
| 26 73 | 0.00 | | 600,000 | 49,955 | 0 |
| 27 74 | 0.00 | | 600,000 | 39,251 | 0 |
| 28 75 | 0.00 | | 600,000 | 26,673 | 0 |
| 29 76 | 0.00 | | 600,000 | 191,601 | 0 |
| 30 77 | 0.00 | | | | |
| | | | 600,000 | 188,306 | 0 |
| 31 78 | 0.00 | | 600,000 | 183,784 | 0 |
| 32 79 | 0.00 | | 600,000 | 177,913 | 0 |
| 33 80 | 0.00 | | 600,000 | 170,433 | 0 |
| 34 81 | 0.00 | | 600,000 | 161,084 | 0 |
| 35 82 | 0.00 | | | | |
| | | | 600,000 | 149,536 | 0 |
| 36 83 | 0.00 | | 600,000 | 135,351 | 0 |
| 37 84 | 0.00 | | 600,000 | 118,025 | 0 |
| 38 85 | 0.00 | | 600,000 | 96,691 | 0 |
| 39 86 | 0.00 | | 600,000 | 250,192 | 0 |
| 40 87 | 0.00 | | | | |
| | | | 600,000 | 238,507 | 0 |
| 41 88 | 0.00 | | 600,000 | 224,956 | 0 |
| 42 89 | 0.00 | | 600,000 | 207,961 | 0 |
| 43 90 | 0.00 | | 600,000 | 187,195 | 0 |
| 44 91 | 0.00 | | 600,000 | 161,755 | 0 |
| 45 92 | 0.00 | | | | |
| | | | 600,000 | 130,446 | 0 |
| 46 93 | 0.00 | | 600,000 | 91,662 | 0 |
| 47 94 | 0.00 | | | | |
| TOTALS | | | 600,000 | 91,662 | 0 |
| 47 94 | 3,327 | | | | |

Please see page 1 of this illustration for important explanatory material and disclosure information.

3/17/ $\not{\phi}$ 2006
4 %

PREMIUMS: The illustration assumes that premiums are paid quarterly in advance.
CASH VALUE: This is the amount which, subject to any Market Value Equity Concept adjustment, is available for loans, withdrawals, or surrenders. It is calculated by (I) crediting Premiums Paid, (II) deducting applicable Loads and Policy Fees, (III) crediting Interest, and (IV) deducting the Administrative Charge and applicable Risk Charge. Loads include provisions for commissions paid to agents and premium taxes paid to the state of issue. Policy fees are determined by the company and are $30 annually. The Administrative Charge is defined in the certificate and will not exceed the greater of 10% of Interest earnings or 1.5% per annum of account values. The Risk Charge is deducted monthly and will not exceed the amount shown in the table of maximum risk rates per $1,000 attached to the group master policy.
INTEREST RATE ASSUMPTIONS: The Ultimate Cash Values and current Cash Values assume a hypothetical net interest rate (after the Administrative Charge) of 4.66% before the targeted paid-up date and guaranteed minimum thereafter. The guaranteed Cash Values assume a net interest rate of 4% (after the Administrative Charge).
CASH VALUE INCREASE: This illustration assumes an increase in Cash Values equal to the following percentages of premiums (excluding unscheduled premiums and recurring unscheduled premiums) paid during the first ten years: end of 20th year 30%; end of 30th year 300%; end of 40th year 300%.
MORTALITY ASSUMPTIONS: The Ultimate Cash Values and Current Cash Values assume the Risk Charge currently being used by the company. The Guaranteed Cash Values assume the maximum Risk Charge allowed under the group master policy.

WITHDRAWALS AND SURRENDERS: Upon a surrender, your Cash Values will be adjusted by a surrender charge equal to the lesser of the Cash Values or the following amounts per thousand of initial face amount: years 1 to 15 $78.73; year 16 $62.98; year 17 $47.24; year 18 $31.49; year 19 $15.75; years 20 on - zero. The surrender charge applies only to Cash Value created by scheduled premiums. The Cash Value illustrated is net of the surrender charge.
GUARANTEE: You are guaranteed that your Cash Values, subject to any Market Value Equity Concept adjustment, will never be less than those illustrated in the column headed Current Cash Value-Guaranteed. Under guaranteed assumptions the certificate will lapse in year 10.

THIS ILLUSTRATION APPROXIMATES DEATH BENEFITS AND CASH VALUE. THE ACTUAL DEATH BENEFIT AND CASH VALUE MAY DIFFER FROM THAT ILLUSTRATED. FOR THE ACTUAL DEATH BENEFIT AND CASH VALUE, PLEASE REFER TO THE ANNUAL STATEMENT OR CONTACT OUR CUSTOMER SERVICE DEPARTMENT AT 1-800-914-1007. YOU ARE ADVISED TO CONSULT WITH INDEPENDENT TAX COUNSEL REGARDING THE TAX TREATMENT OF THIS LIFE INSURANCE CONTRACT.

VERSION:DRL A11.0(IBM 6/1/1992) PREPARED BY:Life Investors CASE: SIDLD  UP.L:10  CP.L:0  RR:REG NS
; CLP:1

EXHIBIT  F



**TRANSAMERICA**
LIFE INSURANCE COMPANY

Transamerica Life Insurance Company
*Administrative Office:*
PO Box 9008
Clearwater, FL 33758-9008
1-800-934-1007 • 800-451-7585 Fax

January 3, 2011

L. Buetlich, P. Headley Rarey and J. Headley, Trustees
The Headley Grandchildren Irrevocable Trust
384 Tesconi Court
Santa Rosa CA  95404

RE:     Transamerica Life Insurance Company
        Contract No. 000G027598
        Insured:   John M. Headley
        Insured:   Delores A. headley

Dear  L. Buetlich, P. Headley Rarey and J. Headley:

Congratulations!  Your particular Direct Recognition Life policy #000G027598 has now reached the end of the 20th year and as part of this milestone your account will have applied to its cash value the amount of $165,711.67.  This figure is arrived at based on 38% of the first ten years of scheduled premiums paid into your contract, as of November 1, 2010.

Please note that future amounts to be so credited will also be based on percentages of the first 10 years of scheduled premium.  Any such amounts would be paid at the end of the 30th and 40th years based on a consideration of guaranteed and non-guaranteed portions.

Should you have any questions, please contact our Customer Service line at 1-800-934-1007 Monday through Friday, 9:00 A.M. to 5:00 P.M. Eastern Time.  Thank you for giving us the opportunity to be of service.

Sincerely,

*V. Ellen Methvin*

V. Ellen Methvin
Policy Services

VEM/mmi

an **AEGON** company

# EXHIBIT G

## _DIRECT RECOGNITION LIFE_         _Transamerica Corporation_

DEATH BENEFIT OPTION 'A'                       GROUP PERMANENT INSURANCE ILLUSTRATION

NON-LEVEL FACE AMOUNTS

THIS IS AN IN-FORCE ILLUSTRATION WHICH PROJECTS CASH VALUES AND BENEFITS BASED ON CERTAIN ASSUMPTIONS DETAILED BELOW.

PREPARED FOR: Kenneth A Silverman          PREPARED BY: Transamerica Life Ins Co  DATE OF ILLUSTRATION:  07/29/2015
      MALE-NON-SMOKER AGE 45  NEAREST BIRTHDAY                           CONTRACT NUMBER:     G012797
      INITIAL FACE AMOUNT: $780,000
              WITH WAIVER OF PREMIUM FOR DISABILITY PRIOR TO AGE 65
                INITIAL UNSCHEDULED PREMIUM:  $30,000

| END OF YEAR | AGE | UNSCHED PREMIUMS ACTIVITY | SCHEDULED PREMIUMS | ANNUAL LOAN | GROSS LOAN INTEREST | NET COST OF INT AT 28% TAX BRACKET | NET DEATH BENEFIT | SURRENDER PROJECTED | VALUE GUAR. |
|---|---|---|---|---|---|---|---|---|---|
| 26 | 71 | 0 | 4,000 | 0 | 0 | 0 | 748,000 | 56,477 | 0 |
| 27 | 72 | 0 | 4,000 | 0 | 0 | 0 | 748,000 | 51,094 | 0 |
| 28 | 73 | 0 | 4,000 | 0 | 0 | 0 | 748,000 | 44,339 | 0 |
| 29 | 74 | 0 | 4,000 | 0 | 0 | 0 | 748,000 | 36,018 | 0 |
| 30 | 75 | 0 | 4,000 | 0 | 0 | 0 | 748,000 | 154,891 | 0 |
| 31 | 76 | 0 | 4,000 | 0 | 0 | 0 | 748,000 | 150,920 | 0 |
| 32 | 77 | 0 | 4,000 | 0 | 0 | 0 | 748,000 | 145,519 | 0 |
| 33 | 78 | 0 | 4,000 | 0 | 0 | 0 | 748,000 | 138,474 | 0 |
| 34 | 79 | 0 | 4,000 | 0 | 0 | 0 | 748,000 | 129,553 | 0 |
| 35 | 80 | 0 | 4,000 | 0 | 0 | 0 | 748,000 | 118,545 | 0 |
| 36 | 81 | 0 | 4,000 | 0 | 0 | 0 | 748,000 | 105,241 | 0 |
| 37 | 82 | 0 | 4,000 | 0 | 0 | 0 | 748,000 | 89,222 | 0 |
| 38 | 83 | 0 | 4,000 | 0 | 0 | 0 | 748,000 | 70,060 | 0 |
| 39 | 84 | 0 | 4,000 | 0 | 0 | 0 | 748,000 | 47,220 | 0 |
| 40 | 85 | 0 | 4,000 | 0 | 0 | 0 | 748,000 | 148,993 | 0 |
| 41 | 86 | 0 | 4,000 | 0 | 0 | 0 | 748,000 | 128,410 | 0 |
| 42 | 87 | 0 | 4,000 | 0 | 0 | 0 | 748,000 | 103,000 | 0 |
| 43 | 88 | 0 | 4,000 | 0 | 0 | 0 | 748,000 | 71,804 | 0 |
| 44 | 89 | 0 | 4,000 | 0 | 0 | 0 | 748,000 | 33,976 | 0 |
| 45 | 90 | 0 | 4,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| 46 | 91 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 47 | 92 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 48 | 93 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 49 | 94 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 50 | 95 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

TOTALS

| 50 | 95 | 0 | 80,000 | 0 | 0 | 0 | 0 | 0 | 0 |

Please see page 2 of this illustration for important explanatory material and disclosure information.

_DIRECT RECOGNITION LIFE_                          _Transamerica Corporation_

ILLUSTRATION:  This is an illustration of the values and benefits of your policy. It is intended to depict how your policy might perform under certain circumstances. IT IS NOT INTENDED TO PREDICT ACTUAL PERFORMANCE. Interest rates and policy values set forth in this illustration are not guaranteed, except where clearly labeled as such.

PREMIUMS:  This illustration assumes that anyscheduled premium payments depicted are paid quarterly in advance, and that unscheduled premiums are paid annually in advance.

CASH VALUE:  This is the amount which, subject to any Market Value Equity Concept adjustment, is available for loans, withdrawals, or surrenders.  It is calculated by (I) crediting Premiums Paid, (II) deducting applicable Loads and Policy Fees, (III) crediting Interest, and (IV) deducting the Administrative Charge and applicable Risk Charge.   Loads include provisions for commissions paid to agents and premium taxes paid.  Policy fees are determined by the company and are $30.00 annually.  The Administrative Charge is defined in the certificate and will not exceed the greater of 10% of Interest earnings or 1.5% per annum of account values. The Risk Charge is deducted monthly and will not exceed the amount shown in the table of maximum risk rates per $1,000 attached to the group master policy.

INTEREST RATE ASSUMPTIONS: The Illustrated Cash Values (and the Ultimate Cash Values, if shown), assume a net Interest rate (after the Administrative Charge) of 4.00% before the targeted paid-up date and guaranteed minimum thereafter. The Guaranteed Cash Values are based on the guaranteed net Interest rate of 4% (after the Administrative Charge).

CASH VALUE INCREASE:  The Illustrated Cash Value assumes a bonus credit equal to the following percentages of premiums (excluding unscheduled premiums and recurring unscheduled premiums) paid during the first ten years: end of 20th year 30.00%; end of 30th year 300.00%; end of 40th year 300.00%; the Guaranteed Cash Values include the guaranteed bonus credits of 22.50%, 75.00% and 75.00%, respectively.

MORTALITY ASSUMPTIONS: The Illustrated Cash Values (and the Ultimate Cash Values, if shown) assume the Risk Charge currently being used by the company. The Guaranteed Cash Values assume the maximum Risk Charge allowed under the group master policy.

POLICY LOAN INTEREST RATE: This illustration assumes a policy loan Interest rate of 15.00% .

WITHDRAWALS AND SURRENDERS: Upon a surrender, your Cash Values will be adjusted by a surrender charge equal to the lesser of the Cash Values or the following amounts per thousand of initial face amount: years 1 to 15 $54.62; year 16 $43.69; year 17 $32.77; year 18 $21.85; year 19 $10.92; years 20 and later - zero. The surrender charge applies only to Cash Value created by scheduled premiums. The Cash Values illustrated are net of any applicable surrender charge.

GUARANTEE:  Your Cash Values, subject to any Market Value Equity Concept adjustment, will never be less than those illustrated in the column headed Current Cash Value-Guaranteed.  Under guaranteed assumptions the certificate will lapse in year 11.

THIS ILLUSTRATION DEPICTS APPROXIMATE DEATH BENEFITS AND CASH VALUES. THE ACTUAL DEATH BENEFIT AND CASH VALUE MAY DIFFER FROM THAT ILLUSTRATED. FOR THE ACTUAL DEATH BENEFIT AND CASH VALUE, PLEASE REFER TO THE ANNUAL STATEMENT OR CONTACT OUR CUSTOMER SERVICE DEPARTMENT AT 1-800-934-1007.

THIS IS AN ILLUSTRATION ONLY, AND NOT AN OFFER, CONTRACT OR PROMISE OF FUTURE POLICY PERFORMANCE. RATES AND VALUES SHOWN ARE ILLUSTRATIVE ONLY. COVERAGE IS SUBJECT TO THE TERMS AND CONDITIONS OF THE CONTRACT.

YOU ARE ADVISED TO CONSULT WITH INDEPENDENT TAX COUNSEL REGARDING THE TAX TREATMENT OF THIS LIFE INSURANCE CONTRACT.

    I hereby acknowledge receipt of a copy of this sales illustration, and confirm that the guarantees, bene~ aud the relation between deposits and premiums to the account values, costs and benefits under the group ma policy and its riders have been explained to me, have been fully disclosed to my satisfaction, are acceptabl that I have been given an opportunity to ask any questions about it. I acknowledge that I have been advi consult with independent tax counsel regarding the tax treatment of the life insurance coverage evidenced b certificate.

GLP:1

VERSION:DRL  A11.8(IBM  6/1/1992)  PREPARED  BY:Transamerica Life Ins Co CASE: A ... UP.L:10.00 CP.L:0
LOANS: loaned UP in year 1 of $30,000 repaid in year 5;

_Page 2_

EXHIBIT H



**TRANSAMERICA®**

4333 EDGEWOOD ROAD NE
CEDAR RAPIDS, IA 52499-0001

March 18, 2016

ROBERT F. HEGARTY
8 CROWN COURT
ORINDA CA 94563

RE:       Policy Certificate No. 000G012767
          Insured:  ROBERT F. HEGARTY

Dear Mr. Hegarty:

We are writing to you about the Direct Recognition Life Policy referenced above. Consistent with the terms of the settlement of a class action lawsuit* in 2001 that included your policy, we will not credit any cash value bonuses for this policy for the 30th and 40th anniversary years.

Please review the enclosed illustration paying careful attention to the number of years your policy is projected to continue under current interest rate assumptions. Please note that additional premiums may be required in order for the policy to reach maturity.

We recognize the importance of providing insurance protection for your family, and we'd like to work with you to keep this coverage in place.  If you wish to learn about your available options, please call us toll free at 1-844-987-0897 (weekdays from 8 am – 6 pm, Central Time).  We have a team of specialists who can explain the options and provide additional illustrations based on various scenarios.

Transamerica Life Insurance Company

*Richard Oakes, et al. vs. Bankers United Life Assurance Company et al., District Court of Dallas County, Texas, 192nd Judicial District, case no. 96-06849.  Please see enclosed Final Order and Judgment.

Enclosures:  [current illustration and Final Order & Judgment]

**Transamerica Life Insurance Company**

000G012767 - ROBERT F. HEGARTY
48 year old Male Non-smoker

| Beginning of Year Date | Contract Year | Age | Premiums | Current Illustrated Values @ 4% | | Guaranteed Illustrated Values @ 4% | | End of year Loan Balance |
|---|---|---|---|---|---|---|---|---|
| | | | | Net Death Benefit | End of Year Net Cash Value | Net Death Benefit | End of Year Net Cash Value | |
| 8/27/2015 | 27 | 74 | $0 | $600,000 | $45,484 | $600,000 | $45,484 | $0 |
| 8/27/2016 | 28 | 75 | $0 | $600,000 | $34,205 | $600,000 | $0 | $0 |
| 8/27/2017 | 29 | 76 | $0 | $600,000 | $21,081 | | | $0 |
| 8/27/2018 | 30 | 77 | $0 | $600,000 | $5,644 | | | $0 |
| 8/27/2019 | 31 | 78 | $0 | $600,000 | $0 | | | $0 |

**Assumptions:**

Face Amount:                                                                $600,000.00
Assumes no further premiums will be paid
Death Benefit option:                                        L
Contract is a Non-MEC

This illustration approximates death benefits and cash values.  The actual death benefit and cash value may differ from that illustrated.
For actual death benefit and cash value please refer to your annual statement or contact our Customer Service Department at:
1 - 844 - 987 - 0897
You are advised to consult an independent tax counsel regarding tax treatment of this life insurance contract.

**Transamerica Life Insurance Company**

000G012767 - ROBERT F. HEGARTY
48 year old Male Non-smoker

| | |
|---|---|
| ILLUSTRATION | This is an illustration of the values and benefits of your policy. It is intended to depict how your policy might perform under certain circumstances. IT IS NOT INTENDED TO PREDICT ACTUAL PERFORMANCE. Interest rates and policy values set forth in this illustration are not guaranteed, except where clearly labeled as such. |
| PREMIUMS | This illustration assumes that any scheduled premium payments depicted are paid annually in advance. |
| CASH VALUE | This is the amount which, subject to any Market Value Equity Concept adjustment, is available for loans, withdrawals, or surrenders. It is calculated by (I) crediting Premiums Paid, (II) deducting applicable Loads and Policy Fees, (III) crediting Interest, and (IV) deducting the Administrative Charge and applicable Risk Charge.<br>Loads include provisions for commissions paid to agents and premium taxes paid. Policy fees are determined by the company and are $30.00 annually.<br>The Administrative Charge is defined in the certificate and will not exceed the greater of 10% of interest earnings or 1.5% per annum of account values.<br>The Risk Charge is deducted monthly and will not exceed the amount shown in the table of maximum risk rates per $1,000 attached to the group master policy. |
| INTEREST RATE ASSUMPTIONS | The Current Illustrated Values assume interest rates of 4% after the Administrative Charge.  The Guaranteed Illustrated Values are based on the guaranteed net interest rate of 4% after the Administrative Charge. |
| MORTALITY ASSUMPTIONS | The Current Illustrated Values assume the Risk Charge currently being used by the company. The Guaranteed Illustrated Values assume the maximum Risk Charge allowed under the group master policy. |

EXHIBIT I

.

:

**From:** "Puig, Gerardo" <Gerardo.Puig@Transamerica.com>
**Date:** September 10, 2019 at 2:48:42 PM EDT
**To:** richard glickman <glickmanlawcorp@gmail.com>
**Subject: RE: Bob Hegarty's DRL Life Insurance Contract [EXTERNAL]**

Dick,

      Transamerica will not voluntarily agree to a preliminary injunction to keep the policy in benefit during the pendency of this litigation.

      I would be happy to request an illustration showing the premium necessary to keep the policy in benefit, but I need specifics as to the time period in question. As you know, it is impossible to predict how long the litigation will take. Give me a time frame, and I will request the illustration immediately.

Gerry

**Gerardo Puig, Esquire | Assistant General Counsel | Litigation**

**o:** 410-347-8636 | **f:** 410-576-4554

**e:** gerardo.puig@transamerica.com | **w:** www.transamerica.com

**Transamerica**

100 Light Street, Floor B1, Baltimore, MD  21202-2559

Facebook | Twitter | YouTube | LinkedIn

***CONFIDENTIALITY/PROPRIETARY NOTICE***

This message and any accompanying documents are intended only for the use of the individual or entity to which they are addressed and may contain information that is privileged, confidential, or exempt from disclosure under applicable law. Further, the attached email may contain information that is proprietary and/or that constitutes a trade secret. If the recipient of this email is not the addressee, you are hereby notified that you are strictly prohibited from reading, disseminating, distributing, or copying this communication. If you have received this email in error, please notify the sender immediately and destroy the original transmission.

*Protecting privacy is very important to us. Senders should not send documents containing personal information, bank information, health information, etc. from unsecured/unencrypted email accounts.* Thank you.

**From:** richard glickman [mailto:glickmanlawcorp@gmail.com]
**Sent:** Friday, September 06, 2019 6:48 PM
**To:** Puig, Gerardo <Gerardo.Puig@Transamerica.com>
**Subject:** Bob Hegarty's DRL Life Insurance Contract [EXTERNAL]

Hi Gerry,

Attached is the annual statement Bob Hegarty just received for his DRL Life Insurance Contract with Transamerica ("Bob's Life Insurance"). This statement appears to show that Bob's Life Insurance will lapse sometime in the next four to six months. But as the Illustration Bob received in 2006 made clear, Bob's Life Insurance would not lapse at any time in the next ten years if Bob's 30-year persistency bonus were timely paid. Of course, Bob had to pay all premiums called for in the 2006 Illustration -- which he did. Since one of the remedies sought in the litigation resulting from Bob's draft Complaint is to prevent Bob's Life Insurance from lapsing, two questions now arise:

    1. Will Transamerica agree to keep Bob's Life Insurance in force during the pendency of Bob's litigation with it, i.e., in effect, will Transamerica voluntarily agree to a preliminary injunction?

    2. If Transamerica will not agree, how much annual premium must Bob pay to keep Bob's Life Insurance in force during the pendency of his upcoming litigation with Transamerica?

As these are important questions to Bob, and affect whether he seeks a preliminary injunction in the upcoming litigation, I would appreciate as prompt a response as possible and, in no event, one no later than next Wednesday (September 11).


Thanks for your help with this matter.


Dick Glickman

415-362-7685

Please note: This message originated outside your organization. Please use caution when opening links or attachments.

**Transamerica Life Insurance Company**

**000G012767 - ROBERT F. HEGARTY**
**48 year old Male Non-smoker**

| Beginning of Year Date | Contract Year | Age | Premiums | Current Illustrated Values @ 4% | | Guaranteed Illustrated Values @ 4% | | |
| | | | | Net Death Benefit | End of Year Net Cash Value | Net Death Benefit | End of Year Net Cash Value | End of year Loan Balance |
|---|---|---|---|---|---|---|---|---|
| 8/27/2019 | 31 | 78 | $17,076 | $600,000 | $4,101 | $600,000 | $4,101 | $0 |
| 8/27/2020 | 32 | 79 | $22,768 | $600,000 | $6,333 | $600,000 | $0 | $0 |
| 8/27/2021 | 33 | 80 | $22,768 | $600,000 | $7,341 | | | $0 |
| 8/27/2022 | 34 | 81 | $22,768 | $600,000 | $6,872 | | | $0 |
| 8/27/2023 | 35 | 82 | $22,768 | $600,000 | $4,692 | | | $0 |
| 8/27/2024 | 36 | 83 | $22,768 | $600,000 | $500 | | | $0 |
| 8/27/2025 | 37 | 84 | $22,768 | $600,000 | $0 | | | $0 |

Assumptions:

Face Amount: $600,000.00
Policy has an outstanding loan of: $0.00
4% net interest rate for future values.
Death Benefit option: L
Contract is a Non-MEC
Assumes quarterly premium payments of $5,691.89.
Based on the assumptions used, this policy will lapse in year 37 on a current, non-guaranteed basis, and lapse in year 32
   on a guaranteed basis, due to insufficient cash value to pay the cost of insurance.

This illustration approximates death benefits and cash values.  The actual death benefit and cash value may differ from that illustrated.
For actual death benefit and cash value please refer to your annual statement or contact our Customer Service Department at:
1 - 800 - 934 - 1007
You are advised to consult an independent tax counsel regarding tax treatment of this life insurance contract.

## Transamerica Life Insurance Company

**000G012767 - ROBERT F. HEGARTY**
**48 year old Male Non-smoker**

ILLUSTRATION    This is an illustration of the values and benefits of your policy. It is intended to depict how your policy might perform under certain circumstances. IT IS NOT INTENDED TO PREDICT ACTUAL PERFORMANCE. Interest rates and policy values set forth in this illustration are not guaranteed, except where clearly labeled as such.  The Death Benefit column shows the value, if paid upon death, at the end of the policy year.

PREMIUMS    This illustration assumes that any scheduled premium payments depicted are paid quarterly in advance.  The monthly policy date is based on the policy date stored on record.

CASH VALUE    This is the amount which, subject to any Market Value Equity Concept adjustment, is available for loans, withdrawals, or surrenders. It is calculated by (I) crediting Premiums Paid, (II) deducting applicable Loads and Policy Fees, (III) crediting Interest, and (IV) deducting the Administrative Charge and applicable Risk Charge.

Loads include provisions for commissions paid to agents and premium taxes paid. Policy fees are determined by the company and are $30.00 annually.

The Administrative Charge is defined in the certificate and will not exceed the greater of 10% of Interest earnings or 1.5% per annum of account values.

The Risk Charge is deducted monthly and will not exceed the amount shown in the table of maximum risk rates per $1,000 attached to the group master policy.

The Current Illustrated Values assume the Risk Charge currently being used by the company. The Guaranteed Illustrated Values assume the maximum Risk Charge allowed under the group master policy.

INTEREST RATE    The Current Illustrated Values assume interest rates of 4% after the Administrative Charge.  The Guaranteed Illustrated Values are
ASSUMPTIONS    based on the guaranteed net interest rate of 4% after the Administrative Charge.  The premiums, benefits, values, credits or charges under the policy that are not guaranteed or cannot be determined at issue are subject to change by the company. This illustration assumes that the currently illustrated non-guaranteed elements will continue unchanged for all years shown. This is not likely to occur, and actual results may be more or less favorable.